IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LITE-NETICS, LLC,<br><br>　　　Plaintiff/Counter-Defendant,<br><br>　　v.<br><br>NU TSAI CAPITAL, LLC d/b/a HOLIDAY BRIGHT LIGHTS,<br><br>　　　Defendant/Counter-Plaintiff. | CIVIL ACTION NO.: 8:22-cv-00314 |

**MEMORANDUM IN SUPPORT OF COUNTERCLAIM PLAINTIFF NU TSAI CAPITAL, LLC'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Counterclaim Plaintiff Nu Tsai Capital, LLC d/b/a Holiday Bright Lights ("HBL" or "Counterclaim Plaintiff") respectfully requests that this Court enter a temporary restraining order ("TRO") and preliminary injunction against Lite-Netics, LLC ("Lite-Netics" or "Counterclaim Defendant") under Federal Rule of Civil Procedure 65 for the reasons set forth below.

**FACTS**

HBL is an Omaha-based designer, importer and distributor of holiday lighting products.[1] Lite-Netics is also a purveyor of at least one such product. HBL came out with (and received its own patent for) improved products that do not fail in the field because of moisture problems, like Lite-Netics' products do. Lite-Netics might be upset about that. But its filing of a meritless patent suit, and then capitalizing on that filing through false marketplace statements right before the busy holiday season, is an inappropriate and improper response.

---

[1] HBL incorporates by reference its facts and evidence presented in its verified Counterclaims, filed contemporaneously with this Memorandum. The facts within such Counterclaims are sworn and verified in an accompanying Declaration by HBL's president, Richard Martini.

1

HBL requests a TRO (and later, a preliminary injunction) because Lite-Netics has made (and appears poised to keep making) bad faith, gratuitous and false marketplace statements defaming HBL and its products to HBL's customer base and interfering with its customer relationships. This must stop.

This is an emergency to HBL. It is currently September, moving into October. Now is precisely the time of the year when major holiday lighting customers—decorators, end-users, and landscapers—make purchasing decisions from companies like HBL and Lite-Netics. Lite-Netics' communications to multiple HBL customers incorrectly claim or imply:

- that HBL "copied" a Lite-Netics product when designing and commercializing HBL's Magnetic Clip and/or vastly improved Magnetic Cord products;

- that Lite-Netics might "include[e] any known company using or reselling the HBL products as co-defendants in this lawsuit" (in other words, would sue the recipients of such communications)—a misleading scare tactic because prevailing federal law would lead to an ***immediate stay of such customer-suit assertions***, were they ever brought. *In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1364 (Fed. Cir. 2014) (granting mandamus); and

- that HBL "infringes" Lite-Netics' patents, even though its own judicial admissions (including photographs in its own Complaint) proves that this is not true, and any reasonable investigation would have concluded noninfringement.

Noninfringement is so apparent that HBL has separately moved to dismiss the Complaint under Rule 12(b)(6), since Lite-Netics "pleads itself out of court." These marketplace statements (individually or together) injure, and are calculated to injure, HBL's reputation and contaminate HBL's product sales.

To be clear, HBL is itself an inventor and patent owner. HBL values the patent system.

Every patent owner has a First Amendment right to notify people of patent licensing opportunities, or to start the necessary clock for a claim for damages (35 U.S.C. § 287) when there is a good faith belief that someone infringes. But parties can abuse these rights, and Lite-Netics has in recent days abused them here. The First Amendment does not shield false, bad faith, gratuitous and harmful marketplace statements whose direct intent and impact is to smear the integrity and business reputation, and drive down sales, of its target.

## ARGUMENT

### I. Applicable Legal Standards

The Court has the authority to issue a temporary restraining order and preliminary injunction under Federal Rule of Civil Procedure 65 and its inherent authority. In appropriate circumstances, a temporary restraining order may be granted *ex parte* without written or oral notice to the adverse party. In determining whether a Temporary Restraining Order and/or Preliminary Injunction is warranted, Nebraska courts follow Eighth Circuit standards announced in *Dataphase Systems, Inc. v. C L Systems, Inc.*, 640 F.2d 109 (8th Cir. 1981).

Injunctive relief functions to "preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Kansas City Southern Trans. Co., Inc. v. Teamsters Local Union #41*, 126 F.3d 1059, 1065 (8th Cir. 1997) (internal quotation omitted). Injunctive relief is appropriate where the party seeking the relief has no adequate remedy at law. Such relief requires applicants to show: "(1) the probability of success on the merits; (2) the threat of irreparable harm to the movant; (3) the balance between this harm and the injury that granting the injunction will inflict on the other interested parties; and (4) whether the issuance of an injunction is in the public interest." *Entergy, Arkansas, Inc. v. Nebraska*, 210 F.3d 887, 898 (8th Cir. 2000) (citing *Dataphase*, 640 F.2d at 114). No one factor is dispositive of the request for injunction; a court considers all of

the factors and decides whether "on balance, they weigh in towards granting the injunction." *Dataphase*, 640 F.2d at 113; *see also Brandstad*, 118 F. Supp. 2d at 938 (citing *Baker Elec. Co-Op, Inc. v. Chaske*, 28 F.3d 1466, 1472 (8th Cir. 1994)). The burden of establishing that preliminary relief is warranted is on the party seeking the injunction. *Id.*

## II. HBL Is Likely To Succeed On the Merits of Its Case

HBL is likely to succeed on its claim for tortious interference with business relationships under Nebraska law. For liability to attach, HBL must prove: (1) the existence of a valid business relationship or expectancy; (2) knowledge by Lite-Netics of the relationship or expectancy; and (3) an unjustified intentional act of interference by Lite-Netics. *See Forest Prods. Indus., Inc. v. ConAgra Foods, Inc.*, 460 F.3d 1000, 1002 (8th Cir. 2006) (also noting damages and causation of damages as additional elements, which are not germane to emergency equitable relief, as long as likely irreparable harm absent the injunction is shown).

This is no ordinary patent dispute where facts available to the plaintiff suggested infringement, or details required discovery to unearth. Nor is it a case where an accused infringer played coy, or ostrich-like ducked its head in the sand when accusations started flying. Rather, with punctilious care, as soon as Lite-Netics opened a private channel of communications, HBL through counsel immediately responded with detailed, probative and factual explanations for why no infringement was possible. (*See* Declaration of Richard Martini ("Martini Decl."), ¶ 6). The last such communication was in June 2022. (*Id.*, ¶ 9). Lite-Netics made no effort to point out any flaw in counsel's analysis, and indeed failed to respond at all. Instead, it brought the present lawsuit on August 31, 2022, and ramped up its smear campaign in the wilds of the marketplace, merchandising the existence of this suit for its commercial gain through statements to HBL customers. (*Id.*).

4

In particular, despite noninfringement, in May 2022 and September 2022, Lite-Netics directed letters and emails to HBL's customers, which were false and misleading representations of fact, made in bad faith, and meant to deceive customers regarding the nature, characteristics, or qualities of HBL's goods, services, and commercial activities. (*Id.*, ¶¶ 7, 10). Even while knowing the falsity of their assertions and baselessness of their claims, Lite-Netics sent letters and/or emails with the intent of harming HBL's business dealings. (*Id.*). As a result of Lite-Netics' conduct, HBL has suffered and will continue to suffer substantial damage to its business, market reputation, and goodwill. (*Id.*, ¶¶ 11–13). Furthermore, Lite-Netics' conduct is likely to discourage current and potential clients and customers from conducting business with HBL. *(Id.*, ¶¶ 11–12). And Lite-Netics calculated for all this to happen at the most sensitive sales time of the year—September. (*Id.*, ¶¶ 12).

As presently known, such communications went to Jabo's Ace Hardware and Decorator's Warehouse (both in Texas) and Novelty Lights (in Colorado). *(Id.*, ¶10) Each appears to have included the same letter (in WORD file format) containing the smears against HBL. Others very likely exist about which HBL does not yet know. (*Id.*, ¶ 10).

In cases like this, courts step in to protect victims of commercial smear campaigns. Courts do not hesitate to enter temporary restraining orders and preliminary injunctions. For example, in *Canning Logistics Services, LLC. v. Baxter Bailey & Associates, Inc. et al*, the district court considered a motion for temporary restraining order and preliminary injunction, where the defendant sent a series of emails to the plaintiff's customers that accused the plaintiff of dishonesty and failure to pay debts. 2017 U.S. Dist. LEXIS 75473, at *2–*4 (D. Neb. May 16, 2017). The court found that the plaintiff met its burden of showing a probability of success on the merits with respect to its action for tortious interference with business relationships. *Id.* at *6. The same is true

here.

That is not all. HBL is also likely to succeed on its claim for defamation. Under Nebraska law, for liability to attach, HBL must prove: (1) a false and defamatory statement made about the claimant; (2) an unprivileged publication to a third party; and (3) fault amounting to at least negligence on the part of the publisher. *Harrington v. City of Omaha*, 2021 U.S. Dist. LEXIS 106599, at *34 (D. Neb. June 7, 2021) (citing *JB & Assocs., Inc. v. Neb. Cancer Coal.*, 303 Neb. 855, 932 (N.W.2d 71, 78)) (also noting damages as an additional element, which is not germane to emergency equitable relief, as long as likely irreparable harm absent the injunction is shown); *cf. Matheson v. Stork*, 239 Neb. 547, 553 (1991) (words that "prejudice one in his or her profession or trade" are defamatory "per se" and do not need pleading or proof of special damages).

Lite-Netics' letters and emails were false and misleading statements of fact regarding the nature, characteristics, or qualities of HBL's products. (Martini Decl., ¶¶ 7, 10). Lite-Netics sent these letters and emails directly to HBL's customers on at least two separate occasions, of which HBL is aware. (*Id.*, ¶¶ 7, 10). Moreover, these letters and emails were sent intentionally, in bad faith, with the intent of harming HBL's business dealings, even while knowing the falsity of their assertions and baselessness of their claims (*Id.*).

### III. HBL Will Suffer Irreparable Harm Without An Injunction

HBL will also suffer irreparable harm without injunctive relief. Lite-Netics has already engaged in bad faith, untrue statements to injure HBL, and will likely continue until stopped. Lite-Netics sent letters or emails to HBL's clients and customers directly accusing HBL of infringing the Asserted Patents, accusing HBL of "copying" the Lite-Netics commercial product, threatening to sue any company using or reselling HBL products, and including the first page of the filed Complaint as an attachment to amplify its marketplace threats. These efforts were objectively

baseless with the intent to injure HBL and its business. Multiple retailer customers of HBL, including Decorator's Warehouse, Novelty Lights, and Jabo's Ace Hardware, have contacted HBL with concern, as they must question whether they will receive their shipments and orders as planned, and must question HBL's integrity after such grave allegations. (Martini Decl., ¶ 11).

Because of the nature of HBL's business, HBL's reputational and good-will harm will suffer the greatest impact in these, the most sensitive of all months of the year. During this time, HBL's end-users and decorators typically purchase HBL's products in preparation for sale and use during the holiday season. (*Id.*, ¶ 12). The holiday light industry is also relatively small, and rumors spread quickly. (*Id.*, ¶ 13). Even non-recipients of Lite-Netics' bad faith communications will likely learn about and be affected by them, in ways impossible for HBL or the Court to measure. *(Id.*, ¶¶ 12-13). A customer can simply decide not to add magnetic lights to its portfolio, never giving any reason, not purchasing from any supplier until the cloud of accusations clears in some uncertain future. (*Id.*).

Moreover, Lite-Netics' harmful, false, and defamatory communications will likely cause lasting and irreparable damage to HBL's business reputation and goodwill, beyond mere monetary damages. For example, it would be impossible for the Court or the jury to perform an accounting for sales never made. This precise type of loss of intangible reputation and goodwill constitutes irreparable injury under the law and supports emergency relief. *Canning*, at *7; *see also United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (stating that "loss of intangible assets such as reputation and goodwill can constitute irreparable injury.").

HBL has firsthand experience of the irreparable harm that news of intellectual property litigation can cause to its business reputation, even when HBL ultimately prevails in that litigation. In 2014, HBL ultimately prevailed in a different suit brought by another company in the holiday

7

space. (Martini Decl., ¶ 13, discussing *Marvellous Day v. HBL*, 1:11-cv-08768 (N.D. Ill.)). Despite HBL's successful invalidation of the design patent-in-suit on summary judgment, and dismissal on the pleadings of every business tort allegation the plaintiff made (*i.e.*, a total defense sweep), HBL nevertheless suffers from time to time, into the present day, public social media attacks about that litigation, as if HBL had done something wrong or acted unethically by running its business by copying the intellectual property of others. (*Id.*, ¶ 13). If winning a case cannot avert such damaging innuendos in the holiday lighting space, it is only worse when a case yet-to-be-won is still pending, and the plaintiff merchandises its mere existence to fabricate, publish and broadcast those exact smears and innuendos, and try to drive sales to itself. While monetary damages alone can compensate for harm already incurred, injunctive relief is appropriate to "protect . . . against the loss of any additional customers due to the illegalities of the defendants." *Overholt Crop Ins. Serv. Co. v. Travis*, 941 F.2d 1361, 1371 (8th Cir. 1991). HBL has suffered and will likely suffer irreparable harm if Lite-Netics' conduct continues.

**IV.     Lite-Netics Will Not Suffer Harm if the Court Issues Injunctive Relief**

Lite-Netics will not suffer harm by a court order directing it to discontinue its smear campaign. In the unlikely event Lite-Netics is entitled to relief for patent infringement, this Honorable Court will provide that. Litigation belongs in the courts, not in the wild of the marketplace. False and defamatory speech, especially disseminated in bad faith, is not protected under the First Amendment. *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 504 (1984); *United States v. Alvarez*, 132 S. Ct. 2537, 2560 (2012) ("false factual statements possess no First Amendment value.").

Similarly, the Constitution of Nebraska states: "Every person may freely speak, write and publish on all subjects, *being responsible for the abuse of that liberty; and in all trials for libel,*

*both civil and criminal, the truth when published with good motives, and for justifiable ends*, shall be a sufficient defense." Neb. Const. Art. I, § 5 (emphasis added). Therefore, acts of defamation are forms of unprotected speech under Nebraska law, and restricting such speech cannot impose a harm on a plaintiff like Lite-Netics. If the court enters the requested injunction, Lite-Netics will not be harmed.

Finally, Lite-Netics has relinquished its right to notify the public of its patent right by making these false and defamatory accusations in bad faith. Of the three false statements noted above within the offending marketplace communications (HBL "copying" / the fake threat of being added to the suit / that HBL "infringes"), the "infringement" statement might arguably be nonactionable on First Amendment grounds. This is because the privileged right of a patentee to notify the public of its patent right is rooted under 35 U.S.C. § 287. This statute authorizes patentholders to "give notice to the public" of the patent by marking its patented articles and makes marking or specific notice to the accused infringer a prerequisite to the recovery of damages. *Zenith Electronics Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999). However, the Federal Circuit has held that a patentee may be deprived of the right to make statements about potential infringement of its patent if such marketplace behavior is made in bad faith. *Id.* at 1353. Such bad faith marketplace statements have no place in furthering the purposes of patent law. *Id.* Here, Lite-Netics' statements fall precisely within this category: Lite-Netics delivered these false and defamatory accusations to HBL's customers in bad faith, while having full knowledge of their objective baselessness and falsity. As such, these statements are not protected under the First Amendment or under U.S. patent law.

The Federal Circuit issued an instructive decision in *GP Indus. v. Eran Indus.*, 500 F.3d 1369, 1372 (Fed. Cir. 2007). There (unlike here), the court reviewed a broad and general injunction

that would prevent the patentee from sharing any information about its patent rights. *See id.* at 1372-73. HBL here seeks to enjoin only false and misleading statements, not every statement that might touch on patents. Also, in *GP Indus.* the Federal Circuit reversed the district court's grant of a preliminary injunction only because that decision had not established the patent owner's allegation of infringement was "objectively baseless." *Id.* at 1375. HBL, however, has adequately shown this very thing that was missing from the facts in *GP Indus.* (in its Motion to Dismiss under Rule 12(b)(6) and Counterclaims filed contemporaneously with this Memorandum). Lite-Netics pled itself out of Court by including pictures of the accused products that conclusively show noninfringement. Lite-Netics' infringement allegations are thus objectively baseless such that Lite-Netics could not reasonably and "realistically expect success on the merits." *See id.* at 1374. Accordingly, the Federal Circuit's decision in *GP Indus.* supports this Court enjoining Lite-Netics from making objectively baseless, defamatory, and injurious statements about HBL to HBL's customers.

HBL seeks no order to prevent Lite-Netics from acting in good faith through normal communication channels to conduct legitimate marketing/advertising. Lite-Netics can even offer patent licenses to all comers if it wants. Rather, HBL merely seeks to enjoin Lite-Netics from making additional defamatory and injurious statements about HBL to HBL's customers, both actual and prospective. For these reasons, the balance of the harms favors the requested relief.

V. **An Injunction Would Further the Public Interest**

This Court should also enjoin Lite-Netics because the public interest would be furthered by such an injunction. Competition and the free market benefit from dissemination of truthful information. Competition and the free market are distorted when bad actors are allowed to disseminate false information. No public interest is served by allowing an entity to manipulate

customers in the holiday lighting industry into believing they are about to face a lawsuit against themselves based on purchases from HBL, when the customer suit exception guarantees they will *not* face any such burden. No public interest is served by allowing an entity to claim its competitor has copied its product, when that in fact is *not* true, and the competitor's product was awarded its own patent. And no public interest is served by encouraging false, bad faith and unfounded patent infringement assertions as scare tactics in a marketplace, or as the seed of advertising smear campaigns. Granting the injunction will preserve the public's interest in the sanctity and integrity of the judicial system for resolving disputes among commercial entities.

### CONCLUSION AND REQUEST FOR RELIEF

For all of these reasons, HBL respectfully requests that this Court issue a temporary restraining order and preliminary injunction that restrains Lite-Netics, along with its officers, directors, shareholders, and other agents from making statements via letters, emails, Facebook, Twitter, or on any other social media, mass media, direct marketing, robocalls, press releases, blogs, or websites suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. The Court should also require Lite-Netics to publicize this Court's Order to that effect, and to provide complete discovery to HBL of all relevant marketplace statements. As discussed above, the threat of harm to HBL in the absence of a restraining order is significant. In contrast, the potential harm Lite-Netics will suffer if a temporary restraining order is issued is minimal. It will not be prevented from conducting any of its business, maintaining its current customers, or recruiting new customers. Thus, the balance of injuries to the parties strongly weighs in favor of issuance of the temporary restraining order. This small threat of harm to Lite-Netics likewise justifies the Court to require only a minimal security bond. *See* Fed. R. Civ P. 65(c) ("The court may issue a

preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

This request is set forth in the accompanying proposed order, submitted for the Court's convenience.

Dated: September 30, 2022                     Respectfully Submitted

                                              By: */s/Brian T. McKernan*
                                              Brian T. McKernan (NE#22174)
                                              Luke Holst (NE#23834)
                                              McGrath North Mullin & Kratz, PC
                                              First National Tower, Suite 3700
                                              Omaha, NE 68102
                                              (402) 341-3070
                                              bmckernan@mcgrathnorth.com
                                              LHolst@mcgrathnorth.com

                                              and

                                              */s/Robert P. Greenspoon*
                                              Robert P. Greenspoon (admission pro hac vice forthcoming)
                                              William W. Flachsbart (admission pro hac vice forthcoming)
                                              Dunlap Bennett & Ludwig, PLLC
                                              333 N. Michigan Ave, #2700
                                              Chicago, IL 60601
                                              Phone: 312-551-9500
                                              rgreenspoon@dbllawyers.com

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing Memorandum of Law in support of Motion for Temporary Restraining Order and Preliminary Injunction has been served on September 30, 2022 to all counsel of record who are deemed to have consented to electronic service via the Court's CM/ECF system.

                                                  */s/Brian T. McKernan*
                                                  Brian T. McKernan