IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LITE-NETICS, LLC,<br><br>       Plaintiff/Counter-Defendant,<br><br>vs.<br><br>NU TSAI CAPITAL LLC, d/b/a HOLIDAY BRIGHT LIGHTS,<br><br>       Defendant/Counterclaimant. | **NO. 8:22CV314**<br><br>**MEMORANDUM AND ORDER REGARDING DEFENDANT/COUNTERCLAIMANT'S MOTION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY RESTRAINING ORDER** |

The rough and tumble of competition is a hallmark of the American marketplace. Consumers are bombarded daily with advertising comparing one vendor's products with another's, as well as a substantial amount of hype and puffery. What the American marketplace does not tolerate, however, is unfair competition based on false and baseless statements by one vendor about another vendor. The question presented in this case is whether one vendor has crossed that line. At this preliminary stage of the proceedings, the Court concludes that one vendor has.

This action is nominally for infringement of patents for magnetic holiday light fixtures. However, it is now before the Court on the September 30, 2022, Motion for Temporary Restraining Order by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL) based on HBL's counterclaims for tortious interference with business relations and defamation. Filing 12.[1] HBL seeks an order enjoining plaintiff/counter-defendant Lite-Netics, LLC, from making statements in various media suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent

---

[1] The Motion before the Court is part of a Motion for Temporary Restraining Order and Preliminary Injunction. Filing 12.

1

infringer. Pursuant to an Order for an expedited response, Filing 19, Lite-Netics filed its Opposition to Motion for Temporary Restraining Order on October 5, 2022. Filing 20.[2] HBL then filed a Reply in Support of Counterclaim Plaintiff Nu Tsai Capital, LLC's Motion for Temporary Restraining Order on October 6, 2022. Filing 22.[3] On October 7, 2022, Lite-Netics sought leave to file a sur-reply with a copy of the proposed sur-reply attached. Filing 23. The Court denied that request, Filing 24, and the Court has not considered Lite-Netics's proffered sur-reply in resolving the Motion before the Court.[4] For the reasons stated below, HBL's Motion for Temporary Restraining Order is granted.

## I.   INTRODUCTION

### A.  Factual Background

This background is drawn from Lite-Netics's Complaint and HBL's Counterclaim. It has been augmented, where necessary, with information from the parties' submissions concerning the Motion for TRO.

#### 1.  The Parties, Patents, and Claims

Lite-Netics alleges that it is a Texas limited liability company with a place of business in Lubbock, Texas. Filing 1 at 2 (¶ 4).[5] Lite-Netics alleges that it sells patented magnetic light strands

---

[2] Lite-Netics's Opposition is captioned Brief Opposing Nu Tsai's Motion for Temporary Restraining Order and Preliminary Injunction, but only a temporary restraining order is currently at issue.

[3] HBL expressly reserves the right to file a subsequent more detailed reply to support it preliminary injunction request. Filing 22 at 1.

[4] There is no provision in either the Federal Rules of Civil Procedure or the Court's local rules expressly authorizing the filing of a sur-reply. NECivR 7.1(c) may permit the filing of a sur-reply but only with leave of the court. Whether to allow a sur-reply is a matter in the court's discretion. *See Postawko v. Missouri Dep't of Corr.*, 910 F.3d 1030, 1037 n.3 (8th Cir. 2018). The Court finds a sur-reply inappropriate in the context of a TRO, which can be granted *ex parte* and without notice to the opposing party. Fed. R. Civ. P. 65(b)(1). Lite-Netics was given a more than fair opportunity to be heard when the Court set a deadline for it to file an opposition before deciding the request for a TRO. Furthermore, any relief granted at this point will be temporary. *Id.* at (b)(2).

[5] Citations to most documents are to the docket number and the docket page number (*e.g.*, Filing 13 at 2), unless the Court finds it appropriate to cite to numbered paragraphs within such documents (*e.g.*, Filing 14-1 at 1 (Martini Decl., ¶ 1). Citations to pleadings are to the docket number, docket page number, and paragraph number (*e.g.*, Filing 1 at 2 (¶ 4)).

used to illuminate homes and businesses during the holidays. Filing 1 at 1 (¶ 2). It identifies the

patents at issue here as U.S. Patent No. 7,549,779 (the '779 Patent) and U.S. Patent No. 8,128,264

(the '264 Patent) (collectively, the Asserted Patents), which the inventor and company founder,

Shawn Genenbacher, has assigned to Lite-Netics. Filing 1 at 3 (¶ 10). Both patents describe the

invention as "a light fixture assembly." Filing 1-1 at 2 ('779 Patent, abstract); Filing 1-2 at 2 ('264

Patent, abstract). The light fixture assembly has "[a] neodymium disc magnet" ('779 Patent) or

"[a] strong magnet" ('264 Patent) "embedded in the base, thereby allowing the assembly to be

mounted magnetically to metal surfaces." Filing 1-1 at 2 ('779 Patent, abstract); Filing 1-2 at 2

('264 Patent, abstract). Lite-Netics alleges that "[t]he patented products provide users with an easy,

damage-free installation and effortless take-down." Filing 1 at 1 (¶ 2).

In its Complaint filed August 31, 2022, Lite-Netics provides the following image as an

example of one embodiment of a magnetic light fixture disclosed in the Asserted Patents and the

following photograph of its actual product:




Filing 1 at 4 (¶ 13), 5 (¶ 17). Referring to Fig. 9A, Lite-Netics explains, "The magnetic light fixture

includes a socket (8) configured to couple with a light bulb (7) at a first end and a base (3) at a

second end. A magnet (1) is configured to be embedded in the base (3)." Filing 1 at 3 (¶ 13). The

Asserted Patents explain that the light fixture assembly also includes "[a] plastic protective coating

**2**," "two retaining clips **5**," an optional "side clip **6**," and "a copper conductor **10**." Filing 1-1 at 7

('779 Patent at 3:36–37, 3:46, 3:54); Filing 1-2 at 6 ('264 Patent at 3:57–59, 3:62, 4:1).

In its Complaint, Lite-Netics alleges that, by 2017, Genenbacher had noticed that competing lighting companies were offering certain clip-on magnetic light fixtures that he believed infringed the Asserted Patents when added to a light string. Filing 1 at 6 (¶ 20). Genenbacher instructed his counsel to send over thirty cease-and-desist letters, and one recipient was HBL. Filing 1 at 6 (¶ 20). Subsequently, in Spring 2022, Lite-Netics alleges that it learned that HBL is marketing a "Magnetic Cord" and a "Magnetic Clip" that it believes infringe the Asserted Patents. Filing 1 at 6 (¶ 21). Lite-Netics filed its Complaint for Willful Patent Infringement against HBL initiating this action on August 31, 2022. Filing 1. Count I of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '779 Patent. Filing 1 at 7-9 (¶¶ 24–35). Count II of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '264 Patent. Filing 1 at 9–11 (¶¶ 35–48).

In its Counterclaim filed September 30, 2022, HBL alleges that it is an Illinois limited liability company with a principal place of business in Omaha, Nebraska. Filing 11 at 1 (unnumbered first paragraph and ¶ 2).[6] HBL denies that its products infringe either of Lite-Netics's patents. It alleges that, among other differences, the Magnetic Cord has two embedded magnets per fixture protruding from the base, rather than one magnet flush with the base, and that the magnets it uses do not have the "pull strength" claimed in the Asserted Patents. Filing 11 at 2 (¶ 8). HBL also contends that its Magnetic Clip is a separate "slip on" device that is not a light fixture

---

[6] HBL has not yet filed an Answer either separately or with its Counterclaim. Instead, on September 30, 2022, the same day it filed the Motion for TRO, it filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims on which relief can be granted. Filing 8.

assembly. Filing 11 at 2–3 (¶ 8). HBL alleges that it owns its own patent, U.S. Patent No.

11,333,309 (the '309 Patent), for its Magnetic Cord design. Filing 11 at 4 (¶ 14).

HBL acknowledges that Lite-Netics's Complaint includes the following photograph of

HBL's Magnetic Clip:



Filing 1 at 7 (¶ 21) (image); Filing 13 at 10 (acknowledging that Lite-Netics includes photographs

of the accused products in its Complaint).

HBL includes the '309 Patent as Exhibit H to its Counterclaims. Filing 11-8. One image of

the patented product from the '309 Patent and a photo of the actual Magnetic Cord from Lite-

Netics's Complaint are shown here:





Filing 11 at 2 ('309 Patent, cover page image); Filing 1 at 6 (¶ 21). The '309 Patent explains that "two magnets **20** and **50** [with **50** not shown in the image above] protrude from the base of a socket **10**," with "a pocket **30** shaped to receive a magnet **50**" and "drain holes **40** for the socket **10**." Filing 11-8 at 7 ('309 Patent, 2:17–18, 2:24–25, 2:65). The '309 Patent explains further that "a channel between magnets **20** and **50** further helps the circulation of air when socket **10** is magnetically fixed to a surface." Filing 11-8 at 7 ('309 Patent, 2:59–61).

In its Counterclaim against Lite-Netics, HBL asserts six causes of action. Count I asserts a federal claim for unfair competition and false advertising under 15 U.S.C. § 1125(a). Filing 11 at 7–9 (¶¶ 28–36). Count II asserts a claim of unfair competition under the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1602. Filing 11 at 9–10 (¶¶ 37–43). Count III asserts a claim for deceptive trade practices in violation of the Nebraska Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-302 and 87-303. Filing 11 at 10–11 (¶¶ 44–49). Count IV asserts tortious interference with business relations and prospective business relations. Filing 11 at 11–12 (¶¶ 50–58). Count V asserts defamation. Filing 11 as 12–13 (¶¶ 59–65). Count VI asserts bad faith patent infringement communications under Colorado law, Colo. Rev. Stat. § 6-12-102 (2018). Filing 11 at 13–14 (¶¶ 66–69).

### 2. The Parties' Communications about Infringement

The focus for purposes of the Motion now before the Court is Lite-Netics's alleged conduct in the marketplace accusing HBL of misconduct. HBL alleges that it has been marketing and selling its Magnetic Clip product since before 2017. Filing 11 at 3 (¶ 9). It acknowledges that in 2017, it received a cease-and-desist letter from Lite-Netics and/or Genenbacher, through counsel. Filing 11 at 3 (¶ 9). A copy of that letter is attached to HBL's Counterclaim as Exhibit A. Filing 11-1. The letter advised HBL of the Asserted patents, then states in pertinent part, as follows:

> We are now aware that you are currently using, offering to sell and selling light fixture assemblies provided by Daryl Holland, as shown in the image below. We would like to let you know that these light fixtures assemblies may infringe one or more of the Genenbacher Patents. Please see attached Exhibit C for a comparison of the light fixture assembly in comparison to the Genenbacher Patents.
>
> [Image of Magnetic Clip omitted.]
>
> We ask that you stop selling these products or any other products that infringe the Genenbacher Patents. If you have any questions or if you would like to discuss a possible resolution of this matter, please do not hesitate to contact me.

Filing 11-1 at 2–3 (exhibits attached to the letter were not included with the letter). HBL alleges,

> This communication was facially and obviously wrong, since clips like the Magnetic Clip were expressly disclaimed by the inventor as inferior prior art in columns 1 and 2 of the Asserted Patents. Thus it would have been impossible for any reasonable investigation to conclude that the Magnetic Clips infringed.

Filing 11 at 3 (¶ 9). HBL alleges that "Lite-Netics did not attempt any relevant communications with HBL for almost five years, until 2022. HBL relied on this silence, and continued to sell the Magnetic Clip." Filing 11 at 3 (¶ 10). Lite-Netics points out that HBL never responded to the 2017 communication. Filing 21-1 at 3 (Genenbacher Decl., ¶ 8).

HBL alleges that, over the years, it learned of complaints in the marketplace about Lite-Netics's light fixtures tending to fail in use because of moisture build up when the lights were used outdoors as intended. Filing 11 at 3 (¶ 11). Lite-Netics states that it is unaware of receiving any complaints that its products failed in the field because of moisture build-up. Filing 21-1 at 2–3 (Genenbacher Decl. at ¶ 7). Lite-Netics contends that HBL has a "less than sterling reputation in the holiday lighting community" because it "has been known to look for ways to design around others' products, apparently to maximize their profits and avoid the middleman." Filing 21-1 at 3 (Genenbacher Decl. at ¶ 9). Indeed, in its briefing, Lite-Netics repeatedly accuses HBL of "knocking off" other companies' products. *See, e.g.*, Filing 20 at 6, 7–9.

Even though the parties dispute whether Lite-Netics's products failed in the field, "HBL set out to invent an improvement over the Lite-Netics design." Filing 11 at 3 (¶ 12). Specifically,

> To provide customers an improved product resolving the moisture issues of Lite-Netics' fixtures, HBL devised its own proprietary moisture-mitigating design, incorporating it into the accused Magnetic Cords. In the improved design, two protruding magnets exist at the base of each light fixture, separated by a drain channel and having apertures (weep holes), facilitating evaporation of moisture built up. This new design works well.

Filing 11 at 3–4 (¶ 12); *see also* Filing 11-8 at 7 ('309 Patent, 1:33–60 (explaining the problems with the '779 Patent and summarizing the invention). HBL alleges that it "did not desire to, and did not, 'copy' any product of Lite-Netics." Filing 11 at 4 (¶ 13). HBL was granted its own patent, U.S. Patent No. 11,333,309 (the '309 Patent) for the Magnetic Cord design. Filing 11 at 4 (¶ 14); Filing 11-8 (Counterclaim, Exhibit H). The '779 Patent is identified as prior art in the '309 Patent, Filing 11-8 at 2, and HBL disclosed and discussed at least the '779 Patent in its own patent specification. Filing 11 at 4 (¶ 14); Filing 11-8 at 7 ('309 Patent at 1:31–45).

Notwithstanding HBL's own patent, on April 12, 2022, Lite-Netics sent HBL a cease-and-desist letter, through counsel, accusing HBL's Magnetic Cord of infringing the Asserted Patents, but not mentioning the Magnetic Clip. Filing 11 at 4 (¶ 16); Filing 11-2 (Counterclaim, Exhibit B (chart for comparison not included with the exhibit)). HBL's counsel responded on April 19, 2022, pointing out reasons why the Magnetic Cord did not infringe the Asserted Patents and questioning whether the claims of the '779 patent were invalid as indefinite. Filing 11 at 5 (¶ 17); Filing 11-3 (Counterclaim Exhibit C). HBL alleges, "As of at least April 19, 2022, Lite-Netics and Genenbacher (and their counsel) were aware of HBL's noninfringement (both by the Magnetic Clip and the Magnetic Cord), and likely patent invalidity as well." Filing 11 at 5 (¶ 19). Lite-Netics points out that HBL's response states,

> Finally, your letter noted FRE 408, but did not supply a settlement demand. If your client has in mind a price for a fully paid-up release and covenant not to sue,

8

my client will consider it under FRE 408 for purposes of achieving an increment of design freedom if it ever chose to change its design.

Filing 11-3 at 2 (Counterclaim, Exhibit C); Filing 20 at 9 (citing this language). From this language, Lite-Netics asks the Court to infer that such a request for settlement is "not exactly what someone so sure it is non-infringing would be requesting." Filing 20 at 9. Lite-Netics asserts that Genenbacher was not interested in licensing or selling his patents to a competitor. Filing 21-1 at 4 (¶ 11).

Lite-Netics responded to HBL's April letter on May 27, 2022, reiterating accusations that HBL's Magnetic Cords infringe the Asserted Patents, Filing 11 at 5-6 (¶ 22), because "the magnet . . . does not protrude outside the perimeter . . . of the base," and including a photo of a "pull test" demonstrating that the two magnets in HBL's product have a combined pull strength of more than 5 pounds. Filing 11-5 at 2–3 (Counterclaim, Exhibit E). HBL contends this letter provides no plausible factual showing to support a claim that the Magnetic Cord or Magnetic Clip infringe every claim limitation of any claim of the Asserted Patents. Filing 11 at 6 (¶ 22). HBL responded to this communication by email on June 21, 2022, reaffirming HBL's position that the Magnetic Cord does not infringe the Asserted Patents, Filing 11 at 6 (¶ 23), because "[t]he negative limitation you personally added during prosecution to overcome prior art does not describe perimeter protrusion" but is "a negative limitation written broadly to make any type of protrusion . . . exclude a product from the claim's scope." Filing 11-6 at 2 (Counterclaim, Exhibit F).

### 3. Lite-Netics's Communications to HBL's Customers

HBL alleges that, despite its response in April to Lite-Netics's cease-and-desist letter, in May 2022, Lite-Netics's counsel sent several letters to HBL's clients and customers "alerting" them of activities allegedly infringing the Lite-Netics's patents. *See* Filing 11 at 5 (¶ 20); Filing

9

11-4 (Counterclaim, Exhibit D). HBL "understands" that Ace Hardware Corp., Decorator's Warehouse, Novelty Lights, and Jabo's Ace Hardware are customers that received such letters. Filing 11 at 5 (¶ 20). Lite-Netics alleges that these communications were sent to its own customers after its customers asked how HBL could sell the same product as Lite-Netics's patented product. Filing 21-1 at 5 (Genenbacher Decl. at ¶ 14). As Lite-Netics points out, Filing 20 at 10, the letter submitted as Exhibit D to HBL's Counterclaim does not identify any alleged infringer.

HBL alleges that in September 2022, after Lite-Netics had filed this lawsuit, Lite-Netics sent letters or emails to HBL's clients and customers accusing HBL by name of infringing the Asserted Patent. Filing 11 at 6–7 (¶ 26); Filing 11-7 (Counterclaim, Exhibit G). Again, Lite-Netics contends that the correspondence was sent to its own top customers to notify them that Lite-Netics had taken action to protect the Asserted Patents against HBL's products. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 14). Lite-Netics asserts that it was unaware of any purported business relationship that these companies might have had with HBL when the communications were sent out, because the recipients were customers of Lite-Netics. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15). There is no evidence in the record that Lite-Netics had any exclusive agreement with any of these companies.

The key paragraph of this communication, as shown in Exhibit G to HBL's Counterclaim, states the following:

> We have become aware of recent attempts by other companies to make and sell similar products that infringe our patents. While we encourage healthy competition, copying of patented products does not promote innovation in our industry, nor does it recognize the efforts undertaken by Litenetics [sic] in developing its' [sic] products. For your information, Litenetics has filed a major patent infringement lawsuit against Holiday Bright Lights to include all legal rights and remedies to stop them from making and selling infringing products. We are also considering including any known company using or reselling the HBL products as co-defendants in this lawsuit. Litenetics has invested a significant amount of time,

effort, and resources in developing its intellectual property, and we will not allow our patent rights to be trampled.

Filing 11-7 at 2. The communication ends with the following paragraph:

The following is the 1st page of the complaint. Should you need additional information, please let us know.

Filing 11-7 at 2. As promised in this communication, attached to it is the first page of Lite-Netics's Complaint in this action. Filing 11-7 at 3; Filing 1 at 1.

HBL alleges that Lite-Netics knew that its statements in its September 2022 communications were false; that Lite-Netics sent these letters or emails with knowledge that its patent infringement allegations against HBL are objectively baseless, and with intent to injure HBL and its business; and that threats of this nature to HBL customers were misleading because, even if Lite-Netics added purchasing parties as new defendants to the suit, controlling federal law would lead to an immediate stay of such assertions. Filing 11 at 7 (¶ 26) (citing *In re Nintendo of Am., Inc.*, 756 F.3d 1363, 1364 (Fed. Cir. 2014) (granting mandamus)). HBL identifies some of its clients and customers that received Lite-Netics's "letters and injurious threats" after Lite-Netics filed this lawsuit as Novelty Lights, Inc., in Denver, Colorado; Jabo's Ace Hardware with businesses throughout Texas; and Decorator's Warehouse, with businesses in Arlington, Texas. Lite-Netics alleges that the communications were proper because they fall within the "litigation privilege." Filing 20 at 22–23.

**B. Procedural Background**

HBL filed the Motion for Temporary Restraining Order now before the Court shortly after noon on Friday, September 30, 2022. Filing 12. The request for a TRO is based on HBL's counterclaims of tortious interference with business relationships and defamation. Filing 12 at 4; Filing 12 at 6. On Monday, October 3, 2022, the Court filed an Order Setting Deadline for Opposition to Defendant/Counterclaimant's Motion For Temporary Restraining Order giving Lite-

Netics until 5:00 pm on Wednesday, October 5, 2022, to file a brief in opposition and any index of supporting evidence and affidavits in response to HBL's Motion. Filing 19 at 2. The Court stated in that Order that it believed that the Motion for TRO could be addressed through written submissions and evidence, but if either party believed an evidentiary hearing was necessary, that party was required to file such request and state with specificity why an evidentiary hearing was necessary. Filing 19 at 2. Lite-Netics filed its Brief Opposing Nu Tsai's Motion for Temporary Restraining Order and Preliminary Injunction on October 5, 2022, as required, as well as a supporting declaration by Shawn Genenbacher. Filing 20; Filing 21. HBL then filed a Reply on October 6, 2022. Filing 22. On October 7, 2022, Lite-Netics sought leave to file a sur-reply with a copy of the proposed sur-reply attached. Filing 23. The Court denied that request, Filing 24, and as explained at the beginning of this decision, the Court has not considered Lite-Netics's proffered sur-reply in resolving the Motion before the Court.

No party requested an evidentiary hearing on the Motion for TRO. Therefore, the Court will resolve that Motion on the parties' written submissions.

## II. LEGAL ANALYSIS

### A. Standards for a TRO

Rule 65 of the Federal Rules of Civil Procedure provides, in pertinent part, "The court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney." Fed. R. Civ. P. 65(b)(1). Rule 65(b)(1) imposes significant requirements for a TRO issued without notice. Fed. R. Civ. P. 65(b)(1)(A)–(B); *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022) (noting that there is a material difference between a TRO and a preliminary injunction in the allowed duration and the requirement of notice). In this case, however, Lite-Netics had notice of HBL's request for a TRO, the Court has required Lite-Netics to respond, and both

parties are represented by counsel. Nevertheless, the Court will assume that any TRO issued in this instance will still need to adhere to the durational limits of Rule 65(b).

Rule 65(b) does not identify the standard the Court must apply in deciding whether or not to grant a request for a TRO. "[T]he standard for analyzing a motion for a temporary restraining order is the same as [the standard for] a motion for a preliminary injunction." *Tumey*, 27 F.4th at 665. Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey*, 27 F.4th at 664 (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[7] No single factor is dispositive. *Id.* at 665. Furthermore, a TRO is an extraordinary remedy never awarded as of right; the primary function of a TRO is preserving the status quo until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a TRO. *Id.* Lastly, the burden of establishing the propriety of a TRO is on the movant. *Id.*

### B. Application of the Standards

As a prefatory matter, the Court finds that the relief HBL seeks is available from a TRO. Lite-Netics argues that granting the TRO would have the effect of disturbing the status quo in favor of HBL poaching Lite-Netics's customers. Filing 20 at 24. Nevertheless, the Court concludes

---

[7] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), with *Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

that HBL does not seek a dramatic alteration of the status quo, but maintenance of it, by forestalling allegedly injurious action by Lite-Netics. *See Tumey*, 27 F.4th at 665. The TRO will not authorize HBL to "poach" Lite-Netics's customers. HBL also does not seek an order for affirmative action by Lite-Netics, which would be an improper purpose for a TRO. *See id.* Thus, the Court turns to consideration of the *Winter* factors to determine whether HBL is entitled to the relief it seeks.

       *1. HBL is Likely to Succeed on Its Claims*

The Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)).

The likelihood of success is considered in light of the elements of the movant's claim or claims. *See, e.g., 301, 712, 2103 & 3151 LLC v. City of Minneapolis,* 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). Thus, the Court will consider in turn HBL's likelihood of success on the two claims on which HBL's request for a TRO is based.

       a.  HBL has a Fair Chance of Prevailing on Its Tortious Interference Claim

           i.  The Parties' Arguments

HBL argues that it is likely to succeed on its tortious interference claim, because as soon as Lite-Netics opened private discussions, HBL responded promptly and thoroughly explained why no infringement was possible. Filing 13 at 4. HBL argues that Lite-Netics did not point out any flaws in HBL's communications or even respond at all and instead initiated a "smear

14

campaign" in the marketplace. Filing 13 at 4. That campaign, HBL asserts, involved false and misleading representations of fact, made in bad faith, and meant to deceive customers regarding the nature, characteristics, or qualities of HBL's goods, services, and commercial activities, all at the most sensitive time of the year for the products at issue. Filing 13 at 5. HBL points to another instance in which this Court issued a TRO to address improper communications with customers of another. Filing 13 at 5 (citing *Canning Logistics Servs., LLC v. Baxter Bailey & Assocs., Inc.*, No. 8:17CV116, 2017 WL 2178350, at *2 (D. Neb. May 16, 2017) (Smith Camp, C.J.).

Lite-Netics argues HBL fails to show that Lite-Netics's infringement claims are objectively unreasonable. Filing 20 at 14. Indeed, Lite-Netics argues that state law tortious interference claims are preempted by federal patent law unless the claims are based on a showing of bad faith in asserting infringement. Filing 20 at 14. Lite-Netics argues further that the Federal Circuit Court of Appeals has established that communicating potential infringement to customers is not improper if the patent owner has a good faith belief that the claims are accurate. Filing 20 at 14. Furthermore, Lite-Netics contends that bad faith allegations of infringement cannot be decided at this stage without ample discovery, briefing, and claim construction in a *Markman* hearing. Filing 20 at 17.[8] Nevertheless, Lite-Netics argues that HBL's use of two magnets instead of one in its light fixture assembly in the Magnetic Cord falls within the scope of infringement under the doctrine of equivalents, Filing 20 at 18–19, and that the combined magnets have the required "pull strength." Filing 20 at 19–20. Lite-Netics also argues that the "protrusion" limitation of the '264 patent relates to protrusion outside the base, not just that the sides of the magnet are not exposed. Filing 20 at 21. Lite-Netics next argues that HBL fails to offer anything but vague suggestions that there was

---

[8] The purpose of a "*Markman* hearing" is for the court to interpret the claims of a contested patent. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996)).

a contract or business relationship between HBL and its purported customers and that Lite-Netics

knew of any alleged business relationship that HBL had with the purported customers to whom

Lite-Netics sent communications. Filing 20 at 16.

> ii.  Elements of a Tortious Interference Claim

As the Nebraska Supreme Court recently explained,

> To succeed on a claim for tortious interference with a business relationship
> or expectancy, a plaintiff must prove (1) the existence of a valid business
> relationship or expectancy, (2) knowledge by the interferer of the relationship or
> expectancy, (3) an unjustified intentional act of interference on the part of the
> interferer, (4) proof that the interference caused the harm sustained, and (5) damage
> to the party whose relationship or expectancy was disrupted. In order to be
> actionable, interference with a business relationship must be both intentional and
> unjustified.

*Dick v. Koski Pro. Grp., P.C.*, 950 N.W.2d 321, 377 (Neb. 2020) (citations omitted), *opinion

modified on other grounds on denial of reh'g*, 953 N.W.2d 257 (Neb. 2021). A contractual

relationship between HBL and its customers is not required. *Id.* (requiring "a business relationship

or expectancy").

> iii.  Lite-Netics Knew the Recipients of the Communications
>        were HBL's Customers

In this case there are at least reasonable inferences that HBL had business relationships or

expectancies with the companies to which Lite-Netics sent its allegedly tortious communications

and that Lite-Netics knew of these business relationships. *Koski Pro. Grp.*, 950 N.W.2d at 377

(first and second elements). The inferences of relationships arise from evidence that the businesses

provided information about Lite-Netics's communications to HBL, as well as evidence that

customers have called HBL in response to Lite-Netics's communications to them expressing their

worries and questioning whether HBL will be able to meet supply commitments for the named

products as well as how the litigation would affect their orders and shipments. Filing 15-1 at 3

(Martini Decl., ¶ 11). Lite-Netics professes not to know of such relationships because these

16

companies were customers of Lite-Netics.[9] Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15). Lite-Netics has not identified any exclusive relationship agreement it had with any of these customers, however, that would preclude them from having relationships with other vendors of similar products. At this preliminary stage, the inferences that Lite-Netics knew of the relationships arising from its targeting of these businesses are sufficient to overcome Lite-Netics's denials. One does not ordinarily threaten one's own customers with a lawsuit, as the Court infers Lite-Netics does in the September 2022 communications.

> ### iv. Lite-Netics's Communications were Improper and Baseless

The critical element at this point is whether any interference by Lite-Netics was "improper" and "unjustified." *Koski Pro. Grp.*, 950 N.W.2d at 377 (third element). Lite-Netics is correct that "[s]tate tort claims based on enforcing a patent, including for tortious interference, are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018) (citing *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008)). In explaining this "bad faith" requirement, the Federal Circuit Court of Appeals explained that "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1332 (Fed. Cir. 2012) (quoting *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004)). This "bad faith" requirement is not an impediment to HBL's tortious interference claim in this case, at least at this preliminary stage of the proceedings.

---

[9] The Court finds this assertion rather disingenuous when retailers routinely offer similar products from various vendors. Also, all Lite-Netics would have to do to ascertain whether one of its customers was also selling products from another vendor is check the retailer's website or walk into their store.

As to the "improper or unjustified" element of the tort claim, the Nebraska Supreme Court explained,

> Factors to consider in determining whether interference with a business relationship was unjustified include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. The issue is whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Koski Pro. Grp., P.C.*, 950 N.W.2d at 378 (citations omitted). Under Nebraska law, it is clear that "valid competition," involving truthful statements, cannot be the basis for a tortious interference claim. *Id.* It is also clear that even communications that are malicious are not enough by themselves to impose liability, because "if the information provided is truthful, the interference is not unjustified." *Thompson v. Johnson*, 910 N.W.2d 800, 807–09 (Neb. 2018).

The Court is not predetermining which party will prevail, only considering whether HBL's showing is sufficient to demonstrate it has "at least a fair chance of prevailing." *Wildhawk Invs., LLC*, 27 F.4th at 593 (internal citations and quotation marks omitted). The Court finds that HBL has made sufficiently plausible allegations that Lite-Netics's communications to HBL's customers were untruthful, known by Lite-Netics' to be untruthful, and were made in bad faith (*i.e.*, baseless), which takes those communications out of the realm of "valid competition," thus demonstrating a fair chance of prevailing on a tortious interference claim that is not preempted. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09; *Energy Heating, LLC*, 889 F.3d at 1304.

As one preliminary matter, the Court is not persuaded by Lite-Netics' argument that the Court cannot determine whether its assertions that HBL was infringing its patents were baseless until after discovery and claim construction, including a *Markman* hearing. Filing 20 at 17. Such a rule would also mean that a court could never grant a patent holder a TRO to enjoin infringement

18

by a competitor, which clearly is not the case. Also, the likelihood of success requirement involves only demonstration of a "fair chance of prevailing," not a certainty of prevailing, *see Wildhawk Invs., LLC*, 27 F.4th at 593, and a TRO is frequently granted before discovery and even without notice to the opposing party. *See* Fed. R. Civ. P. 65(b). Also as a preliminary matter, Lite-Netic's uses "designing around" a patent as if it were a bad thing. "Designing around" a patent is not prohibited by statute or caselaw and, indeed, is encouraged by the patent law. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (explaining that a court "should bear in mind that the patent law encourages competitors to design or invent around existing patents" (citing *Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993)). Lite-Netics has not identified any authority suggesting that "designing around" a patent is somehow tortious.

More directly to the point, in communications to HBL's customers, Lite-Netics has accused HBL of tortious conduct—patent infringement—but HBL has plausibly shown that Lite-Netics knew that such a claim was baseless, thus not protected by its truth. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09. At least at this stage of the litigation, the Court cannot see how Lite-Netics could reasonably believe that HBL's Magnetic Clips infringe or copy the Asserted Patents. The independent claims of both Asserted Patents are for "[a] light fixture assembly" with a magnet "embedded in the base," and in the '779 Patent, that base is "attached to the second end of the light bulb socket," and in the '264 Patent, that base is "integrally attached to the second end of the light bulb socket." Filing 1-1 at 7 ('779 Patent, 4:52–63 (Claim **1**)); Filing 1-2 at 8 ('264 Patent, 5:20–32 (Claim **1**)). The Magnetic Clips are not "light fixture assemblies" at all, but devices that clip onto light fixture assemblies. Furthermore, the Magnetic Clips are neither "a base attached to the second end of the light bulb socket" nor "a base integrally attached to the

19

second end of the light bulb socket" because they clip onto the outside of the light bulb socket base. Furthermore, the '779 Patent expressly distinguishes the claimed invention from and thus disclaims "clips." *See* Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights). Indeed, Genenbacher continues to maintain that the '779 Patent overcame the "cumbersome[ness]" of clips. Filing 21-1 at 2 (¶ 5).

Likewise, at this stage of the litigation, the Court cannot see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes or copies the '779 Patent. This is so, where the Magnetic Cord has two magnets, each with a pull strength less than five pounds, contrary to the requirements of claim **1** of the '779 Patent. That claim of the '779 Patent claims "a [*i.e.* one] neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds." Filing 1-1 at 7 ('799 Patent at 4:62–63)). Nowhere does the '779 Patent state or suggest that two or a plurality of magnets may be used in an embodiment of the Patent.

Lite-Netics also is not saved by the doctrine of equivalents because Lite-Netics has cited no controlling authority—which in this instance means authority from the Federal Circuit Court of Appeals or the United States Supreme Court—that it is not required to plead "doctrine of equivalents" infringement and the Court has found none. Lite-Netics cites a case from the Middle District of Alabama that, in turn, cites *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007), and *Spansion, Inc. v. Int'l Trade Comm'n,* 629 F.3d 1331, 1349 (Fed. Cir. 2010). In *McZeal*, however, the plaintiff expressly pleaded "[t]he defendant's INTERNATIONAL WALKIE TALKIE machine physically have [sic] or perform all of the basic elements contained in the patent claims of the plaintiff and further infringes under the doctrine of equivalents." *McZeal*, 501 F.3d at 1357 (citing the Complaint at 14 and 56). The decision in *Spansion* does not discuss pleading at all. Rather, it states, "To prove direct infringement, Tessera must establish by

20

a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Spansion*, F.3d at 1349 (Fed. Cir. 2010) (internal quotation marks and citations omitted). With all due respect to the Middle District of Alabama, this Court believes that to assert a claim of infringement based on doctrine of equivalents under the prevailing *Twombley* and *Iqbal* pleading standard, the patent holder must plead a plausible factual basis for an equivalent of a claimed limitation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009); *see also Metricolor LLC v. L'Oreal S.A.*, 791 F. App'x 183 (Fed. Cir. 2019) (unpublished opinion) (affirming refusal to consider doctrine of equivalents mentioned for the first time in opposition to a motion to dismiss and not expressly pleaded). Lite-Netics has not done so. Its contention that a device with two magnets embedded in the base literally infringes a limitation stated in terms of a single magnet is baseless.

Nor can the Court see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes the '264 Patent, even assuming without deciding that Lite-Netics can legitimately assert that using two magnets infringes a claim expressly stated in terms of a single magnet under the doctrine of equivalents. This is so, because the Magnetic Cord has magnets protruding from the base, contrary to the requirements of claim **1** of the '264 Patent, which claims "a magnet embedded in the base such that said magnet does not protrude outside of said base." Filing 1-2 at 5 ('264 Patent at 5:27–28)). The Court is not persuaded by Lite-Netics's argument that HBL has imported from the specification a definition of lack of protrusion as meaning only that the magnet sticks out of the base and that the limitation would require that the sides are not exposed. Filing 20 at 20–21. A person of ordinary skill in the art would presumably understand that "a magnet embedded in the base such that said magnet does not protrude outside of said base" means the magnet does not protrude from the base in any direction, whether from the base in the direction opposite the bulb

or beyond the perimeter of the base, *i.e.*, perpendicular to the bulb. Thus, a magnet that extends beyond the end of the base does not fall within this limitation and alleging that it does is not only false but baseless.

There is another substantial ground for finding that HBL has a fair chance of succeeding on its claim of tortious interference. That reason is that Lite-Netics's communications to HBL's customers in September 2022 threatened to "include[e] any known company using or reselling the HBL products as co-defendants in this lawsuit." Filing 11-7 at 2. As the Federal Circuit Court of Appeals explained in *In re Nintendo of Am., Inc*., 756 F.3d 1363 (Fed. Cir. 2014), a manufacturer's liability for patent infringement is a predicate to recovery from any defendant who is merely a customer or retailer of the manufacturer's product. 756 F.3d at 1366. Thus, the suit against the manufacturer must proceed first and separate from the suit against the customers or retailers, because if the manufacturer prevails, the claims against its customers and retailers are moot. 756 F.3d at 1366. The Court is not persuaded by Lite-Netics's attempt to read a customer suit rule as only a defense that the customers can assert to stay the litigation until the suit against the manufacturer has been resolved, but that it does not prevent a suit from immediately commencing against the customer. The *Nintendo* case involved the severance and the stay of a case brought against a manufacturer and its retailers at the same time, in the same lawsuit, in the same district. *Id.* Nevertheless, Lite-Netics is correct that the *Nintendo* decision does not preclude Lite-Netics from suing customers for infringement of its patents for selling HBL's products in this suit or a separate action—although any such suit would be subject to an immediate stay pending the outcome of the patent infringement suit against HBL.

The Court recognizes that it is possible that this Court would lack personal jurisdiction over some of HBL's customers, which might bar adding them to this lawsuit and require separate

litigation in a different district, or the customers might be able to demonstrate that another district was more convenient. *Cf. id.* (considering the convenience of the district for suits against customers). That is not the basis for a TRO restraining threats to sue customers, however. What makes Lite-Netics's threats to sue customers improper is that the claim that HBL's products infringe Lite-Netics's Asserted Patents is once again that the allegation of infringement is untrue and baseless based upon the current record in front of this Court. It is on that ground that the Court will enjoin Lite-Netics from threatening to sue HBL's customers. If Lite-Netics can subsequently show that its infringement claims are not baseless, upon a fuller record, then its communications to customers, including its threat to sue customers for infringement, would be permissible.

Viewing Lite-Netics's conduct through the lens of the factors for determining "improper" or "unjustified" interference, *see Koski Pro. Grp., P.C.*, 950 N.W.2d at 378, the impropriety of Lite-Netics's conduct appears obvious at this point in the litigation. Lite-Netics's conduct was baseless and asserted improper threats against customers or retailers of HBL's products. *See id.* (first factor is the nature of the actor's conduct). Furthermore, where Lite-Netics's conduct was baseless, it is reasonable to infer a motive to injure HBL apart from the merits of any allegation of patent infringement. *See id.* (second factor is actor's motive). HBL had a reasonable expectation or interest in retaining customers, particularly as the height of the sales season for its products approached. *See id.* (third factor is the interest of the other with which the actor's conduct interferes). A mere interest in competition may be worthy, but Lite-Netics's cannot legitimately advance that interest by making baseless accusations or threats. *See id.* (fourth, fifth, and seventh factors are the interests the actor seeks to advance, the relative social interests, and the relations of the parties). Finally, the threats and accusations were directly and "proximate[ly]" related to

interference in HBL's relationship with its customers. *See id.* (sixth factor is the proximity or remoteness of the actor's conduct to the interference).

For all these reasons, HBL has a fair chance of prevailing on its tortious interference claim.

b.   HBL has a Fair Chance of Prevailing on its Defamation Claim

i.   The Parties' Arguments

HBL also relies on its likelihood of success on its defamation claim. Filing 13 at 6. HBL argues that Lite-Netics's letters and emails were false and misleading statements of fact regarding the nature, characteristics, or qualities of HBL's products; sent in bad faith with intent to injure HBL; and sent knowing the falsity and baselessness of Lite-Netics's claims. Filing 13 at 6. As to this claim, Lite-Netics argues that HBL cannot prove falsity. Filing 20 at 22. Lite-Netics also argues that the defamation claim is barred by the "litigation privilege." Filing 20 at 22.

ii.   Elements of Defamation

As the Nebraska Supreme Court has explained,

A defamation claim has four elements: (1) a false and defamatory statement concerning the claimant, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. By statute, truth in and of itself is made a complete defense unless the plaintiff proves the statements were made with actual malice.

*Choice Homes, LLC v. Donner*, 976 N.W.2d 187, 202–03 (Neb. 2022) (citations omitted). As with HBL's tortious interference claim, the only debatable elements here are falsity and lack of privilege of Lite-Netics's communications to HBL's customers. *Id.* ("The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion."); *id.* (identifying "an unprivileged publication to a third party" as element two of a defamation claim).

24

iii. Lite-Netics Made Unprivileged False Statements

HBL has at least a fair chance of demonstrating that Lite-Netics's statements that HBL copied and was infringing Lite-Netics's Asserted Patents and that Lite-Netics could add customers and retailers to this lawsuit were untrue, thus robbing Lite-Netics of a defense based on truth. First, for essentially the reasons stated in the preceding section, Lite-Netics's statements were false.

Turning to the question of whether the statements were privileged, the Court is not persuaded by Lite-Netics's assertion of the "litigation privilege" as defeating HBL's defamation claim. Filing 20 at 22. The Nebraska Supreme Court does not appear to have addressed the "litigation privilege" as a bar to a defamation claim. Furthermore, to the extent that this Court recognized the existence of "litigation privilege" in *Jenkins v. Gen. Collection Co.*, 538 F. Supp. 2d 1165 (D. Neb. 2008), a case on which Lite-Netics relies, that privilege extended only to actions the parties who asserted the privilege took *in the judicial proceedings*. 538 F. Supp. 2d at 1172 (denying defendants' motion for summary judgment based on the litigation privilege). Another case on which Lite-Netics relies, *Inline Packaging, LLC v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015 (8th Cir. 2020), does not mention a "litigation privilege" at all, although it discussed the *Noerr-Pennington* doctrine, which immunizes acts related to the constitutional right to petition the court for grievances, unless the act is a mere sham. 962 F.3d at 1028. The decision held that the party claiming the other brought a sham patent infringement lawsuit could not meet the requirement to show the lawsuit was objectively baseless. *Id.* at 1029. Here, the Court has determined—at least preliminarily—that Lite-Netics's patent infringement claims are baseless, but more importantly, the *Inline Packaging* decision discussed validity of the lawsuit, not whether there was any protection for statements made by a litigant to a third party about the litigation. *Id.*

Finally, Lite-Netics asserts that the Federal Circuit has established that communicating potential infringement to customers is not improper if the patent owner has a good faith belief that

the claims are accurate. Filing 20 at 14 (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 898 (Fed. Cir. 1998)). In *Mikohn*, the Federal Circuit Court of Appeals recognized that "[c]ommunication of accurate information about patent rights, whether by direct notice to potential infringers or by publicity release," is permissible. 165 F.3d at 898. However, it did so with the same caveats that apply to tortious interference claims: the information must be accurate and not in bad faith. *Id.* Again, the Court has found that the information Lite-Netics communicated to HBL's customers was untrue and baseless and therefore in bad faith.

Not to belabor the point, but Lite-Netics has shown no basis for application of any "litigation privilege" or patent holder's privilege protecting its communications about its lawsuit against HBL to any stranger to the litigation. HBL has at least a fair chance—and perhaps a substantial likelihood—of succeeding on its defamation claim, as well as its tortious interference claim, so this *Winter* factor weighs heavily in favor of a TRO.

### 2. HBL Faces a Threat of Irreparable Harm

#### i. The Parties' Arguments

The second *Winter* factor the Court must consider is whether it is likely that HBL will suffer irreparable harm in the absence of a TRO. *Tumey*, 27 F.4th at 664. HBL contends that it can show the required irreparable harm because Lite-Netics has already engaged in bad faith, untrue statements to injure HBL, and will likely continue to do so until stopped. Filing 13 at 6. HBL argues that as a consequence of Lite-Netics's conduct, multiple retailer customers of HBL have contacted HBL with concerns about whether they will receive their shipments and orders as planned, and HBL asserts those customers must also question HBL's integrity after such grave allegations. Filing 13 at 7. The injury to its reputation and goodwill is particularly grave, HBL contends, because these are the most sensitive months of the year for its sales of holiday lights.

Filing 13 at 7. HBL contends that the harm to its reputation and goodwill could be lasting. Filing 13 at 7.

Lite-Netics argues that HBL "waited too long" before seeking a TRO, which undercuts a claim of irreparable harm. Filing 20 at 12. Lite-Netics contends that HBL's request for a TRO was months after it learned of Lite-Netics's first communications to customers and only occurred after the lawsuit was filed. Filing 22 at 12. In short, Lite-Netics argues that HBL's delay demonstrates there is no emergency. Filing 20 at 13. Lite-Netics also argues that HBL's purported harm is "non-existent." Filing 20 at 24.

In its reply, HBL argues that the threat of irreparable harm has increased, as its president has received another urgent phone call from a customer, Jabo's Ace Hardware, concerned that it might be dragged into this lawsuit and passing on the concerns of some of its own customers that they might also become embroiled. Filing 22 at 1–2. HBL also disputes Lite-Netics's contention that HBL "delayed" seeking a TRO by pointing out that HBL sought a TRO in September after Lite-Netics identified it by name in communications to its customers that same month. Filing 22 at 5.

> ii. The Threat of Irreparable Injury to HBL's Reputation and Goodwill is Sufficient and HBL Acted Promptly

The movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Tumey*, 27 F.4th at 664–65 (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)).

27

HBL can show irreparable harm is likely in the absence of a TRO. *Tumey*, 27 F.4th at 664. Loss of reputation and goodwill is a potentially viable theory of irreparable harm. *See Mgmt. Registry, Inc. v. A.W. Companies, Inc*., 920 F.3d 1181, 1183 (8th Cir. 2019) (citing *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996)); *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc*., 336 F.3d 801, 805 (8th Cir. 2003) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). Also, "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.* Thus, such injury may suffice to satisfy the "irreparable harm" prong of the TRO analysis. *Id.* Nevertheless, the claimant must diligently pursue injunctive relief to avoid such reputational harm, *see Wildhawk Invs., LLC*, 27 F.4th at 597 (concluding that the claimant's assertion of irreparable harm from injury to its business reputation and goodwill was "undermined by its decision to wait more than a year to bring th[e] lawsuit despite knowing [defendants] intended to produce the [products at issue] themselves."), while at the same time presenting the court with something more than speculation that it will suffer reputational injury, *see MPAY Inc. v. Erie Custom Computer Applications, Inc*., 970 F.3d 1010, 1020 (8th Cir. 2020) (rejecting irreparable harm based on goodwill and reputation where, without citing to anything in the record, the claimant asserted that harm to its goodwill and reputation was "inevitable," because "[s]peculative harm does not support a preliminary injunction." (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist*., 696 F.3d 771, 779 (8th Cir. 2012)).

In this case, HBL has not delayed in seeking relief, which might undermine its assertion of irreparable harm to reputation and injury. *See Wildhawk Invs., LLC*, 27 F.4th at 597. HBL sought such relief within the same month in which Lite-Netics made the allegedly tortious communications to HBL's customers accusing HBL by name of "copying" and patent

28

infringement. *See* Filing 11 at 6–7 (¶ 26) (alleging that Lite-Netics sent HBL's customers communications accusing HBL of "copying" and infringement in September 2022); Filing 20 at 23 (Lite-Netics admitting that it made such communications in September 2022). It is the September 2022 communications by Lite-Netics that the Court concludes are actionable, at least preliminarily. Thus, HBL acted within a few weeks of actionable misconduct by Lite-Netics, which is well inside the timeframes that were too long in cases cited by Lite-Netics. Filing 20 at 13. It is also far shorter than the fatal delay of a year between learning of the defendants' intent to produce the plaintiff's products themselves and filing suit in *Wildhawk Investments*. *See* 27 F.4th at 597-98.

The Court also finds HBL's evidence of injury to its reputation and goodwill is not merely speculative. HBL offers the affidavit of Richard Martini, its president, averring that worried customers have called him asking whether HBL will be able to meet supply commitments for the accused products and how the litigation would affect their orders and shipments. Filing 15-1 at 3 (Martini Decl., ¶ 11). Furthermore, HBL's Magnetic Cord accused product is also patented. In the patent context, the Federal Circuit Court of Appeals has recognized that "impaired goodwill and competitive position" can "justify injunctions to prevent them before they occur (precisely because they are hard to quantify later)." *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc.*, 895 F.3d 1304, 1331 (Fed. Cir. 2018). Finally, the timing of Lite-Netics's communications to HBL's customers at the height of the sales season for retailers to be purchasing stocks of holiday lights is reasonably likely to exacerbate the impact on HBL's reputation and goodwill, as customers may reasonably be expected to choose a different vendor if they have questions about HBL's ability to perform and if they are unaware that Lite-Netics's threat to add them to this lawsuit is an empty one under the applicable law.

29

Thus, the Court concludes that the second *Winter* factor requiring irreparable harm in the absence of a TRO has been met in this case. *See Tumey*, 27 F.4th at 665.

> 3.  *The Balance of Equities and the Public Interest also Tip in Favor of a TRO*

The last two *Winter* factors are the balance of equities and whether an injunction is in the public interest. *Tumey*, 27 F.4th at 664. These factors also weigh in favor of a TRO in this case.

HBL argues that Lite-Netics will not be harmed by a TRO and that false and defamatory speech is not protected by the United States Constitution or the Nebraska Constitution. Filing 13 at 8–9. HBL argues that Lite-Netics will be free to pursue the marketing of its products, just not by false means. Filing 13 at 10. HBL argues that the public interest favors enjoining bad actors who distort the workings of the marketplace with false information. Filing 13 at 10–11. Lite-Netics responds that it has a right to inform customers that it is pursuing infringers of its patents. Filing 20 at 23–24. It argues that it will undoubtedly suffer from not being able to defend its patents and to provide appropriate reassurance to its customers if a TRO is granted on the terms HBL seeks, but HBL's purported harm is "non-existent." Filing 20 at 24.

The "balance of equities" factor balances the irreparable harm to the claimant if a TRO is not granted against the harm to the other party or others if the TRO is granted. *Wildhawk Inv., LLC.*, 27 F.4th at 593. In this case, the Court concludes that Lite-Netics has no countervailing harm if it is enjoined from making statements in various media suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. Indeed, as explained above, the Court has made a preliminary finding that Lite-Netics has forfeited any privilege to make these communications. As HBL contends, Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means. On the other hand, HBL has established that it will suffer

irreparable harm in the absence of a TRO, as explained in the preceding subsection. Thus, the balance of equities weighs in favor of a TRO.

In the context of litigation between private entities, the public interest considers such things as the public's interest in preventing fraud and enforcing contracts. *See, e.g., Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020) (public interest in preventing fraud); *Medicine Shoppe Int'l., Inc.*, 336 F.3d at 805 ("[W]e agree that the public interest would not be served by permitting a party to avoid contractual obligations."). The public interest is also served by maintaining consumer choice and convenience in the marketplace. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009). Finally, the public interest favors enjoining false statements in marketing. *United Indus. Corp. v. Clorox Co.*, 140 F.3d 1175, 1184 (8th Cir. 1998). Again, the Court has determined that HBL has at least a fair chance of succeeding on its claims that Lite-Netics tortiously interfered with HBL's business relations and defamed HBL by making false and baseless statements to customers. In such circumstances, the public interest favors enjoining such conduct, *see id.*, and not inhibiting choice in the marketplace, *see Gen. Motors Corp.*, 563 F.3d at 321, just as it favors enjoining other kinds of conduct that would distort the marketplace. *See, e.g. Jet Midwest Int'l Co., Ltd.*, 953 F.3d at 1046 (the public interest favors preventing fraud). The public interest also weighs in favor of a TRO.

In summary, HBL has satisfied all the *Winter* factors for issuance of a TRO.

### C.  Scope of the TRO

One of the remaining questions is the scope of the TRO. Pursuant to Federal Rule of Civil Procedure 65(d)(1), "[e]very order granting an injunction and every restraining order must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d). Thus, the TRO in this case must meet these requirements.

31

As to the reasons for issuing the TRO, the Court will summarize its findings set out above.

Fed. R. Civ. P. 65(d)(1)(A). As to the terms of the TRO and the acts it restrains, *id.* at 65(d)(1)(B),

HBL states:

> HBL respectfully requests that this Court issue a temporary restraining order and preliminary injunction that restrains Lite-Netics, along with its officers, directors, shareholders, and other agents from making statements via letters, emails, Facebook, Twitter, or on any other social media, mass media, direct marketing, robocalls, press releases, blogs, or websites suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. The Court should also require Lite-Netics to publicize this Court's Order to that effect, and to provide complete discovery to HBL of all relevant marketplace statements.

Filing 13 at 11. The Court concludes that this statement meets the requirements of Rule 65(d) and

that most of the relief requested is appropriate in the circumstances of this case.

On the other hand, in its Proposed Order, HBL includes language enjoining Lite-Netics, to

disclose to HBL all documents and things related to Lite-Netics' marketplace communications

concerning HBL's alleged "copying" and "infringement" of its patents, or an entity's risk of being

sued as an HBL customer, within two days from the date of the TRO. Such a request is beyond the

appropriate scope of a TRO in this case, where it requires affirmative action. *See Tumey*, 27 F.4th

at 665. Such a term will not be included in the TRO. Similarly, the Proposed Order includes a

request that the Court order Lite-Netics to send the TRO to all persons who received the

marketplace communications at issue in the past. This request likewise is beyond the appropriate

scope of a TRO in this case, where it requires affirmative action. *Id.* The parties may address the

propriety of either or both requests in any additional briefing of the Motion for Preliminary

Injunction, but those requests will not be granted in the TRO. In the interim, nothing prevents

either party from informing its customers of the TRO.

32

### D.  The Bond Requirement

Rule 65(c) provides, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (also excepting the United States, its officers, and its agencies from this requirement). "[T]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.'" *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)). HBL argues that the small threat of harm to Lite-Netics justifies the Court requiring only a minimal security bond, which it suggests in its Proposed Order should be $100. The Court agrees a minimal security bond is appropriate in this case, in light of the balance of the harms as the Court has measured them above. However, the Court considers a $1,000 bond to be the appropriate amount.

HBL's Proposed Order also suggests that HBL should have fourteen days to post such a security or bond. This Court reads Rule 65(c) to require the posting of the bond as a prerequisite to the issuance of the TRO, however. *See* Fed. R. Civ. P. 65(c) (stating that the court may issue a TRO "only if the movant gives security"); Wright & Miller, 11 *Federal Practice and Procedure* § 2954, p. 525 (describing the posting of a bond by a successful applicant as "a prerequisite to the issuance of injunctive relief."). Thus, issuance of the TRO will be made contingent upon the posting of the required security.

### III. CONCLUSION

Upon the foregoing,

33

IT IS ORDERED that HBL's September 30, 2022, Motion for Temporary Restraining Order, Filing 12, is granted on the terms and conditions set out in the attached Temporary Restraining Order. A hearing on HBL's Motion for Preliminary Injunction, Filing 12, will be set by separate order.

Dated this 7th day of October, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LITE-NETICS, LLC,

               Plaintiff/Counter-Defendant,

     vs.

NU TSAI CAPITAL LLC, d/b/a HOLIDAY
BRIGHT LIGHTS,

               Defendant/Counterclaimant.

**NO. 8:22CV314**

**TEMPORARY RESTRAINING ORDER**

The Court having considered the parties' written submission on the September 30, 2022, Motion for Temporary Restraining Order by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL),

THE COURT FINDS, for preliminary purposes,

- that defendant/counterclaimant HBL has made sufficient showing that plaintiff/counter-defendant Lite-Netics, LLC (Lite-Netics) has engaged in tortious interference with business relations and prospective business relations, as claimed in Count IV of HBL's Counterclaim in this action, and has engaged in defamation, as claimed in Count V of HBL's Counterclaim, by sending false, baseless, and defamatory communications to businesses that Lite-Netics knew had business relationships with HBL, falsely accusing accusing HBL of tortious conduct, that is, patent infringement and "copying" of Lite-Netics's products; threatening to include any known company using or reselling the HBL products as co-defendants in this lawsuit contrary to applicable law; and defaming HBL with false and baseless accusations of patent infringement and copying;

- that HBL has shown a threat of irreparable harm to its reputation and goodwill caused by Lite-Netics's conduct that is not merely speculative;

- that the balance of harms favor issuance of a temporary restraining order, because Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means, while HBL has established that it will suffer irreparable harm in the absence of a temporary restraining order; and

- that the public interest favors enjoying false statements to customers and not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace.

IT IS THEREFORE ORDERED that pending the hearing of HBL's application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, Lite-Netics, along with its officers, directors, shareholders, and other agents, is temporarily restrained from making statements via letters, emails, Facebook, Twitter, or any other social media, mass media, direct marketing, robocalls, press releases, blogs, websites or otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer.

AND IT IS FURTHER ORDERED that this Temporary Restraining Order shall expire on fourteen (14) days from the date and time it is issued unless within such time, for good cause shown, the Order is extended for an additional period not to exceed fourteen (14) calendar days, or unless it is further extended under Federal Rule of Civil Procedure 65;

AND IT IS FURTHER ORDERED that, under Federal Rule of Civil Procedure 65(c), this Temporary Restraining Order shall issue upon HBL posting a security or bond in accordance with NECivR 65.1.1 in the amount of $1,000 as security for the payment of such costs and damages as

2

may be incurred or suffered by any party who is subsequently found to be wrongfully enjoined or restrained hereby. This security or bond may be submitted to the Clerk of the Court to be held in trust;

FINALLY, IT IS FURTHER ORDERED that further submissions in support of or opposition to HBL's Motion for Preliminary Injunction shall be filed in accordance with NECivR 7.1.

Dated this 7th day of October, 2022.

BY THE COURT:

Brian C. Buescher
United States District Judge

3