IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LITE-NETICS, LLC, | |
| Plaintiff/Counter-Defendant, | NO. 8:22CV314 |
| vs. | MEMORANDUM AND ORDER REGARDING DEFENDANT/COUNTERCLAIMANT'S MOTION FOR PRELIMINARY INJUNCTION AND PRELIMINARY INJUNCTION |
| NU TSAI CAPITAL LLC, d/b/a HOLIDAY BRIGHT LIGHTS, | |
| Defendant/Counterclaimant. | |

In its October 7, 2022, Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Temporary Restraining Order, Filing 26,[1] this Court observed that the rough-and-tumble of competition is a hallmark of the American marketplace, but the American marketplace does not tolerate unfair competition based on false and baseless statements by one vendor about another vendor. The Court granted a temporary restraining order (TRO) in this case, because the Court concluded preliminarily that plaintiff and counter-defendant Lite-Netics had crossed that line. Now, after further briefing and a preliminary injunction hearing, the Court concludes that the TRO should be continued as a preliminary injunction during the pendency of this litigation or until dissolved by court order. Thus, for the reasons stated below, the Court grants the September 30, 2022, Motion for Preliminary Injunction, Filing 12, by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL).[2]

---

[1] See *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 6151898 (D. Neb. Oct. 7, 2022).

[2] The Motion before the Court is part of a Motion for Temporary Restraining Order and Preliminary Injunction. Filing 12.

1

## I.  INTRODUCTION

### A.  Factual Background

This background is drawn from Lite-Netics's Complaint and HBL's Counterclaim. It has been augmented, where necessary, with information from the parties' submissions concerning the Motion for TRO and the Motion for Preliminary Injunction, including supplemental briefing, evidence submitted after the TRO was issued, Lite-Netics's First Amended Complaint filed October 16, 2022, and arguments presented at the preliminary injunction hearing.

#### 1.  The Parties, Patents, and Claims

Lite-Netics alleges that it is a Texas limited liability company with a place of business in Lubbock, Texas. Filing 1 at 2 (¶ 4); Filing 31 at 2 (¶ 4).[3] Lite-Netics alleges that it sells patented magnetic light strands used to illuminate homes and businesses during the holidays. Filing 1 at 1 (¶ 2); Filing 31 at 1 (¶ 2). It identifies the patents at issue here as U.S. Patent No. 7,549,779 (the '779 Patent) and U.S. Patent No. 8,128,264 (the '264 Patent) (collectively, the Asserted Patents), which the inventor and company founder, Shawn Genenbacher, has assigned to Lite-Netics. Filing 1 at 3 (¶ 10); Filing 31 at 3 (¶ 10). Both patents describe the invention as "a light fixture assembly." Filing 1-1 at 2 ('779 Patent, abstract); Filing 31-1 at 2 (same); Filing 1-2 at 2 ('264 Patent, abstract); Filing 31-2 at 2 (same).[4] The light fixture assembly has "[a] neodymium disc magnet" ('779 Patent) or "[a] strong magnet" ('264 Patent) "embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces." Filing 1-1 at 2 ('779 Patent, abstract); Filing 1-2 at 2

---

[3] Citations to most documents are to the docket number and the docket page number (*e.g.*, Filing 13 at 2), not to any internal page number in the document, unless the Court finds it appropriate to cite to numbered paragraphs within such documents (*e.g.*, Filing 14-1 at 1 (Martini Decl., ¶ 1). Citations to pleadings are to the docket number, docket page number, and paragraph number (*e.g.*, Filing 1 at 2 (¶ 4)).

[4] For the sake of simplicity and consistency, further citations to the Asserted Patents will be to the attachments to Lite-Netics's original Complaint.

('264 Patent, abstract). Lite-Netics alleges that "[t]he patented products provide users with an easy, damage-free installation and effortless take-down." Filing 1 at 1 (¶ 2); Filing 31 at 1 (¶ 2).

In its Complaint filed August 31, 2022, (and its First Amended Complaint filed October 16, 2022), Lite-Netics provides the following image as an example of one embodiment of a magnetic light fixture disclosed in the Asserted Patents and the following photograph of its actual product:




Filing 1 at 4 (¶ 13), 5 (¶ 17); Filing 31 at 4 (¶ 13), 5 (¶ 17). Referring to Fig. 9A, Lite-Netics explains, "The magnetic light fixture includes a socket (8) configured to couple with a light bulb (7) at a first end and a base (3) at a second end. A magnet (1) is configured to be embedded in the base (3)." Filing 1 at 3 (¶ 13); Filing 31 at 3 (¶ 13). The Asserted Patents explain that the light fixture assembly also includes "[a] plastic protective coating **2**," "two retaining clips **5**," an optional "side clip **6**," and "a copper conductor **10**." Filing 1-1 at 7 ('779 Patent at 3:36–37, 3:46, 3:54); Filing 1-2 at 6 ('264 Patent at 3:57–59, 3:62, 4:1).

Lite-Netics alleges that, by 2017, Genenbacher had noticed that competing lighting companies were offering certain clip-on magnetic light fixtures that he believed infringed the Asserted Patents when added to a light string. Filing 1 at 6 (¶ 20); Filing 31 at 6 (¶ 20). Genenbacher instructed his counsel to send over thirty cease-and-desist letters, and one recipient was HBL. Filing 1 at 6 (¶ 20); Filing 31 at 6 (¶ 20). The record does not indicate that there were

3

any communications between Lite-Netics and HBL for the next five years. Subsequently, in spring 2022, Lite-Netics alleges that it learned that HBL is marketing a "Magnetic Cord" and a "Magnetic Clip" that Lite-Netics believes infringe the Asserted Patents. Filing 1 at 6 (¶ 21); Filing 31 at 6 (¶ 21). Lite-Netics filed its Complaint for Willful Patent Infringement against HBL initiating this action on August 31, 2022. Filing 1. Count I of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '779 Patent. Filing 1 at 7-9 (¶¶ 24–35). Count II of its Complaint asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '264 Patent. Filing 1 at 9–11 (¶¶ 35–48).

After the Court issued a TRO, Lite-Netics filed its First Amended Complaint for Willful Patent Infringement on October 16, 2022. Filing 31. Count I of its First Amended Complaint again asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '779 Patent. Filing 31 at 8-10 (¶¶ 27–39). Count II of its First Amended Complaint again asserts direct infringement, inducing infringement, and contributing to infringement of one or more claims of the '264 Patent. Filing 31 at 10–12 (¶¶ 40–52). One of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both." Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42).

In its Counterclaim filed September 30, 2022, HBL alleges that it is an Illinois limited liability company with a principal place of business in Omaha, Nebraska. Filing 11 at 1 (unnumbered first paragraph and ¶ 2).[5] HBL denies that its products infringe either of the

---

[5] HBL has not yet filed an Answer either separately or with its Counterclaim. Instead, on September 30, 2022, the same day it filed the Motion for TRO, it filed a Motion to Dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state claims on which relief can be granted. Filing 8. After Lite-Netics filed its First

Asserted Patents. It alleges that, among other differences, the Magnetic Cord has two embedded magnets per fixture protruding from the base, rather than one magnet flush with the base, and that the magnets it uses do not have the "pull strength" claimed in the Asserted Patents. Filing 11 at 2 (¶ 8). HBL alleges that it owns its own patent, U.S. Patent No. 11,333,309 (the '309 Patent), for its Magnetic Cord design. Filing 11 at 4 (¶ 14). HBL also contends that its Magnetic Clip is a separate "slip on" device that is not a light fixture assembly. Filing 11 at 2–3 (¶ 8).

HBL acknowledges that Lite-Netics's Complaint includes the following photograph of HBL's Magnetic Clip with a light fixture, and Lite-Netics includes with the Second Declaration of Shawn Genenbacher the following photograph of unmounted HBL Magnetic Clips:





Filing 1 at 7 (¶ 21) (image of mounted clip); Filing 31 at 7 (¶ 21) (image); Filing 13 at 10 (acknowledging that Lite-Netics includes photographs of the accused products in its Complaint); Filing 33-1 at 11 (¶ 19) (colored arrows inserted by Mr. Genenbacher omitted).

---

Amended Complaint on October 16, 2022, this Court denied HBL's Motion to Dismiss as moot and without prejudice to the filing of a pre-answer motion directed at the First Amended Complaint. Filing 36. HBL has not so far refiled a Motion To Dismiss.

HBL includes the '309 Patent as Exhibit H to its Counterclaims. Filing 11-8. One image of the patented product from the '309 Patent and a photo of the actual Magnetic Cord[6] from Lite-Netics's Complaint are shown below:




Filing 11 at 2 ('309 Patent, cover page image); Filing 1 at 6 (¶ 21) (photograph of device); Filing 31 at 6 (¶ 21) (same). The '309 Patent explains that "two magnets **20** and **50** [with **50** not shown in the image above] protrude from the base of a socket **10**," with "a pocket **30** shaped to receive a magnet **50**" and "drain holes **40** for the socket **10**." Filing 11-8 at 7 ('309 Patent, 2:17–18, 2:24–25, 2:65). The '309 Patent explains further that "a channel between magnets **20** and **50** further helps the circulation of air when socket **10** is magnetically fixed to a surface." Filing 11-8 at 7 ('309 Patent, 2:59–61).

In its Counterclaim against Lite-Netics, HBL asserts six causes of action. Count I asserts a federal claim for unfair competition and false advertising under 15 U.S.C. § 1125(a). Filing 11 at 7–9 (¶¶ 28–36). Count II asserts a claim of unfair competition under the Nebraska Consumer

---

[6] Although HBL's product is called a "Magnetic Cord," as these images show, the only parts of the product that are magnetic and stick to the gutter or other metal surface are the magnets in the base of each light fixture.

Protection Act, Neb. Rev. Stat. § 59-1602. Filing 11 at 9–10 (¶¶ 37–43). Count III asserts a claim for deceptive trade practices in violation of the Nebraska Deceptive Trade Practices Act, Neb. Rev. Stat. §§ 87-302 and 87-303. Filing 11 at 10–11 (¶¶ 44–49). Count IV asserts tortious interference with business relations and prospective business relations. Filing 11 at 11–12 (¶¶ 50–58). Count V asserts defamation. Filing 11 as 12–13 (¶¶ 59–65). Count VI asserts a claim of bad faith patent infringement communications under Colorado law, Colo. Rev. Stat. § 6-12-102 (2018). Filing 11 at 13–14 (¶¶ 66–69).[7]

## 2. *The Parties' Communications about Infringement*

The focus for purposes of the Motion now before the Court is Lite-Netics's recent conduct in the marketplace accusing HBL of misconduct. HBL alleges that it has been marketing and selling its Magnetic Clip product since before 2017. Filing 11 at 3 (¶ 9). It acknowledges that in 2017, it received a cease-and-desist letter from Lite-Netics and/or Mr. Genenbacher, through counsel. Filing 11 at 3 (¶ 9). A copy of that letter is attached to HBL's Counterclaim as Exhibit A. Filing 11-1. The letter advised HBL of the Asserted Patents, then states in pertinent part, as follows:

> We are now aware that you are currently using, offering to sell and selling light fixture assemblies provided by Daryl Holland, as shown in the image below. We would like to let you know that these light fixture assemblies may infringe one or more of the Genenbacher Patents. Please see attached Exhibit C for a comparison of the light fixture assembly in comparison to the Genenbacher Patents.
>
> [Image of Magnetic Clip omitted.]

---

[7] On October 21, 2022, Lite-Netics filed its Partial Motion to Dismiss Defendant/Counterclaim Plaintiff Nu Tsai Capital, LLC d/b/a Holiday Bright Lights' Count VI – Bad Faith Patent Infringement Communications Under Co Rev. Stat. § 6-12- 102 (2018) Counterclaim seeking dismissal of Count VI pursuant to Rule 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Filing 39. Lite-Netics's motion for partial dismissal of HBL's Counterclaim is not before the Court at this time.

> We ask that you stop selling these products or any other products that infringe the Genenbacher Patents. If you have any questions or if you would like to discuss a possible resolution of this matter, please do not hesitate to contact me.

Filing 11-1 at 2–3 (exhibits attached to the letter were not included with this filing). HBL alleges,

> This communication was facially and obviously wrong, since clips like the Magnetic Clip were expressly disclaimed by the inventor as inferior prior art in columns 1 and 2 of the Asserted Patents. Thus it would have been impossible for any reasonable investigation to conclude that the Magnetic Clips infringed.

Filing 11 at 3 (¶ 9). HBL alleges that "Lite-Netics did not attempt any relevant communications with HBL for almost five years, until 2022. HBL relied on this silence, and [HBL] continued to sell the Magnetic Clip." Filing 11 at 3 (¶ 10). Lite-Netics alleges in its First Amended Complaint that HBL never responded to its 2017 letter. Filing 31 at 6 (¶ 20).

HBL alleges that, over the years, it learned of complaints in the marketplace about Lite-Netics's light fixtures tending to fail in use because of moisture buildup when the lights were used outdoors as intended. Filing 11 at 3 (¶ 11). Lite-Netics states that it is unaware of receiving any complaints that its products failed in the field because of moisture buildup. Filing 21-1 at 2–3 (Genenbacher Decl. at ¶ 7). Lite-Netics contends that HBL has a "less than sterling reputation in the holiday lighting community" because it "has been known to look for ways to design around others' products, apparently to maximize their profits and avoid the middleman." Filing 21-1 at 3 (Genenbacher Decl. at ¶ 9). Indeed, in its TRO briefing, Lite-Netics repeatedly accuses HBL of "knocking off" other companies' products. *See, e.g.*, Filing 20 at 6, 7–9.

Even though the parties dispute whether Lite-Netics's products failed in the field, "HBL set out to invent an improvement over the Lite-Netics design." Filing 11 at 3 (¶ 12). Specifically,

> To provide customers an improved product resolving the moisture issues of Lite-Netics' fixtures, HBL devised its own proprietary moisture-mitigating design, incorporating it into the accused Magnetic Cords. In the improved design, two protruding magnets exist at the base of each light fixture, separated by a drain channel and having apertures (weep holes), facilitating evaporation of moisture built up [sic]. This new design works well.

Filing 11 at 3–4 (¶ 12); *see also* Filing 11-8 at 7 ('309 Patent, 1:33–60 (explaining the problems with the '779 Patent and summarizing the invention). HBL alleges that it "did not desire to, and did not, 'copy' any product of Lite-Netics." Filing 11 at 4 (¶ 13). HBL was granted its own patent, U.S. Patent No. 11,333,309 (the '309 Patent), for the Magnetic Cord design. Filing 11 at 4 (¶ 14); Filing 11-8 (Counterclaim, Exhibit H). The '779 Patent is identified as prior art in the '309 Patent, Filing 11-8 at 2, and HBL disclosed and discussed at least the '779 Patent in its own patent specification. Filing 11 at 4 (¶ 14); Filing 11-8 at 7 ('309 Patent at 1:31–45).

Notwithstanding HBL's own patent, on April 12, 2022, Lite-Netics sent HBL a cease-and-desist letter, through counsel, accusing HBL's Magnetic Cord of infringing the Asserted Patents, but not mentioning the Magnetic Clip. Filing 11 at 4 (¶ 16); Filing 11-2 (Counterclaim, Exhibit B (chart for comparison not included with this Exhibit)). HBL's counsel responded on April 19, 2022, pointing out reasons why the Magnetic Cord did not infringe the Asserted Patents and questioning whether the claims of the '779 patent were invalid as indefinite. Filing 11 at 5 (¶ 17); Filing 11-3 (Counterclaim Exhibit C). HBL alleges, "As of at least April 19, 2022, Lite-Netics and Genenbacher (and their counsel) were aware of HBL's noninfringement (both by the Magnetic Clip and the Magnetic Cord), and likely patent invalidity as well." Filing 11 at 5 (¶ 19). Lite-Netics points out that in HBL's response, HBL also states,

> Finally, your letter noted FRE 408, but did not supply a settlement demand. If your client has in mind a price for a fully paid-up release and covenant not to sue, my client will consider it under FRE 408 for purposes of achieving an increment of design freedom if it ever chose to change its design.

Filing 11-3 at 2 (Counterclaim, Exhibit C); Filing 20 at 9 (citing this language). From this language, Lite-Netics asks the Court to infer that such a request for settlement is "not exactly what someone so sure it is non-infringing would be requesting." Filing 20 at 9. Lite-Netics asserts that

Genenbacher was not interested in licensing or selling his patents to a competitor. Filing 21-1 at 4
(¶ 11).

Lite-Netics responded to HBL's April letter on May 27, 2022, reiterating accusations that
HBL's Magnetic Cords infringe the Asserted Patents, Filing 11 at 5-6 (¶ 22), because "the
magnet . . . does not protrude outside the perimeter . . . of the base," and including a photo of a
"pull test" demonstrating that the two magnets in HBL's product have a combined pull strength of
more than 5 pounds. Filing 11-5 at 2–3 (Counterclaim, Exhibit E). HBL contends this letter
provides no plausible factual showing to support a claim that the Magnetic Cord or Magnetic Clip
infringe every claim limitation of any claim of the Asserted Patents. Filing 11 at 6 (¶ 22). HBL
responded to this communication by email on June 21, 2022, reaffirming HBL's position that the
Magnetic Cord does not infringe the Asserted Patents. Filing 11 at 6 (¶ 23). HBL explained in that
letter, in pertinent parts,

> There is no infringement of the '779 patent at least because no single magnet has a
> pull strength greater than 5lbs (regardless of measurement technique). The picture
> in your letter supports this (showing 6.88lbs for two magnets acting together - not
> one).
>
> * * *
>
> There is no infringement of the '264 patent at least because the two magnets
> protrude below the base. The negative limitation you personally added during
> prosecution to overcome prior art does not describe perimeter protrusion, as your
> letter suggests. It is instead a negative limitation written broadly to make any type
> of protrusion (such as an item protruding below the base - seen in the Chou prior
> art you distinguished) exclude a product from the claim's scope.

Filing 11-6 at 2 (Counterclaim, Exhibit F).

### 3. Lite-Netics's Communications to HBL's Customers

HBL alleges that, despite its response to Lite-Netics's cease-and-desist letter in April, in
May 2022, Lite-Netics's counsel sent several letters to HBL's clients and customers "alerting"
them of activities allegedly infringing Lite-Netics's patents. See Filing 11 at 5 (¶ 20); Filing 11-4

10

(Counterclaim, Exhibit D). HBL "understands" that Ace Hardware Corp., Decorator's Warehouse, Novelty Lights, and Jabo's Ace Hardware are customers that received such letters. Filing 11 at 5 (¶ 20). Lite-Netics alleges that these communications were sent to its own customers after its customers asked how HBL could sell the same product as Lite-Netics's patented product. Filing 21-1 at 5 (Genenbacher Decl. at ¶ 14). As Lite-Netics points out, Filing 20 at 10, the letter submitted as Exhibit D to HBL's Counterclaim does not identify any alleged infringer.

HBL alleges that in September 2022, after Lite-Netics had filed this lawsuit, Lite-Netics sent letters or emails to HBL's clients and customers accusing HBL by name of infringing the Asserted Patents. Filing 11 at 6–7 (¶ 26); Filing 11-7 (Counterclaim, Exhibit G). Again, Lite-Netics contends that the correspondence was sent to its own top customers to notify them that Lite-Netics had taken action to protect the Asserted Patents against HBL's products. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 14). Lite-Netics asserts that it was unaware of any purported business relationship that these companies might have had with HBL when the communications were sent out, because the recipients were customers of Lite-Netics. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15). There is no evidence in the record that Lite-Netics had any exclusive agreement with any of these companies.

The key paragraph of this communication, as shown in Exhibit G to HBL's Counterclaim, states the following:

> We have become aware of recent attempts by other companies to make and sell similar products that infringe our patents. While we encourage healthy competition, copying of patented products does not promote innovation in our industry, nor does it recognize the efforts undertaken by Litenetics [sic] in developing its' [sic] products. For your information, Litenetics has filed a major patent infringement lawsuit against Holiday Bright Lights to include all legal rights and remedies to stop them from making and selling infringing products. We are also considering including any known company using or reselling the HBL products as co-defendants in this lawsuit. Litenetics has invested a significant amount of time,

effort, and resources in developing its intellectual property, and we will not allow
our patent rights to be trampled.

Filing 11-7 at 2. The communication ends with the following paragraph:

The following is the 1st page of the complaint. Should you need additional
information, please let us know.

Filing 11-7 at 2. Lite-Netics did indeed attach the first page of the Complaint in this action to this

communication. Filing 11-7 at 3; Filing 1 at 1.

HBL alleges that Lite-Netics knew that its statements in its September 2022

communications were false; that Lite-Netics sent these letters or emails with knowledge that its

patent infringement allegations against HBL are objectively baseless, and with intent to injure

HBL and its business; and that threats of this nature to HBL customers were misleading because,

even if Lite-Netics added purchasing parties as new defendants to the suit, controlling federal law

would lead to an immediate stay of claims against them. Filing 11 at 7 (¶ 26) (citing *In re Nintendo*

*of Am., Inc*., 756 F.3d 1363, 1364 (Fed. Cir. 2014) (granting mandamus)). HBL identifies some of

its clients and customers that received Lite-Netics's "letters and injurious threats" after Lite-Netics

filed this lawsuit as Novelty Lights, Inc., in Denver, Colorado; Jabo's Ace Hardware with

businesses throughout Texas; and Decorator's Warehouse with businesses in Arlington, Texas.

Lite-Netics alleges that the communications were proper because they fall within the "litigation

privilege." Filing 20 at 22–23; Filing 32 at 34–36.

### B.  Procedural Background

#### 1.  *The TRO Proceedings*

HBL filed a combined Motion for Temporary Restraining Order and Preliminary

Injunction shortly after noon on Friday, September 30, 2022. Filing 12. The request for a TRO,

like the request for a preliminary injunction now before the Court, was based on HBL's

counterclaims of tortious interference with business relationships and defamation. Filing 12 at 4;

Filing 12 at 6. No party requested an evidentiary hearing on the Motion for TRO. Therefore, after expiration of an expedited briefing schedule set by the Court, the Court entered a Memorandum and Order Regarding Defendant/Counterclaimant's Motion for Temporary Restraining Order and Temporary Restraining Order on October 7, 2022. In most pertinent part, the TRO ordered the following:

> [P]ending the hearing of HBL's application for a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure, Lite-Netics, along with its officers, directors, shareholders, and other agents, is temporarily restrained from making statements via letters, emails, Facebook, Twitter, or any other social media, mass media, direct marketing, robocalls, press releases, blogs, websites or otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer.

Filing 26 at 36. The primary basis for such temporary relief was the Court's conclusion that Lite-Netics's statements to customers on which HBL's tortious interference and defamation claims rely were "baseless." *See* Filing 26 at 17–24 (tortious interference), 25–26 (defamation). The Court also determined that the threat of irreparable injury to HBL's reputation and goodwill was sufficient and that HBL acted promptly to protect itself from such harm. Filing 26 at 27–30. The Court also concluded that the balance of equities and the public interest tipped in favor of granting the TRO. Filing 26 at 30–31.

There had been no mention of the doctrine of equivalents in Lite-Netics's original Complaint, any pre-suit communications between the parties, or any of the pre-suit communications to customers at issue here. Instead, the first mention of the doctrine of equivalents in this case was HBL's statement in its brief in support of its September 30, 2022, Motion to Dismiss that "Lite-Netics also did not plead Doctrine of Equivalents infringement." Filing 9 at 3; *see also* Filing 9 at 15 (explaining that "Lite-Netics cannot make, and in fact has not made, any plausible allegation of infringement under the doctrine of equivalents" for various reasons). HBL

did not mention the doctrine of equivalents in its brief in support of its Motion for TRO. Although Lite-Netics did not respond to HBL's Motion to Dismiss before the Court denied that Motion as moot, Lite-Netics did mention the doctrine of equivalents in its brief in opposition to the Motion for TRO. Specifically, Lite-Netics argued that "even if the Court does not adopt the construction to be advanced by Lite-Netics, [HBL's] products should be found to infringe under the doctrine of equivalents" because HBL "is simply cutting a component in half and using both pieces together." Filing 20 at 18. In a footnote, Lite-Netics asserted that "a plaintiff satisfies the pleading requirements for a doctrine of equivalents claim when it brings a claim for direct infringement." Filing 20 at 18 n.1.

In its TRO Order, the Court rejected Lite-Netics's argument that HBL's use of two magnets instead of one in its light fixture assembly in the Magnetic Cord falls within the scope of infringement under the doctrine of equivalents, and that the combined magnets in the Magnetic Cord have the required "pull strength" claimed in the Asserted Patents. The Court explained,

> Lite-Netics also is not saved by the doctrine of equivalents because Lite-Netics has cited no controlling authority—which in this instance means authority from the Federal Circuit Court of Appeals or the United States Supreme Court—that it is not required to plead "doctrine of equivalents" infringement and the Court has found none.

Filing 26 at 20. The Court then explained why the cases on which Lite-Netics relied did not demonstrate that Lite-Netics was not required to plead infringement under the doctrine of equivalents. Filing 26 at 20–21.[8] The Court continued,

---

[8] Lite-Netics cited a case from the Middle District of Alabama that, in turn, cites *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007), and *Spansion, Inc. v. Int'l Trade Comm'n*, 629 F.3d 1331, 1349 (Fed. Cir. 2010). As this Court explained in its TRO ruling, in *McZeal*, the plaintiff expressly pleaded "[t]he defendant's INTERNATIONAL WALKIE TALKIE machine physically have [sic] or perform all of the basic elements contained in the patent claims of the plaintiff and further infringes under the doctrine of equivalents." *McZeal*, 501 F.3d at 1357 (citing the Complaint at 14 and 56). The Court also explained that the decision in *Spansion* does not discuss pleading at all. Rather, it states, "To prove direct infringement, Tessera must establish by a preponderance of the evidence that one or more claims of the patent read on the accused device literally or under the doctrine of equivalents." *Spansion*, F.3d at 1349 (Fed. Cir. 2010) (internal quotation marks and citations omitted).

> [T]his Court believes that to assert a claim of infringement based on doctrine of equivalents under the prevailing *Twombley* and *Iqbal* pleading standard, the patent holder must plead a plausible factual basis for an equivalent of a claimed limitation. *See Ashcroft v. Iqbal*, 556 U.S. 662, 680–83 (2009); *see also Metricolor LLC v. L'Oreal S.A.*, 791 F. App'x 183 (Fed. Cir. 2019) (unpublished opinion) (affirming refusal to consider doctrine of equivalents mentioned for the first time in opposition to a motion to dismiss and not expressly pleaded). Lite-Netics has not done so. Its contention that a device with two magnets embedded in the base literally infringes a limitation stated in terms of a single magnet is baseless.

Filing 26 at 21.[9]

### 2. *Filings in Anticipation of the Preliminary Injunction Hearing*

On October 7, 2022, the Court entered a separate Order scheduling a hearing on HBL's Motion for Preliminary Injunction for October 17, 2022, as well as setting certain other requirements for the preliminary injunction hearing and setting a briefing schedule. Filing 27. Pursuant to a joint request from the parties, Filing 29, the Court reset the preliminary injunction hearing for October 24, 2022, and reset the briefing deadlines. Filing 30.

On October 16, 2022, the day before the deadline for supplemental briefs on the Motion for Preliminary Injunction, Lite-Netics filed its First Amended Complaint. Filing 31. As mentioned above, one of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both." Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42). Thus, Lite-Netics has now attempted to overcome the pleading deficiency in its original Complaint pointed out by HBL and the Court. HBL disputes the relevance of the belated allegations of infringement under the doctrine of equivalents, *see* Filing 34 at 2–3, but the Court will address that issue in due course.

---

[9] The Court also concluded that, assuming without deciding that Lite-Netics can legitimately assert that using two magnets infringes a claim expressly stated in terms of a single magnet under the doctrine of equivalents, the Magnetic Cord lacked other limitations set out in the Asserted Patents and that a TRO was appropriate on other grounds. Filing 26 at 21–24. Those grounds will be reiterated below.

Refocusing on procedural matters, Lite-Netics filed its lengthy Opposition to [HBL's] Motion for Preliminary Injunction shortly before the Court's deadline on October 17, 2022. Filing 32. Lite-Netics also filed an index of additional evidence. Filing 33. A few minutes later, HBL filed its concise Supplemental Brief in Support of Preliminary Injunction, Filing 34, and an index of additional evidence, Filing 35. On October 20, 2022, the parties filed reply briefs in the opposite order. HBL filed its Reply in Support of Counterclaim Plaintiff [HBL's] Motion For Preliminary Injunction shortly before the Court's deadline. Filing 37. A few minutes later, Lite-Netics filed its Reply Brief to [HBL's] Supplemental Brief in Support of Preliminary Injunction. Filing 38. Neither party filed additional evidence with its reply.

### 3. The Preliminary Injunction Hearing

No party informed the Court of its intent to present live testimony at the preliminary injunction hearing by the deadline set by the Court. Consequently, the hearing on the Motion for Preliminary Injunction on October 24, 2022, consisted of arguments of counsel. The parties also offered some of the evidence previously submitted to the record as exhibits to facilitate their arguments. HBL offered and the Court admitted as exhibits a Declaration of Richard Martini, Filing 14-1, as Exhibit 101; a declaration of Rich Firneno, a customer of HBL, Filing 35-1, as Exhibit 102; the '309 Patent, Filing 10-2, as Exhibit 103; the prosecution history of the '779 Patent, Filing 10-3, as Exhibit 104; and the prosecution history of the '264 Patent, Filing 10-4, as Exhibit 105. In addition, HBL offered a portion of Lite-Netics's magnetic light cord as Demonstrative Exhibit 106; a portion of HBL's Magnetic Cord as Demonstrative Exhibit 107; and one Magnetic Clip as Demonstrative Exhibit 108. Lite-Netics offered and the Court admitted as exhibits the two declarations of Shawn Genenbacher, Filing 21-1 and Filing 33-1, as Exhibits 1 and 2, respectively. Lite-Netics also offered and the Court admitted four prior art patents, consisting of Dougan, Filing

33-2, as Exhibit 3; Chou, Filing 33-3, as Exhibit 4; Hofer, Filing 33-4, as Exhibit 5; and Clement, Filing 33-5, as Exhibit 6.

The parties' arguments were spirited and informative. At the end of the hearing, the parties acknowledged that the order resetting the preliminary injunction hearing, Filing 30, had extended the TRO for a second fourteen-day period and that the TRO would continue for the second full fourteen-day period or until the Court filed this preliminary injunction ruling.

## II. LEGAL ANALYSIS

### A. Standards for a Preliminary Injunction

Rule 65 of the Federal Rules of Civil Procedure provides, in part, "The court may issue a preliminary injunction only on notice to the adverse party." Fed. R. Civ. P. 65(a)(1). Rule 65(a)(2) also provides for consolidation of the preliminary injunction hearing with trial on the merits. Fed. R. Civ. P. 65(a)(2). The adverse party here, Lite-Netics, has received notice of the request for a preliminary injunction; no party has suggested that the preliminary injunction hearing should be consolidated with trial on the merits; and the Court does not find such consolidation to be appropriate.[10]

Rule 65 does not identify the standard the Court must apply in deciding whether or not to grant a request for a preliminary injunction. The Eighth Circuit Court of Appeals has explained that "the standard for analyzing a motion for a temporary restraining order is the same as [the

---

[10] Lite-Netics suggested in opposition to the Motion for Temporary Restraining Order and Preliminary Injunction, however, that it was inappropriate for the Court to decide whether allegations of infringement were in bad faith without ample discovery, briefing, and claim construction in a *Markman* hearing. Filing 20 at 17. The Court was not persuaded by that contention because such a rule would also mean that a court could never grant a patent holder a TRO to enjoin infringement by a competitor, which clearly is not the case. Filing 26 at 18–19. The Court also pointed out that the likelihood of success requirement for a TRO or preliminary injunction involves only demonstration of a "fair chance of prevailing," not a certainty of prevailing, and that a TRO is frequently granted before discovery and even without notice to the opposing party. Filing 26 at 19. Similarly, a preliminary injunction may be granted before discovery and the purpose of a preliminary injunction is to maintain the status quo pending litigation not to resolve finally any question presented in the litigation. *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 664 (8th Cir. 2022).

standard for analyzing] a motion for a preliminary injunction." *Tumey v. Mycroft AI, Inc.*, 27 F.4th 657, 665 (8th Cir. 2022). Thus, to obtain either a TRO or a preliminary injunction, "'[a] plaintiff . . . must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest.'" *Tumey*, 27 F.4th at 664 (bracketed numbers inserted) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008), and also citing *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc)).[11] No single factor is dispositive. *Id.* at 665. Furthermore, a preliminary injunction is an extraordinary remedy never awarded as of right; the primary function of a preliminary injunction is preserving the status quo until the district court has an opportunity to grant full effective relief; and requiring a non-movant to take affirmative action goes beyond the purpose of a preliminary injunction. *Id.* at 664. Lastly, the burden of establishing the propriety of a preliminary injunction is on the movant. *Id.*

The parties' briefing on the request for a preliminary injunction after the Court issued its TRO ruling focused more tightly on two issues: (1) whether Lite-Netics's allegations of infringement by HBL were "baseless," which relates to the first *Winter* factor concerning HBL's likelihood of success on the merits of its tort claims; and (2) whether HBL can show irreparable harm, rather than mere speculative harm, which relates to the second *Winter* factor. The parties' oral arguments at the preliminary injunction hearing were almost entirely devoted to the first issue.

---

[11] Courts in this Circuit have for decades called the considerations for determining whether to grant a TRO or a preliminary injunction the "*Dataphase* factors," set out in *Dataphase Sys., Inc. v. C.L. Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The much more recent statements of the pertinent considerations by the Supreme Court in *Winter* and by the Eighth Circuit Court of Appeals in *Tumey*, while identifying the same considerations, give them sufficiently different definition to warrant reference to the "*Winter* factors" rather than the "*Dataphase* factors." *Compare Winter*, 555 U.S. at 20 (as quoted in the body of this decision), with *Dataphase*, 640 F.2d at 114 ("[W]hether a preliminary injunction should issue involves consideration of (1) the threat of irreparable harm to the movant; (2) the state of balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that movant will succeed on the merits; and (4) the public interest.").

The Court will address (and/or reassess) its prior findings on all the *Winter* factors in light of the parties' additional arguments and evidence relating to whether a preliminary injunction should now replace the TRO.[12]

### B. Likelihood of Success on the Merits

The Eighth Circuit Court of Appeals has stated "that '[w]hile no single [*Winter*] factor is determinative, the probability of success factor is the most significant.'" *Tumey*, 27 F.4th at 665 (quoting *Carson v. Simon*, 978 F.3d 1051, 1059 (8th Cir. 2020) (cleaned up)). This factor requires the movant to demonstrate "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC v. Brava I.P., LLC*, 27 F.4th 587, 593 (8th Cir. 2022) (quoting *Richland/Wilkin Joint Powers Auth. v. U.S. Army Corps of Eng'rs*, 826 F.3d 1030, 1041 (8th Cir. 2016)). The likelihood of success is considered in light of the elements of the movant's claim or claims. *See, e.g., 301, 712, 2103 & 3151 LLC v. City of Minneapolis*, 27 F.4th 1377, 1383 (8th Cir. 2022) (analyzing likelihood of success in light of the elements of the movant's "takings" claim). The parties have not disputed this statement of the applicable standards. Indeed, HBL emphasized at the preliminary injunction hearing that the applicable standard considers whether the movant has a "fair chance of prevailing on the merits" not whether the movant finally prevails on the merits. The Court observed in its TRO ruling—and reiterates now—that it is not predetermining which party will prevail, only considering whether HBL's showing is sufficient to demonstrate that it has "at least a 'fair chance of prevailing.'" *Wildhawk Invs., LLC*, 27 F.4th at 593.

---

[12] It is not altogether clear whether any appeal of this Court's decisions on the Motion for TRO and the Motion for a Preliminary Injunction would be to the Federal Circuit Court of Appeals or the Eighth Circuit Court of Appeals, despite certain patent law matters being at issue. Both parties acknowledged and applied Eighth Circuit standards for a TRO or preliminary injunction. *See, e.g.,* Filing 13 at 3–4; Filing 20 at 11–13. They also referred to the *Dataphase* and *Winter* factors in their oral arguments on the preliminary injunction.

1.  *HBL has a Fair Chance of Prevailing on Its Tortious Interference Claim*

    a.   Applicable Law

In its TRO ruling, the Court pointed out that, under Nebraska law,

> To succeed on a claim for tortious interference with a business relationship or expectancy, a plaintiff must prove (1) the existence of a valid business relationship or expectancy, (2) knowledge by the interferer of the relationship or expectancy, (3) an unjustified intentional act of interference on the part of the interferer, (4) proof that the interference caused the harm sustained, and (5) damage to the party whose relationship or expectancy was disrupted. In order to be actionable, interference with a business relationship must be both intentional and unjustified.

*Dick v. Koski Pro. Grp., P.C.*, 950 N.W.2d 321, 377 (Neb. 2020) (citations omitted), *opinion modified on other grounds on denial of reh'g*, 953 N.W.2d 257 (Neb. 2021). A contractual relationship between HBL and its customers is not required. *Id.* (requiring "a business relationship or expectancy").

In its TRO ruling, the Court found that the critical element was whether any interference by Lite-Netics was "improper" and "unjustified." *Koski Pro. Grp.*, 950 N.W.2d at 377 (third element). Lite-Netics is correct that "[s]tate tort claims based on enforcing a patent, including for tortious interference, are preempted by federal patent laws, unless the claimant can show that the patent holder acted in bad faith." *Energy Heating, LLC v. Heat On-The-Fly, LLC*, 889 F.3d 1291, 1304 (Fed. Cir. 2018) (citing *800 Adept, Inc. v. Murex Sec., Ltd.*, 539 F.3d 1354, 1369 (Fed. Cir. 2008)). In explaining this "bad faith" requirement, the Federal Circuit Court of Appeals explained that "[a] plaintiff claiming that a patent holder has engaged in wrongful conduct by asserting claims of patent infringement must establish that the claims of infringement were objectively baseless." *Matthews Int'l Corp. v. Biosafe Eng'g, LLC*, 695 F.3d 1322, 1332 (Fed. Cir. 2012) (quoting *Globetrotter Software, Inc. v. Elan Computer Grp., Inc.*, 362 F.3d 1367, 1374 (Fed. Cir. 2004)).

This Court previously concluded that this "bad faith" requirement was not an impediment to HBL's tortious interference claim in this case.

As to the "improper or unjustified" element of the tort claim, the Nebraska Supreme Court explained,

> Factors to consider in determining whether interference with a business relationship was unjustified include: (1) the nature of the actor's conduct, (2) the actor's motive, (3) the interests of the other with which the actor's conduct interferes, (4) the interests sought to be advanced by the actor, (5) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (6) the proximity or remoteness of the actor's conduct to the interference, and (7) the relations between the parties. The issue is whether, upon a consideration of the relative significance of the factors involved, the conduct should be permitted without liability, despite its effect of harm to another.

*Koski Pro. Grp., P.C.*, 950 N.W.2d at 378 (citations omitted). Under Nebraska law, it is clear that "valid competition," involving truthful statements, cannot be the basis for a tortious interference claim. *Id.* Indeed, even communications that are malicious are not enough by themselves to impose liability, because "if the information provided is truthful, the interference is not unjustified." *Thompson v. Johnson*, 910 N.W.2d 800, 807–09 (Neb. 2018).

The parties have not disputed these statements of the applicable law. Therefore, the Court turns to HBL's likelihood of success on proving its tortious interference claim. In its TRO ruling, the Court found that HBL had made sufficiently plausible allegations that Lite-Netics's communications to HBL's customers were untruthful, known by Lite-Netics to be untruthful, and were made in bad faith (i.e., baseless), which takes those communications out of the realm of "valid competition," thus demonstrating a fair chance of prevailing on a tortious interference claim that is not preempted. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09; *Energy Heating, LLC*, 889 F.3d at 1304. Lite-Netics now asks the Court to reach the opposite conclusion at the preliminary injunction stage of the case.

21

      b.  HBL is Likely to Succeed in Showing Lite-Netics Knew of
         HBL's Business Relationships

In its TRO ruling, the Court concluded that there are at least reasonable inferences that HBL had business relationships or expectancies with the companies to which Lite-Netics sent its allegedly tortious communications and that Lite-Netics knew of these business relationships. *Koski Pro. Grp.*, 950 N.W.2d at 377 (first and second elements). The inferences of relationships arise from evidence that the businesses provided information about Lite-Netics's communications to HBL, as well as evidence that customers have called HBL in response to Lite-Netics's communications to them expressing their worries and questioning whether HBL will be able to meet supply commitments for the named products as well as how the litigation would affect their orders and shipments. Filing 15-1 at 3 (Martini Decl., ¶ 11). At the TRO state, Lite-Netics professed not to know of such relationships because these companies were customers of Lite-Netics. Filing 21-1 at 6 (Genenbacher Decl. at ¶ 15).[13] Lite-Netics had not—and still has not—identified any exclusive relationship agreement it had with any of these customers, however, that would preclude them from having relationships with other vendors of similar products. At most, Lite-Netics reiterated its founder's belief that these were Lite-Netics's customers. At the TRO stage, the Court concluded that inferences that Lite-Netics knew of the relationships arising from its targeting of these businesses are sufficient to overcome Lite-Netics's denials. The Court observed that one does not ordinarily threaten one's own customers with a lawsuit, as the Court inferred Lite-Netics did in the September 2022 communications.

---

[13] As the Court observed in its TRO ruling, Lite-Netics's assertions that it did not know these companies were HBL's customers is rather disingenuous when retailers routinely offer similar products from various vendors. Also, all Lite-Netics would have to do to ascertain whether one of its customers was also selling products from another vendor is check the retailer's website or walk into its store.

Lite-Netics does not challenge these conclusions in its opposition to the Motion for Preliminary Injunction, and the Court reaffirms them now.

### c.  HBL is Likely to Succeed in Showing Lite-Netics's Allegations of Infringement Were Baseless

#### i.  Allegations of Literal Infringement are Likely Baseless

##### (1) The Magnetic Clip Does Not Literally Infringe the Asserted Patents

In its TRO ruling, the Court found that in communications to HBL's customers, Lite-Netics accused HBL of tortious conduct—patent infringement—but HBL had plausibly shown that Lite-Netics knew that such a claim was baseless, thus not protected by its truth. *Cf. Koski Pro. Grp.*, 950 N.W.2d at 378; *Thompson*, 910 N.W.2d at 807–09. At least at the TRO stage of the litigation, the Court could not see how Lite-Netics could reasonably believe that HBL's Magnetic Clips infringe or copy the Asserted Patents.[14] The independent claims of both Asserted Patents are for "[a] light fixture assembly" with a magnet "embedded in the base," and in the '779 Patent, that base is "attached to the second end of the light bulb socket," and in the '264 Patent, that base is "integrally attached to the second end of the light bulb socket." Filing 1-1 at 7 ('779 Patent, 4:52–63 (Claim **1**)); Filing 1-2 at 8 ('264 Patent, 5:20–32 (Claim **1**)). In the TRO ruling, the Court found that the Magnetic Clips are not "light fixture assemblies" at all, but devices that clip onto light fixture assemblies. Furthermore, the Court found that the Magnetic Clips are neither "a base attached to the second end of the light bulb socket" nor "a base integrally attached to the second

---

[14] As a preliminary matter, in the TRO ruling, the Court observed that Lite-Netics used "designing around" a patent in its TRO briefing as if it were a bad thing. The Court explained that "designing around" a patent is not prohibited by statute or caselaw and, indeed, is encouraged by the patent law. *See WMS Gaming, Inc. v. Int'l Game Tech.*, 184 F.3d 1339, 1355 (Fed. Cir. 1999) (explaining that a court "should bear in mind that the patent law encourages competitors to design or invent around existing patents" (citing *Westvaco Corp. v. International Paper Co.*, 991 F.2d 735, 745 (Fed. Cir. 1993)). Lite-Netics had not then and has not now identified any authority suggesting that "designing around" a patent is somehow tortious. Lite-Netics has not reiterated its use of "designing around" as somehow constituting misconduct in opposition to the Motion for Preliminary Injunction.

end of the light bulb socket" because they clip onto the outside of the light bulb socket base. Furthermore, the Court pointed out that the '779 Patent expressly distinguishes the claimed invention from and thus disclaims "clips." *See* Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights). Indeed, the Court pointed out that Mr. Genenbacher continues to maintain that the '779 Patent overcame the "cumbersome[ness]" of clips. Filing 21-1 at 2 (¶ 5).

In opposition to the Motion for Preliminary Injunction, Lite-Netics now clarifies that the Magnetic Clip does not "directly" infringe the '779 Patent but only "indirectly" infringes it, because it allows (induces and contributes to) end users' infringement of the '779 Patent. Filing 32 at 22. Lite-Netics argues that this is so because when the Magnetic Clip attaches to the base of a light fixture on a string of lights, the Magnetic Clip and base of the light fixture form a singular base. Filing 32 at 23. Furthermore, Lite-Netics argues that the Magnetic Clip literally infringes the '779 Patent, because it includes a neodymium magnet with sufficient pull force. Filing 32 at 23. Lite-Netics contends that the Magnetic Clip literally (but only indirectly) infringes the '264 Patent because when the Magnetic Clip attaches to a light fixture, the Magnetic Clip is part of the base of the light fixture, Filing 32 at 30, and its magnet is embedded into the base of the light fixture assembly and therefore does not protrude outside the base, Filing 32 at 32.[15]

At the preliminary injunction hearing, Lite-Netics developed this argument further. Lite-Netics argued that simply clipping the Magnetic Clip onto the base of an existing magnet is actually making the Magnetic Clip one and the same with the base. Lite-Netics argued that just because one element is claimed does not mean that that element has to be comprised of only one

---

[15] Lite-Netics also argues that the Magnetic Clip indirectly infringes claim **2** of the '264 Patent. Filing 32 at 33. However, infringement of claim **2**, a dependent claim, is irrelevant if the Magnetic Clip does not infringe the independent claim 1, on which claim **2** depends.

component, and when the clip is installed, the base becomes a two-component base. Lite-Netics also points to the description of an alternative embodiment in the specification of the '264 patent in which the light assembly can be separated into two components such that the magnet can be replaced without replacing the entire light assembly.

In support of its Motion for Preliminary Injunction, as to the Magnetic Clip, HBL argues that there is no inducement of or contribution to literal infringement because the Magnetic Clip does not form "a singular base" when it is put on the base of a light fixture because it "pockets" the base of the light fixture and clips onto the external electric cord. Filing 34 at 5. HBL points out that this is exactly the "attachment" structure disclaimed in the specifications of the Asserted Patents. Filing 34 at 5. At the preliminary injunction hearing, HBL contended that the Magnetic Clip does not become part of a two-component base, because it never attaches to the light fixture at all. Rather, HBL asserts, the arms on the Magnetic Clip attach to the electric cord.

Lite-Netics's new and renewed arguments do not convince the Court that it was wrong in its conclusion that HBL has a fair chance of prevailing on its claim that Lite-Netics's allegations of literal infringement by the Magnetic Clips are baseless. *See Wildhawk Invs., LLC*, 27 F.4th at 593. Even though Lite-Netics now focuses on the purported attachment of the Magnetic Clip to the base of the light fixture as the aspect that induces or contributes to infringement of the Asserted Patents, the Court remains unpersuaded. The Court reiterates that the Magnetic Clips are neither "a base attached to the second end of the light bulb socket" nor "a base integrally attached to the second end of the light bulb socket," as claimed in the Asserted Patents. Filing 1-1 at 7 ('779 Patent, 4:52–63 (Claim **1**)); Filing 1-2 at 8 ('264 Patent, 5:20–32 (Claim **1**)). As HBL argues, the Magnetic Clip does not "attach" to the base of the light fixture to form "a singular base," as Lite-Netics contends; instead, it "pockets" the base of the light fixture and is attached only to the

external electric cord. Filing 37 at 5. The Court corrects or clarifies its prior statement that the Magnetic Clips clip onto the outside of the light bulb socket base, because the illustrations—and the opportunity to examine the example of a Magnetic Clip provided as a demonstrative exhibit at the preliminary injunction hearing—make clear that the Magnetic Clips instead clip onto the electric cord not the light fixture or its base. *See, e.g.,* Filing 1 at 7 (¶ 21) (image); Filing 31 at 7 (¶ 21) (image), included above, page 5.

Furthermore, even if "integrally attached" means "discrete parts physically joined together as a unit without each part losing its own separate identity," *In re Cuozzo Speed Techs., LLC*, 793 F.3d 1268, 1280 (Fed. Cir. 2015), something more than "touching" is indicated by "attached." *See, e.g., Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021) (construing fixed, attached, and fastened as synonyms). The Court does not accept Lite-Netics's contention that the clip is "integrally attached" to the light fixture simply because it fits "snugly" to the bottom of the light fixture. Filing 32 at 32. There is no means of "attachment" at all to the bottom or base of the light fixture, only to the electrical cord. Nor does the Court accept Lite-Netics's contention at the preliminary injunction hearing that the Magnetic Clip is attached to the bottom of the light fixture or base, because "pressure" is applied to the base of the lamp when the Magnetic Clip is installed, so attachment to the wires makes no difference. No ordinary person or person of ordinary skill in the art would understand external "pressure" constitutes "attachment." Lite-Netics has pointed to nothing to suggest such a meaning is intended by "attached" or that a person of ordinary skill in the art would give "attached" such a meaning.

Indeed, Lite-Netics went so far at the preliminary injunction hearing as to argue that the electrical wires of the cord are actually part of the base at that point because they have been installed into the base or into the light fixture and so they're coming out of the base and become

26

part of it. Nowhere does the '264 explain or suggest that the electrical wires are part of the "base" of the light fixture. Instead, the summary of the invention discusses an embodiment "with electrical wires . . . inserted through the side of the socket," then describes a "base" that "includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor." Filing 1-2 at 6 ('264 Patent, 2:13–17). The wires are never described as part of or a component of the "base." *See also* Filing 1-2 at 7 (3:61–64) ("A molded wire clamp **4** in the base helps to hold the electrical wires **9** in contact with a copper conductor **10** in the socket **8** when the base **3** and socket **8** are assembled, as shown in FIG. 1."), (4:9–11) ("The conductors **10** provide electrical connection between the wires **9** and the base of the light bulb (not shown)[in Fig. 5]."); Filing 1-2 at 8 (Claim **1**) (5:20–27) (claiming a light fixture assembly comprising "a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places a light bulb inserted into the first end in electrical contact with said electrical wires" and "a base integrally attached to the second end of the light bulb socket"). Lite-Netics disputes HBL's contention that the Magnetic Clip does not infringe because it does not attach to the base when Lite-Netics does not even state a limitation in the claim about what it has to be attached to. This argument is simply contrary to the claim language of the '264 Patent, which expressly claims "a base integrally attached to the second end of the light bulb socket" and "a magnet embedded in the base." Filing 1-2 at 8 (5:26–28). The Magnetic Clip has a magnet that is not embedded in the base of the light bulb socket but embedded in a clip, and that clip is not attached to the light bulb socket but attached to the electrical cords.

The Court also reiterates that the '779 Patent (like the '264 Patent) expressly distinguishes the claimed invention from and thus disclaims external "clips" that attach to the electrical cord *See*

Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights); *see also* Filing 1-2 at 6 ('264 Patent, 139–2:4). Both Asserted Patents criticize the Dougan prior art that "provides a clip that is secured to the electrical cord that connects a string of lights." Filing 1-1 at 6 (1:36–38). The stated criticism is,

> Dougan requires a separate set of clips/wedges to be purchased and then added to the string of lights before mounting them. While the insertion and removal of the wedges from the fascia and soffit may seem simple in theory, it is likely the user will encounter some difficulties in this operation.

Filing 1-1 at 6 (1:47–52). They also criticize the Clement prior art that "provides a member that is clipped to the electrical cord of a string of decorative lights," but "uses a magnet to secure it to metal surfaces." Filing 1-2 at 6 (1:55–58). The stated criticism is,

> Clement still requires the user to purchase a separate set of members and then clip them onto the electrical cord of the light string before mounting the lights, requiring additional time and effort.

Filing 1-1 at 6 (1:60–64). The desire that the Asserted Patents claim to fulfill is for "a method for temporarily mounting a string of decorative lights to a metal surface without the need for damaging the surface and without the need to install additional items to the light string." Filing 1-1 at 6 (1:65–2:2). The Magnetic Clips like the Dougan and Clement prior art involve "a separate set of clips" (or "a separate set of members") that clip to the electrical cord of the string of lights and, thus, involve "the need to install additional items to the light string."

Finally, as to literal infringement by the Magnetic Clip, at the preliminary injunction hearing, Lite-Netics pointed to the description of an alternative embodiment in the specification of the '264 patent described as a light assembly that can be separated into two components such that the magnet can be replaced without replacing the entire light assembly. Lite-Netics argued this means that the Magnetic Clip contributes to literal infringement of the '264 Patent because it is a separate end piece. The pertinent part of the description is the following:

28

> In an alternative embodiment not shown in the drawings, the base of the light assembly can be separated into two components such that the magnet can be replaced without replacing the entire light assembly. A separate end piece for the base contains a magnet embedded as described above in reference to other embodiments. One end of the separate end can be removably joined to the main base of the light assembly. The manner of joining can be by threading the main base and the separate end piece to allow the end piece with magnet embedded to be screwed into the main base of the light assembly. Other means of attachment such as a quick disconnect type snap may be employed without departing from the scope and spirit of the invention. Should the magnet fail, or should it become dislodged from the separate end piece, the separate end piece can be removed and replaced with a new one.

Filing 1-2 at 7–8 (4:55–5:3). Lite-Netics described this part of the description as talking about clipping something onto the magnet or to the base of the lamp in the actual specifications, so Lite-Netics argued that to say that Lite-Netics disclaimed clipping the magnet onto the base of the lamp would be contrary to the '264 Patent's own specification. HBL argues that this alternative embodiment is talking about different bases, and in the context of the description, the base attaches to the socket for the light bulb. HBL contends that this embodiment does not describe a clip-on magnet.

Examining the description more carefully, it is apparent that what is described is a base with two components, in which a separate end piece for the base contains a magnet. Filing 1-2 at 7 (4:55–60). One end of the separate end piece can be "removably joined to the main base of the light assembly," for example, by threading the main base and the separate end piece together (*i.e.*, screwing together the two components of the base) or by using a "quick disconnect type snap." Filing 1-2 at 7 (4:60–66). It is clear, however, that the separate end piece must be "attached" to the "main base." Filing 1-2 at 7 (4:65) (referring to "means of attachment" of the separate end piece to the main base). Again, the Magnetic Clip is not "attached" to the base, let alone to any "main base" and/or "separate end piece," by screwing it into either of those components, snapping it into

either of those components, or by any "other means of attachment," for the reasons explained above as to the meaning of "attach." Rather, it attaches to the electrical cord.

Thus, HBL is likely to prevail on its claim that Lite-Netics's allegations that the Magnetic Clip infringes the Asserted Patents on a literal infringement theory is baseless.

### (2) The Magnetic Cord Does Not Literally Infringe the Asserted Patents

At the TRO stage of the litigation, the Court could not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes or copies the '779 Patent. This is so, the Court explained, where the Magnetic Cord has two magnets, each with a pull strength less than five pounds, contrary to the requirements of claim **1** of the '779 Patent. That claim of the '779 Patent claims "a [*i.e.* one] neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds." Filing 1-1 at 7 ('799 Patent at 4:62–63)). The Court observed that nowhere does the '779 Patent state or suggest that two or a plurality of magnets may be used in an embodiment of the Patent.

In its supplemental brief in opposition to HBL's Motion for a Preliminary Injunction, Lite-Netics argues that its claim that HBL's Magnetic Cord literally infringes the Asserted Patents is not baseless. Filing 32 at 14.[16] Lite-Netics relies on authority it had not previously cited and an argument that is best described as a repackaging of its prior argument that the use of two magnets does not avoid infringement. *See* Filing 20 at 17. Specifically, Lite-Netics now asserts that the Federal Circuit has repeatedly held that "a" or "an" means "one or more" when used in claims containing the open-ended transitional phrase "comprising." Filing 32 at 14. Thus, Lite-Netics argues that references to "a neodymium magnet" in the Asserted Patents should be read as "one or

---

[16] To be precise, Lite-Netics asserts more baldly that "[t]he Magnetic Cord literally infringes" elements of the '779 patent, Filing 32 at 14, and the '264 patent, Filing 32 at 26.

more neodymium magnets." Filing 32 at 15. Similarly, it argues that the "five-pound pull force" limitation in the '779 Patent literally covers the aggregate pull force from one or more magnets. Filing 32 at 15.

In its supplemental briefs, HBL relies on its prior briefing and the Court's reasoning in its TRO ruling. Filing 34 at 1; Filing 37 at 2. Somewhat more specifically, in its reply, HBL asserts that, notwithstanding the Court's analysis in its TRO ruling, Lite-Netics "brazenly doubles down on its irrational 'two-is-one' argument, stating that the last element of claim 1 [of the '779 Patent] requires 'one or more magnets' that have an aggregated pull strength of more than 5 pounds." Filing 34 at 2. HBL asserts that this argument is inconsistent with plain English and common sense because quantity of magnets is not the issue, the quality of the one magnet is. By "quality of the one magnet," HBL means that unless one identifiable magnet in an HBL Magnetic Cord has the right pull strength, there is no infringement. Filing 34 at 2. To put it another way, HBL argues that the intrinsic record does not contemplate more than one magnet, let alone combined pull strength of two side-by-side magnets. Filing 37 at 3. At the preliminary injunction hearing, HBL described its interpretation as consistent with the "public notice function" of patents which says that a competitor gets to rely on how a patent holder voluntarily wrote the patent claim.

Lite-Netics's belated argument is partially correct. As the Federal Circuit Court of Appeals has explained, "This court has 'repeatedly emphasized that an indefinite article "a" or "an" in patent parlance carries the meaning of "one or more" in open-ended claims containing the transitional phrase "comprising."'" *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). What Lite-Netics overlooked in its supplemental briefing is that there are exceptions to this rule, although they are "extremely limited." *Id.* The exceptions arise when a patentee

31

"'evince[s] a clear intent' to limit 'a' or 'an' to 'one.'" *Id.*  (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc*., 512 F.3d 1338, 1342 (Fed. Cir. 2008)). At the preliminary injunction hearing, Lite-Netics did acknowledge that the rule that "a" or "an" means "one or more" does have an exception when there is clear expression by the patentee that it has to be only one. Lite-Netics then argued that it never included such a clear expression in the Asserted Patents, because it never said one magnet could not be two. Lite-Netics asserted that anytime the specification is silent, as it is here, as to whether there are one or two of something, the courts "always" interpret the limitation broadly to mean "one or two," as in "one or two neodymium magnets." Thus, Lite-Netics argued at the preliminary injunction hearing that the Magnetic Cord literally infringes the Asserted Patents.

Lite-Netics overstates its case when it asserts that "silence" on the number of items when "a" or "an" is used is "always" interpreted to mean "one or more." In *Convolve*, the Federal Circuit explained, "absent a clear intent in the claims themselves, the specification, or the prosecution history, we interpret 'a processor' as 'one or more processors.'" *Convolve, Inc.*, 812 F.3d at 1321. In short, the context in which "a" or "an" is used is important. *See McRO, Inc. v. Bandai Namco Games Am. Inc*., 959 F.3d 1091, 1099 (Fed. Cir. 2020) (explaining "the word 'a' is hardly the only relevant textual evidence of meaning"); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1342 (Fed. Cir. 2016) ("While we have held that the use of a singular indefinite article with a claim feature may support an interpretation of 'one or more' of those claim features, *see, e.g., Free Motion Fitness, Inc. v. Cybex Int'l, Inc*., 423 F.3d 1343, 1350 (Fed. Cir. 2005), the context of claim 31 shows that this is not such a case.").

The Federal Circuit Court of Appeals explained how the exception to the rule that "a" or "an" means "one or more" arises in *Insituform Technologies, Inc. v. Cat Contracting, Inc.*, 99 F.3d 1098 (Fed. Cir. 1996). In that case, the Court explained,

Looking first to the claim language, we note preliminarily that Insituform has conceded that claim 1 contains no terms that have a specialized or technical meaning. Furthermore, nothing in the text of claim 1 suggests the use of more than one cup. Specifically, claim 1 refers to "a cup" and "the cup" repeatedly, suggesting that only one cup is involved. Indeed, rather than describing the process in terms of more than one cup, claim 1 specifically describes using the same cup repeatedly. Also, claim 1 uses the phrase "region of vacuum application" in a manner indicating that only one such region exists at any given time. This use of the phrase "region of vacuum application" is thus inconsistent with the use of more than one cup at any given time, as each cup creates its own associated region of vacuum application. Likewise, it is also inconsistent with the creation of a continuous, rather than discontinuous, vacuum.

*Insituform Techs., Inc*., 99 F.3d at 1105–06. The court also found the text of the specification and the drawings did not disclose the use of more than one cup. *Id*. at 1106–07.

Similarly, in *Abtox, Inc. v. Exitron Corp*., 122 F.3d 1019 (Fed. Cir.), *opinion amended on reh'g*, 131 F.3d 1009 (Fed. Cir. 1997), on which HBL relies, the Federal Circuit acknowledged first that "patent claim parlance also recognizes that an article can carry the meaning of 'one or more,' for example in a claim using the transitional phrase 'comprising.'" 122 F.3d at 1023 (citing *North Am. Vaccine, Inc. v. American Cyanamid Co*., 7 F.3d 1571, 1575–76, 1336 (Fed. Cir. 1993), and Robert C. Faber, *Landis on Mechanics of Patent Claim Drafting* 531 (3d ed. 1990)). Nevertheless, the court explained,

The terms used in claim 3 of the '261 patent to demarcate the regions of the apparatus—"gas-confining chamber," "microwave cavity," and "field free zone"—are defined in relation to each other. For example, microwave energy from the "microwave cavity" is brought "into said chamber." Therefore, this language separates the "microwave cavity" from the "gas-confining chamber." The claim continues to describe "a portion of the internal volume of said chamber ... providing a field free [sterilization] zone." This language places the sterilization zone within the "gas-confining chamber."

Repeatedly the claim refers to "said chamber" as it describes various portions of the apparatus. This term itself, "said chamber," reinforces the singular nature of the chamber. The claim does not place the sterilization zone vaguely within "a chamber," but within "said chamber." This language clarifies that only one chamber is in question. Likewise, claim 1 of the '586 patent discloses a "field-free zone away from said [microwave] cavity." This language suggests some separation between

33

the sterilization zone and the microwave cavity. Even this language, however, contains no suggestion of separate gas-confining chambers.

*Abtox*, 122 F.3d at 1023–24. The court went even further, however, by "seek[ing] the meaning of the claim terms by examining their fuller context." *Id*. at 1024. Specifically, the court explained,

> The written description supplies additional context for understanding whether the claim language limits the patent scope to a single unitary chamber or extends to encompass a device with multiple gas-confining chambers. Figure 2, for instance, shows a single chamber. That chamber, as described in the claims, features a sterilizing zone separate and downstream from the plasma-generating zone. These zones denote regions and functions within the same chamber, rather than multiple chambers. Nothing in the written description suggests that the claim language encompasses a device with more than one gas-confining chamber. For example, to distinguish the RF sterilizer from the microwave sterilizer, the specification notes that the microwave plasma generator "cannot be mounted concentric about the long axis" shown in figure 2. Col. 7, ll. 57–58. The specification continues:

>> [T]he microwave cavity 16 is mounted at one end of chamber 11, and a perforated metallic shield 17 may be placed just beyond it toward the opposite end of the chamber, spanning the entire diameter cross section of the chamber, thus creating a field-free and glowless reactive zone immediately below it and away from the microwave cavity.

> Col 7., ll. 59–65. This explanation discloses a non-metallic sterilization zone separate from the metallic plasma-generating zone within the same chamber. While a Faraday shield lies between the zones, both zones are contained within the single chamber 11. MDT argues that these clearly separate zones disclosed in the specification evidence the district court's error in stating that the Jacob patents do not cover plasma generation "in *an enclosure* that is *in any way separate* from *the enclosure* in which the sterilization takes place." To the contrary, although a Faraday shield separates the zones to prevent free passage of particular particles, the zones remain within the same chamber, not in distinct gas-confining chambers.

*Abtox, Inc*., 122 F.3d at 1024 (emphasis in the original). The court then found confirmation of its reading in the record of the administrative proceedings before the Patent and Trademark Office (PTO). *Id*. at 1024–27. The court explained,

> The district court misread the prosecution history, but nonetheless arrived at a correct single chamber limitation for microwave sterilizers. That reliance on the prosecution history was in error. Nevertheless, because the claim language, as interpreted in light of the specification, limits the microwave devices to a single gas-confining chamber, this court affirms the district court's grant of summary judgment.

*Abtox, Inc.*, 122 F.3d at 1027. Thus, *Abtox*, like *Insituform* confirm that an exception to the rule that "a" or "an" means "one or more" when the claim language and specification demonstrate otherwise.

Consideration of the intrinsic record of the Asserted Patents leads to the same conclusion in this case. That intrinsic record does not contemplate more than one magnet, let alone combined pull strength of two side-by-side magnets. Filing 37 at 3. In other words, the specification indicates a "clear intent" that "a neodymium magnet" means "one neodymium magnet," not "one or more." *See Convolve*, 812 F.3d at 1321; *Abtox, Inc.*, 122 F.3d at 1023–27; *Insituform Techs., Inc.*, 99 F.3d at 1105–06. The summary of the invention of the Asserted Patents refers to "a neodymium magnet" and "the neodymium magnet." Filing 1-1 at 6 (2:20–23). The detailed description of the Asserted Patents likewise repeatedly refers not just to "a neodymium magnet" but to "the neodymium magnet" and "said magnet," meaning "that one." Filing 31-1 at 7 (3:15–15) ("The assembly base 3 is constructed of plastic or similar material and has an embedded neodymium magnet 1."), (3:33–34) ("As shown, the magnet 1 is embedded flush with the surface of the assembly base 3. . . ."), (Claim **1**) (4:61–63) (claiming "a neodymium magnet embedded in the base wherein said magnet has a pull strength of a least five pounds"). Indeed, there is not one reference to the possibility of more than one magnet embedded in the base to be found in the detailed description or the claims of the '779 patent, despite acknowledgements that "the magnet" may be of "[o]ther shapes, sizes and thicknesses," not just a disc magnet ½ inch in diameter and 1/8 inch thick, *see* Filing 31-1 at 7 (3:15–17); or may be "samarium-cobalt" rather than "neodymium," *see* Filing 31-1 at 7 (3:22–23); may have "[o]ther strength" than a 16 pound pull force, *see* Filing 31-1 at 7 (3:29-30); and may be embedded in various ways, including "flush with the surface of the base facing away from the light bulb," *see* Filing 31-1 at 8 (Claim **10**) (5:19–20). The same is true of the summary of the

invention, the detailed description, and the claims of the '264 Patent. *See* Filing 31-2 at 6 (2:22–34), 7 (3:25–57, 4:23, 4:55–67), 8 (5:27–35). It is also obvious that where only one magnet was ever contemplated in the Asserted Patents, the combined pull strength of multiple magnets to meet the minimum pull force claimed also was never contemplated.

The decision of the Federal Circuit Court of Appeals in *Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293 (Fed. Cir. 2005), on which Lite-Netics relies, is not to the contrary. In that case, the court explained,

> The dispute reduces to whether the "channel" must be formed in a unitary structure. The claim requires that the anchor seat means have "an anchor seat portion spaced apart from said bone interface including a channel to receive said rod," '555 patent, col. 8, ll. 41–42, and that the "securing means ... cause[s] said rod to bear against said channel," id., ll. 51–54. The claim does not state that the anchor seat portion forming the channel is unitary. Although the sole embodiment described in the specification depicts a unitary structure, id., col. 5, ll. 20–21, the mere depiction of a structural claim feature as unitary in an embodiment, without more, does not mandate that the structural limitation be unitary. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1367 (Fed.Cir.2002) (holding that "member" encompassed a multi-component structure where the preferred embodiment showed a single-component structure, but the specification did not otherwise require a certain number of components). There is nothing in the written description or prosecution history that limits the channel to being formed in a single-component structure. Thus, the district court correctly concluded that the "bear against said channel" language of claim 5 does not exclude an "anchor seat portion" composed of multiple components.

*Cross Med. Prod., Inc.*, 424 F.3d at 1309. Unlike the situation in *Cross Medical Products*, not only was every depiction of "a neodymium magnet" of one magnet, the written description and claims in the Asserted Patents repeatedly limit the structure in question to "a neodymium" magnet, meaning "one," as explained above.

Thus, the Court reiterates its prior conclusion that it does it not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes or copies the '779 Patent, and its claim that the Magnetic Cord literally infringes or copies the '779 Patent is likely baseless.

36

Additionally, in its TRO ruling, the Court stated that it could not see how Lite-Netics could reasonably believe that HBL's Magnetic Cord infringes the '264 Patent. This is so, the Court explained, because the Magnetic Cord has magnets protruding from the base, contrary to the requirements of claim **1** of the '264 Patent, which claims "a magnet embedded in the base such that said magnet does not protrude outside of said base." Filing 1-2 at 5 ('264 Patent at 5:27–28)). The Court was not persuaded by Lite-Netics's argument that HBL has imported from the specification a definition of lack of protrusion as meaning only that the magnet does not stick out of the base and that the limitation would require that the sides of the magnet are not exposed. Filing 20 at 20–21. This Court concluded that a person of ordinary skill in the art would presumably understand that "a magnet embedded in the base such that said magnet does not protrude outside of said base" means the magnet does not protrude from the base in any direction, whether from the base in the direction opposite the bulb or beyond the perimeter of the base, *i.e.*, perpendicular to the bulb. Thus, the Court concluded that a magnet that extends beyond the end of the base does not fall within this limitation and alleging that it does is not only false but baseless.

Lite-Netics now argues in opposition to the Motion for Preliminary Injunction that claim differentiation prevents acceptance of HBL's broad interpretation of "does not protrude." Filing 32 at 27. This is so, Lite-Netics contends, because Claims **4** and **23** expressly require the magnet to be "flush" with the base, but that language would be superfluous, if the independent claims, Claims **1** and **17**, already required such a limitation. Filing 32 at 27. Lite-Netics also argues that the "does not protrude" limitation was added to distinguish Chou (with a fixing seat for the light fixture) and Hofer (with an external magnet attached to the light fixture) prior art devices. Filing 32 at 27–28. Specifically, Lite-Netic's explains that Hofer's magnet was not embedded in the base of the lamp; instead, Hofer's device utilized a magnet affixed to an attachment mechanism that

37

attached to the base of the light fixture. Filing 32 at 27. Thus, Lite-Netics argues, Hofer's magnet was located completely outside of the base. Filing 32 at 28. Lite-Netics points out that, unlike Hofer's device, HBL's Magnetic Cord has a magnet embedded into the base of the light fixture, and the magnet forms a part of the base of the light fixture, so the magnet is not hanging off the side or end of the base, and it does not protrude wholly outside of the base. Filing 32 at 28. Thus, Lite-Netics appears to argue that "does not protrude" covers any magnet that is not located completely outside of the base. Filing 32 at 29.

HBL contends that under the independent claims of the '264 Patent, the magnet could be "sunken" into or "flush" with the base, while the dependent claims are limited to magnets that are "flush." Filing 37 at 6–7. Thus, HBL argues that claim differentiation does not save Lite-Netics's construction. Moreover, HBL argues that claim differentiation cannot overcome a contrary construction dictated by the written description or prosecution history. Filing 37 at 6. HBL argues that the unequivocal language of the independent claims at issue here requires a "non-protruding magnet," not just one that is not completely outside the base. Filing 37 at 6.

The parties did not address the "does not protrude" limitation in their arguments at the preliminary injunction hearing beyond one argument by HBL. That argument was in relation to infringement under the doctrine of equivalents, however, so it will be addressed when the Court turns to infringement under that doctrine.

The Court agrees with HBL that "does not protrude" cannot reasonably be understood to mean "not completely outside of the base." Rather, "does not protrude" may mean the magnet is either "flush" with the end of the base or "sunken" into the base. The ordinary meaning of "protrude" to a person of ordinary skill in the art—or anyone else—is "to jut out beyond the surrounding surface or context." *See* https://unabridged.merriam-

webster.com/unabridged/protrude. In contrast, "outside" means "beyond the limits of." *See* https://unabridged.merriam-webster.com/unabridged/outside. Indeed, if the Court were to accept Lite-Netics's construction of "does not protrude" as meaning "not outside," part of the claimed limitation in Claim **1** becomes entirely superfluous. That is because the limitation states not just "does not protrude," which in Lite-Netics's construction means "is not entirely outside," but adds "outside of said base." *See* Filing 1-2 at 8 (Claim 1) (5:28–29) (limitation stating "a magnet embedded in the base such that said magnet does not protrude outside of said base"). To put it another way, reiteration of "outside of said base" is redundant of Lite-Netics's construction of "does not protrude" as "not outside of the base." The Court also agrees with HBL's contention that, in the independent claims of the '264 Patent, the magnet that is "embedded in the base such that said magnet does not protrude outside of said base" could be "sunken" into the base or "flush" with the surface of the base. *See* Filing 1-2 at 8 (Claim **1**) (5:28–29), (Claim **17**) (6:27–28). Thus, the dependent claims select one of those options because they are limited to magnets that are "flush." Filing 1-2 at 8 (Claim **4**) (5:41–42), (Claim **23**) (6:50–51). That language is not superfluous as it does differentiate the dependent claims from the independent claims. Therefore, claim differentiation does not save Lite-Netics's construction.

Thus, the Court now reiterates its prior conclusion that Lite-Netics's claim that HBL's Magnetic Cord literally infringes or copies the '264 Patent is likely baseless.

### ii.  New Allegations of Equivalents Infringement

In opposition to the Motion for Preliminary Injunction, Lite-Netics makes wholly new arguments that its claims of infringement were not baseless because HBL's products infringe the Asserted Patents under the doctrine of equivalents. Before considering these new allegations, however, the Court concludes that it should briefly discuss doctrine of equivalents law.

(1) The Doctrine of Equivalents and Limitations on
It

Over three decades ago, the United States Supreme Court summarized the doctrine of

equivalents this way:

> Under [the doctrine of equivalents], a product or process that does not literally
> infringe upon the express terms of a patent claim may nonetheless be found to
> infringe if there is "equivalence" between the elements of the accused product or
> process and the claimed elements of the patented invention.

*Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 21 (1997). More recently, the

Federal Circuit Court of Appeals reiterated that "[e]quivalents remain a firmly entrenched part of

the settled rights protected by the patent." *Bio-Rad Lab'ys, Inc. v. 10X Genomics Inc.*, 967 F.3d

1353, 1363 (Fed. Cir. 2020) (quoting *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535

U.S. 722, 733 (2002) ("*Festo I*")). Further,

> [t]he doctrine of equivalents prevents "the unscrupulous copyist [from] mak[ing]
> unimportant and insubstantial changes and substitutions in the patent which, though
> adding nothing, would be enough to take the copied matter outside the claim, and
> hence outside the reach of law." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*,
> 339 U.S. 605, 607, 70 S.Ct. 854, 94 L.Ed. 1097 (1950). The central question for
> infringement under the doctrine of equivalents is whether "the accused product or
> process contain[s] elements identical or equivalent to each claimed element of the
> patented invention." *Warner-Jenkinson*, 520 U.S. at 40, 117 S.Ct. 1040.

*Eagle Pharms. Inc. v. Slayback Pharma LLC*, 958 F.3d 1171, 1175 (Fed. Cir. 2020). As to

application of the doctrine,

> "A finding of infringement under the doctrine of equivalents requires a
> showing that the difference between the claimed invention and the accused product
> or method was insubstantial or that the accused product or method performs the
> substantially same function in substantially the same way with substantially the
> same result as each claim limitation of the patented product or method." *AquaTex
> Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). "The function,
> way, result inquiry focuses on an examination of the claim and the explanation of
> it found in the written description of the patent." *Id.* (internal quotations omitted).

*Plastic Omnium Advanced Innovation & Rsch. v. Donghee Am., Inc.*, 943 F.3d 929, 938 (Fed. Cir.

2019).

40

One limitation on the doctrine of equivalents is that "[i]f a patentee surrenders some scope during prosecution, that territory isn't available later as a doctrine-of-equivalents battleground." *Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1145 (Fed. Cir. 2021) (citing *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019)). More specifically,

> Scope surrender often occurs through a claim amendment, but it can also result from arguments—that is, if the prosecution history "evince[s] a clear and unmistakable surrender of subject matter." *Id.* The relevant inquiry is "whether a competitor would reasonably believe that the movant had surrendered the relevant subject matter." *Id.* at 1159–60 (quoting *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007)). Whether prosecution-history estoppel applies is a question of law. *Id.* at 1159.

*Traxcell Techs.*, 15 F.4th at 1146. A further limitation is "claim vitiation":

> "Under the doctrine of equivalents, an infringement theory ... fails if it renders a claim limitation inconsequential or ineffective." *Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016). This vitiation doctrine ensures the application of the doctrine of equivalents does not "effectively eliminate [a claim] element in its entirety." *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997). Claim vitiation is a legal determination that "the evidence is such that no reasonable jury could determine two elements to be equivalent." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1356–57 (Fed. Cir. 2012); *see also UCB, Inc. v. Watson Labs. Inc.*, 927 F.3d 1272, 1283 (Fed. Cir. 2019) (Vitiation "is not an exception or threshold determination that forecloses resort to the doctrine of equivalents, but is instead a legal conclusion of a lack of equivalence based on the evidence presented and the theory of equivalence asserted.").

*Edgewell Pers. Care Brands, LLC v. Munchkin, Inc.*, 998 F.3d 917, 923 (Fed. Cir. 2021).

This Court finds that another limitation—of particular relevance here—is "specification estoppel." *See* Timothy R. Holbrook, *Equivalency and Patent Law's Possession Paradox*, 23 Harv. J.L. & Tech. 1, 21 (2009) (Holbrook, *Equivalency*) (listing "specification estoppel" with the doctrines of prosecution history estoppel and public dedication as principles that "preclude the application of the doctrine of equivalents unless the asserted equivalent was unforeseeable."). Applying this principle, "[a] patentee can also lose the ability to assert equivalency if she has

surrendered the relevant subject matter in the specification itself." *Id.* at 26.[17] Prof. Holbrook explained,

> If an applicant distinguishes the prior art or asserts why her invention is better than the prior art [in the specification itself], she cannot use the doctrine of equivalents to recapture that surrendered subject matter. This surrender operates in an estoppel-like fashion, although without the constraints found within prosecution history estoppel, such as a requirement that the surrender be due to an argument or amendment made for reasons related to patentability.

Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26.

"Specification estoppel" appears to the Court to be essentially the same as what HBL calls "specific exclusion," as explained in *Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326 (Fed. Cir. 2014):

> While we have recognized that literal failure to meet a claim limitation does not necessarily constitute a "specific exclusion," *see Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1317 (Fed.Cir.1998), we have found "specific exclusion" where the patentee seeks to encompass a structural feature that is the opposite of, or inconsistent with, the recited limitation. *See, e.g., SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1346–47 (Fed.Cir.2001). Because the Augme patents make clear that embedded and linked code are opposites, we agree with the district court that they "cannot possess only insubstantial differences." *Summary Judgment Order* at *12.

*Augme Techs., Inc.*, 755 F.3d at 1335. HBL explained "specific exclusion" at the preliminary injunction hearing as a rule that a patent holder cannot have a claim that says "not x" and have it read via the doctrine of equivalents on a product that has "x." This explanation appears to the Court to be an accurate characterization in light of *Augme*.

---

[17] Prof. Holbrook cites the following cases as examples of application of this principle: *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1345-46 (Fed. Cir. 2001) (precluding equivalency as a result of disclaimers made in the specification); *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 212 F.3d 1377, 1378 (Fed. Cir. 2000) (per curiam) (affirming a grant of summary judgment of non-infringement because the accused device failed to perform back-up function found in the specification but not in the claims); *Vehicular Techs. Corp. v. Titan Wheel Int'l, Inc.*, 141 F.3d 1084, 1091 (Fed. Cir. 1998) (vacating a grant of a preliminary injunction for the same reason). Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26 n.119.

As an initial matter, HBL argues that Lite-Netics cannot properly rely on the doctrine of equivalents now, even if it has belatedly pleaded it in the First Amended Complaint, because the doctrine cannot be applied "retroactively" to alter Lite-Netics's allegations of infringement in the marketplace that are at issue here. Filing 34 at 2. Lite-Netics counters that it did not share only "literal infringement" allegations with its customers, and that "[t]he recipients likely wouldn't know the difference between the two [theories of infringement]." Filing 38 at 2. Thus, it appears that Lite-Netics argues that its allegations of "infringement" to its customers included both literal and equivalence theories, so both must be evaluated to determine whether Lite-Netics's allegations of infringement were baseless. The Court doubts that Lite-Netics meant "doctrine of equivalents infringement" in its communications to customers—or for that matter in its communications with HBL prior to suit—where there is no hint that Lite-Netics considered the doctrine of equivalents until HBL mentioned the doctrine in its Motion to Dismiss. Nevertheless, the Court will assume without deciding that Lite-Netics can rely on its after-the-fact assertions of doctrine of equivalents infringement to show that its allegations of infringement in its communications to customers were not "baseless." The Court may reconsider this issue in the course of litigation of this case, but the Court finds it is not dispositive of the Motion for Preliminary Injunction.

(2) The Magnetic Clip Does Not Infringe under the
Doctrine of Equivalents

Starting with the Magnetic Clip, Lite-Netics asserts equivalents infringement, because the Magnetic Clip performs the same function as the base (securing the magnet) in the same way (embedding the magnet into the Magnetic Clip) and achieves the same result (affixing the light fixture to a metal surface). Filing 32 at 23, 24–25.[18] At the preliminary injunction hearing, Lite-

---

[18] Lite-Netics makes the nonsensical assertion that "[t]he Magnetic Clip literally infringes at least element [2.1] under the doctrine of equivalents." Filing 32 at 33. A product might infringe a patent literally, under the doctrine of

Netics offered no additional argument as to infringement by the Magnetic Clip under the doctrine of equivalents. HBL argues that equivalence of the Magnetic Clips was expressly disclaimed in the specifications of the Asserted Patents. Filing 37 at 5. HBL argues that Lite-Netics expressly distinguished prior art that utilized clips that attached only to the cord of the light fixture, but that is exactly what the Magnetic Clip does. Filing 37 at 5 (citing Filing 32 at 19). To the extent the parties offered additional arguments on the doctrine of equivalents in their supplemental briefing or at the preliminary injunction hearing, the Court does not find them dispositive at this point in the litigation.

As the Court indicated just above, the principle that it finds dispositive of Lite-Netics's claim that the Magnetic Cord infringes the Asserted Patents is "specification estoppel." *See* Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26; *see also Augme Techs., Inc.*, 755 F.3d at 1335 (describing essentially the same principle as "specific exclusion"). This is precisely what Lite-Netics did as to "clips" in the Asserted Patents. Specifically, the '779 Patent and the '264 Patent both expressly distinguish the claimed invention from and thus disclaim "clips" in the Dougan and Clement prior art. *See* Filing 1-1 at 6 ('779 Patent, 1:34–2:2, identifying deficiencies in "clips" for hanging lights). Thus, the Asserted Patents "distinguish[ ] the prior art or assert[ ] why [the patented] invention is better than the prior art," so that the patent holder "cannot use the doctrine of equivalents to recapture the surrendered subject matter" of magnetic clips that attach to the electrical cord. Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26. In other words, by claiming the invention was not magnetic clips that attach to the electrical cord (*i.e.*, claiming "not x"), Lite-

---

equivalents, or both literally and under the doctrine of equivalents, but a product cannot infringe a patent "literally . . . under the doctrine of equivalents." The Court assumes Lite-Netics made a typographical error, perhaps meaning "directly infringes" rather than "literally infringes." Also, the Court is dubious of Lite-Netics's formulation of the parts of the function-way-result test as applied to the Magnetic Clip. However, the Court need not address that issue at this point in the litigation, as it finds "specification estoppel" likely bars the alleged equivalence.

Netics cannot assert that a product that is a magnetic clip that attaches to the electrical cord (*i.e.*, "x") is an equivalent. *See Augme Techs., Inc.*, 755 F.3d at 1335. Indeed, Genenbacher continues to maintain that the '779 Patent overcame the "cumbersome[ness]" of clips. Filing 21-1 at 2 (¶ 5). HBL's Magnetic Clips do exactly what the '779 Patent (and the '264 Patent) describes as a flaw to be overcome: As shown in the illustration, they are separate members that clip onto the electric cord; they do not attach to the light fixture base. *See, e.g.,* Filing 1 at 7 (¶ 21) (image); Filing 31 at 7 (¶ 21) (image), included above, page 5.

In short, Lite-Netics's contention that HBL's Magnetic Clips infringe or copy the Asserted Patents under the doctrine of equivalents is likely baseless because the doctrine is unavailable here.

### (3) The Magnetic Cord Does Not Infringe under the Doctrine of Equivalents

As to the Magnetic Cord, Lite-Netics argues in its supplemental briefing that there is no presumption that HBL's Magnetic Cord is non-infringing because it has patentable features, where the '309 Patent provides a right to exclude others but does not bar a finding of infringement by a dominant patent, in this case, either or both the '779 Patent and the '264 Patent. Filing 32 at 17. Indeed, Lite-Netics points out that the '309 Patent acknowledges that the light fixture in question could use a single magnet. Filing 32 at 17 (citing Filing 10-2 at 7 (2:30–33)). More specifically, Lite-Netics argues that the two semicircular magnets in the Magnetic Cord light fixture base are equivalent to the one magnet in the Asserted Patents. Filing 32 at 17. HBL responds that this "two are one" theory of infringement under the doctrine of equivalents is foreclosed by prosecution history estoppel and would vitiate the language of the patent claims. Filing 34 at 2–3.

At the preliminary injunction hearing, Lite-Netics explained that its argument about equivalents was not based on equivalence to magnets with less than five pounds of pull force, but about the structure of the magnet. Lite-Netics argued that there was no limitation in the Asserted

Patents regarding whether the structure of a magnet could be round, square, how many there could be, or where they are located. Rather, Lite-Netics argued, the only limitation was that the magnet be embedded in the base. With the focus on structure, Lite-Netics argues that two magnets are the equivalent of one. Lite-Netics pointed out that the patentable feature of the '309 Patent was not the presence of two magnets, but the moisture abatement structures. Lite-Netics did not offer any argument about equivalents of "not protruding outside the base."

At the preliminary injunction hearing, HBL argued that Lite-Netics's doctrine of equivalents argument as to the '779 patent conflates a magnet with less than five pounds of pull force with a magnet that is required in the claims of the '779 Patent to have more than five pounds of strength. As to the '264 patent, HBL argues that Lite-Netics's doctrine of equivalents argument conflates protrusion outside the base with no protrusion outside the base. HBL argued that Lite-Netics's arguments are precluded by "specific exclusion." HBL also reiterated its contention that the '309 Patent was allowed on top of the Asserted Patents, which means that the Patent and Trademark Office thought that it was a substantially different improvement from the Asserted Patents. However, HBL also stated, "It's the moisture abatement that we claim in the '309 Patent."

The Court must first reject HBL's argument that the '309 Patent demonstrates that the Magnetic Cord with two magnets is not equivalent to the Asserted Patents with one magnet. Lite-Netics is correct that there is no presumption that HBL's Magnetic Cord is non-infringing because it has patentable features. *See Tex. Instruments, Inc. v. United States ITC*, 805 F.2d 1558, 1563 (Fed. Cir. 1986) ("Devices that have been modified to such an extent that the modification may be separately patented may nonetheless infringe the claims of the basic patent"). Thus, the '309 Patent provides a right to exclude others but does not bar a finding of infringement by a dominant patent, in this case, either or both the '779 Patent and the '264 Patent. *TransCore, LP v. Elec. Transaction*

46

*Consultants Corp.*, 563 F.3d 1271, 1275 (Fed. Cir. 2009). Second, Lite-Netics argues, and HBL concedes, that the patentable improvement in the '309 Patent is not the presence of two magnets, but the moisture abatement provided by two weep holes.

Instead, the Court's analysis of the likelihood that allegations the Magnetic Cord infringes the Asserted Patents under the doctrine of equivalents are baseless is similar but not identical to the Court's analysis of the application of the doctrine of equivalents to the Magnetic Clips. The Court finds that the principle of "specification estoppel" also forecloses allegations of infringement by the Magnetic Cord under the doctrine of equivalents. "Specification estoppel" is akin to the exception to the rule that "a" or "an" means "one or more" when the specification or claims of a patent demonstrate a clear intent to limit "a" or "an" to "one." *See Convolve*, 812 F.3d at 1321. Indeed, it seems logical to the Court that where a patent holder clearly limits the meaning of "a" or "an" to "one" in the specification or claims for purposes of literal infringement, the patent holder should not be able to recapture "one or more" for purposes of infringement under the doctrine of equivalents. This is so, because the specification indicates intent to distinguish and surrender the scope of foreseeable equivalents by focusing on a specified scope. *See* Holbrook, *Equivalency*, 23 Harv. J.L. & Tech. at 26; *Augme Techs., Inc.*, 755 F.3d at 1335; *but see Insituform Techs., Inc.*, 99 F.3d at 1107–09 (notwithstanding a finding that literal infringement required "one vacuum cup" remanding for consideration of multiple vacuum cups as an equivalent based on the correct claim construction where the district court had used different constructions for literal and equivalents infringement). Such a recapture of surrendered claim scope is contrary to the clear intent of the patent holder at the time of patenting—whatever benefit the patent holder may now wish to derive from asserting a different scope when alleging infringement.

At this preliminary stage of the proceedings, the Court finds that application of "specification estoppel" provides sufficient likelihood that Lite-Netics's allegations that the Magnetic Cord infringes the Asserted Patents under the doctrine of equivalents are baseless. As explained in some detail above, in reference to literal infringement, the specification indicates a "clear intent" that "a neodymium magnet" means "one neodymium magnet," not "one or more." *Convolve*, 812 F.3d at 1321; *Augme Techs., Inc.*, 755 F.3d at 1335; *Insituform Techs., Inc.*, 99 F.3d at 1105–06). The Court will not repeat the language of the specifications leading the Court to this conclusion. It is enough to direct the parties again to the pertinent parts of the specifications. *See* Filing 1-1 at 6–7 (2:20–3:34), (Claim 1) (4::61-63); Filing 1-2 at 6 (2:22–34), 7 (3:25–57, 4:23, 4:55–67), 8 (5:27–35). Also, it is obvious that where only one magnet is ever contemplated in the Asserted Patents, the combined pull strength of multiple magnets to meet the minimum pull force claimed also was never contemplated.[19] These equivalents cannot be recaptured under the doctrine of equivalents, so allegations of infringement under the doctrine of equivalents are likely baseless.

This determination concerning baseless allegations of infringement is not only sufficient to weigh heavily in favor a preliminary injunction, but also supports a further basis for finding likelihood of success on the merits, as explained in the next section.

### d. HBL is Likely to Succeed in Showing Threats to Customers Were Improper

In its TRO ruling, the Court concluded that another substantial ground for finding that HBL had a fair chance of succeeding on its claim of tortious interference for purposes of a TRO was that Lite-Netics's communications to HBL's customers in September 2022 threatened to "includ[e]

---

[19] This conclusion makes it unnecessary to address Lite-Netics's argument in both its briefing and its arguments at the preliminary injunction hearing, based on *Biagro W. Sales, Inc. v. Grow More, Inc.*, 423 F.3d 1296, 1304 (Fed. Cir. 2005), that the aggregated pull strength of two magnets infringes the specified pull strength of a single magnet in the Asserted Patents.

any known company using or reselling the HBL products as co-defendants in this lawsuit." Filing 11-7 at 2. The Court pointed out that the Federal Circuit Court of Appeals explained in *In re Nintendo of Am., Inc.*, 756 F.3d 1363 (Fed. Cir. 2014), that a manufacturer's liability for patent infringement is a predicate to recovery from any defendant who is merely a customer or retailer of the manufacturer's product. Thus, the suit against the manufacturer must proceed first and separate from the suit against the customers or retailers, because if the manufacturer prevails, the claims against its customers and retailers are moot. 756 F.3d at 1366. The Court was not persuaded by Lite-Netics's attempt to read a "customer suit rule" as only a defense that customers can assert to stay the litigation until the suit against the manufacturer has been resolved, but that it does not prevent a suit from immediately commencing against the customer. The *Ninetendo* case involved the severance and the stay of a case brought against a manufacturer and its retailers at the same time, in the same lawsuit, in the same district. *Id.*

Nevertheless, the Court concluded that Lite-Netics is correct that the *Nintendo* decision does not preclude Lite-Netics from suing customers for infringement of its patents for selling HBL's products in this suit or a separate action—although any such suit would be subject to an immediate stay pending the outcome of the patent infringement suit against HBL.[20] The Court concluded that what made Lite-Netics's threats to sue customers improper is that the claim that HBL's products infringe Lite-Netics's Asserted Patents is untrue and baseless in light of the record then in front of this Court. It is on that ground that the Court temporarily enjoined Lite-Netics from threatening to sue HBL's customers. The Court opined that if Lite-Netics can subsequently show

---

[20] The Court recognized in its TRO ruling that it is possible that this Court would lack personal jurisdiction over some of HBL's customers, which might bar adding them to this lawsuit and require separate litigation in a different district, or the customers might be able to demonstrate that another district was more convenient. *Cf. Nintendo*, 756 F.3d at 1366 (considering the convenience of the district for suits against customers). The Court concluded that was not the basis for a TRO restraining threats to sue customers, however.

that its infringement claims are not baseless, upon a fuller record, then its communications to customers, including its threat to sue customers for infringement, would be permissible.

The Court also viewed Lite-Netics's conduct through the lens of the factors for determining "improper" or "unjustified" interference, *see Koski Pro. Grp., P.C.*, 950 N.W.2d at 378, leading it to conclude in its TRO ruling that the impropriety of Lite-Netics's conduct appeared obvious at that early point in the litigation. The Court concluded it was likely that Lite-Netics's conduct was baseless and asserted improper threats against customers or retailers of HBL's products. *See id.* (first factor is the nature of the actor's conduct). Furthermore, where Lite-Netics's conduct was baseless, it would be reasonable to infer a motive to injure HBL apart from the merits of any allegation of patent infringement. *See id.* (second factor is actor's motive). The Court also concluded that HBL could likely show it had a reasonable expectation or interest in retaining customers, particularly as the height of the sales season for its products approached. *See id.* (third factor is the interest of the other with which the actor's conduct interferes). The Court observed that a mere interest in competition may be worthy, but Lite-Netics cannot legitimately advance that interest by making baseless accusations or threats. *See id.* (fourth, fifth, and seventh factors are the interests the actor seeks to advance, the relative social interests, and the relations of the parties). Finally, the Court concluded that the threats and accusations were directly and "proximate[ly]" related to interference in HBL's relationship with its customers. *See id.* (sixth factor is the proximity or remoteness of the actor's conduct to the interference).

For these reasons, the Court concluded in its TRO ruling that HBL has a fair chance of prevailing on its tortious interference claim.

Lite-Netics reiterates in opposition to the Motion for Preliminary Injunction that its communications to customers notifying them of infringement are proper because they were as

"innocuous" as the patent holder's actions in *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891 (Fed. Cir. 1998), and were not baseless. Filing 32 at 12. In *Mikohn*, the Federal Circuit Court of Appeals recognized that "[c]ommunication of accurate information about patent rights, whether by direct notice to potential infringers or by publicity release," is permissible. 165 F.3d at 898. However, as the Court explained in its TRO ruling, the Federal Circuit did so with the caveats that apply to tortious interference claims: the information must be accurate and not in bad faith. *Id.* Not to belabor the point, but the Court has found that the allegations that Lite-Netics communicated to HBL's customers were baseless.

Thus, the Court concludes once again that HBL is likely to prevail on its tortious interference claim. *See Wildhawk Invs., LLC*, 27 F.4th at 593.

### 2. HBL has a Fair Chance of Prevailing on its Defamation Claim

#### a. Applicable Law

In its TRO ruling, the Court explained that, under Nebraska law,

> [a] defamation claim has four elements: (1) a false and defamatory statement concerning the claimant, (2) an unprivileged publication to a third party, (3) fault amounting to at least negligence on the part of the publisher, and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication. By statute, truth in and of itself is made a complete defense unless the plaintiff proves the statements were made with actual malice.

*Choice Homes, LLC v. Donner*, 976 N.W.2d 187, 202–03 (Neb. 2022) (citations omitted). The Court concluded that, as with HBL's tortious interference claim, the only debatable elements on this claim were falsity and lack of privilege of Lite-Netics's communications to HBL's customers. *Id.* ("The threshold question in a defamation suit is whether a reasonable fact finder could conclude that the published statements imply a provably false factual assertion."); *id.* (identifying "an unprivileged publication to a third party" as element two of a defamation claim). The same appears to be true at the preliminary injunction stage of the proceedings.

51

     b.  HBL is Likely to Succeed in Showing that Lite-Netics Made
         Unprivileged False Statements

In its TRO ruling, the Court concluded that HBL has at least a fair chance of demonstrating

that Lite-Netics's statements that HBL copied and was infringing Lite-Netics's Asserted Patents

and that Lite-Netics could add customers and retailers to this lawsuit were untrue, thus robbing

Lite-Netics of a defense based on truth. First, for essentially the reasons the Court had stated with

respect to the tortious interference claim, the Court concluded that Lite-Netics's statements were

false.

Turning to the question of whether the statements were privileged, the Court was not

persuaded by Lite-Netics's assertion that the "litigation privilege" defeats HBL's defamation

claim. Filing 20 at 22. The Court observed that the Nebraska Supreme Court does not appear to

have addressed the "litigation privilege" as a bar to a defamation claim. Furthermore, to the extent

that this Court recognized the existence of "litigation privilege" in *Jenkins v. Gen. Collection Co.*,

538 F. Supp. 2d 1165 (D. Neb. 2008), a case on which Lite-Netics relies, the Court found that the

privilege extended only to actions that parties asserting the privilege took in the judicial

proceedings. 538 F. Supp. 2d at 1172 (denying defendants' motion for summary judgment based

on the litigation privilege).

The Court concluded that another case on which Lite-Netics relies, *Inline Packaging, LLC*

*v. Graphic Packaging Int'l, LLC*, 962 F.3d 1015 (8th Cir. 2020), does not mention a "litigation

privilege" at all, although it discussed the *Noerr-Pennington* doctrine, which immunizes acts

related to the constitutional right to petition the court for grievances, unless the act is a mere sham.

962 F.3d at 1028. That decision held that the party claiming the other brought a sham patent

infringement lawsuit could not meet the requirement to show the lawsuit was objectively baseless.

*Id.* at 1029. Here, the Court determined in the TRO ruling—at least preliminarily—that Lite-

Netics's patent infringement claims are baseless, but more importantly, the *Inline Packaging* decision discussed validity of the lawsuit, not whether there was any protection for statements made by a litigant to a third party about the litigation. *Id.*

Finally, the Court addressed Lite-Netics's assertion that the Federal Circuit has established that communicating potential infringement to customers is not improper if the patent owner has a good faith belief that the claims are accurate. Filing 20 at 14 (citing *Mikohn Gaming Corp. v. Acres Gaming, Inc.*, 165 F.3d 891, 898 (Fed. Cir. 1998)). Again, in *Mikohn*, the Federal Circuit Court of Appeals recognized that the information communicated must be accurate and not in bad faith. *Id.* Again, the Court has found that the information Lite-Netics communicated to HBL's customers was untrue and baseless and therefore in bad faith.

The Court found no basis for application of any "litigation privilege" or patent holder's privilege protecting Lite-Netics's communications about its lawsuit against HBL to any stranger to the litigation. Therefore, the Court concluded that HBL has at least a fair chance—and perhaps a substantial likelihood—of succeeding on its defamation claim, as well as its tortious interference claim, so this *Winter* factor weighed heavily in favor of a TRO.

In opposition to the Motion for Preliminary Injunction, Lite-Netics reiterates that the Federal Circuit has held that federal patent law preempts state law tort claims based on allegations of patent infringement. Filing 32 at 34. The Court has already acknowledged that principle above. *See Energy Heating, LLC*, 889 F.3d at 1304. Lite-Netics also now asserts that federal law bars HBL's defamation claim unless HBL can demonstrate that Lite-Netics's allegedly defamatory communications to customers were baseless. Filing 32 at 35. Again, the Court has pointed out this exception to preemption. *See Energy Heating, LLC*, 889 F.3d at 1304. Moreover, the Court has

found that there is at least a likelihood that Lite-Netics's allegedly defamatory communications to customers were baseless.

In opposition to the Motion for Preliminary Injunction, Lite-Netics also resurrects its argument that HBL's reliance on *In re Nintendo of America, Inc.*, 756 F.3d 1363 (Fed. Cir. 2014), as supporting its allegations of bad faith is misplaced, because the customer suit exception would only provide a stay that would be lifted when the manufacturer is found liable. Filing 32 at 36–37. The Court has already acknowledged that the *Nintendo* decision does not preclude Lite-Netics from suing customers for infringement of its patents for selling HBL's products in this suit or a separate action—although any such suit would be subject to an immediate stay pending the outcome of the patent infringement suit against HBL. In its opposition to the Motion for Preliminary Injunction Lite-Netics appears to overlook the Court's conclusion that what made Lite-Netics's threats to sue customers improper is that the claim that HBL's products infringe Lite-Netics's Asserted Patents is untrue and baseless in light of the record before the Court, both at the TRO stage of the proceedings and now at the preliminary injunction stage. It is on that ground that the Court temporarily enjoined Lite-Netics from threatening to sue HBL's customers, and it is on that ground that the Court will preliminarily enjoin Lite-Netics from doing so during the pendency of this litigation.

Thus, Lite-Netics offers no new arguments to support its challenge to HBL's likelihood of success on the defamation claim. Indeed, Lite-Netics did not separately address the defamation claim at the preliminary injunction hearing. The Court now reiterates its conclusion that HBL has a fair chance of prevailing on its defamation claim, which weighs in favor of issuing a preliminary injunction. *See Wildhawk Invs., LLC*, 27 F.4th at 593.

54

3.   *HBL Faces a Threat of Irreparable Harm*

a.   Loss of Reputation and Goodwill is sufficient harm

The second *Winter* factor the Court must consider is whether it is likely that HBL will suffer irreparable harm in the absence of a TRO. *Tumey*, 27 F.4th at 664. In its TRO ruling, the Court explained that the movant must show that "irreparable injury is likely in the absence of an injunction, not merely a 'possibility' of irreparable harm before a decision on the merits can be rendered." *Tumey*, 27 F.4th at 664–65 (quoting *Winter*, 555 U.S. at 20). "The failure of a movant to show irreparable harm is an 'independently sufficient basis upon which to deny a preliminary injunction.'" *Sessler v. City of Davenport*, 990 F.3d 1150, 1156 (8th Cir. 2021) (quoting *Watkins Inc. v. Lewis*, 346 F.3d 841, 844 (8th Cir. 2003)). The parties do not dispute these standards in their arguments concerning the Motion for Preliminary Injunction.

In its TRO ruling, the Court found that HBL can show irreparable harm is likely in the absence of a TRO. *Tumey*, 27 F.4th at 664. The Court found that loss of reputation and goodwill is a potentially viable theory of irreparable harm. *See Mgmt. Registry, Inc. v. A.W. Companies, Inc.*, 920 F.3d 1181, 1183 (8th Cir. 2019) (citing *Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996); *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003) ("Loss of intangible assets such as reputation and goodwill can constitute irreparable injury." (quoting *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002)). Also, "[h]arm to reputation and goodwill is difficult, if not impossible, to quantify in terms of dollars." *Id.* Thus, such injury may suffice to satisfy the "irreparable harm" prong of the TRO analysis. *Id.*

In its supplemental briefing, Lite-Netics does not appear to dispute that loss of reputation or goodwill can be sufficient irreparable harm. Rather, Lite-Netics disputes the sufficiency of HBL's evidence that it has suffered such harm. *See, e.g.,* Filing 32 at 38–39. The Court will address that contention below.

55

b.   There was No Fatal Delay in HBL's Request for Relief

As the Court also explained in its TRO ruling, the claimant must diligently pursue injunctive relief to avoid alleged reputational harm. *See Wildhawk Invs., LLC*, 27 F.4th at 597 (concluding that the claimant's assertion of irreparable harm from injury to its business reputation and goodwill was "undermined by its decision to wait more than a year to bring th[e] lawsuit despite knowing [defendants] intended to produce the [products at issue] themselves."). At the same time, the claimant must present the court with something more than speculation that it will suffer reputational injury. *See MPAY Inc. v. Erie Custom Computer Applications, Inc.*, 970 F.3d 1010, 1020 (8th Cir. 2020) (rejecting irreparable harm based on goodwill and reputation where, without citing to anything in the record, the claimant asserted that harm to its goodwill and reputation was "inevitable," because "[s]peculative harm does not support a preliminary injunction." (quoting *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 779 (8th Cir. 2012)).

In its TRO ruling, the Court concluded that HBL had not delayed in seeking relief, which might undermine its assertion of irreparable harm to reputation and injury. *See Wildhawk Invs., LLC*, 27 F.4th at 597. HBL sought such relief within the same month in which Lite-Netics made the allegedly tortious communications to HBL's customers accusing HBL by name of "copying" and patent infringement. *See* Filing 11 at 6–7 (¶ 26) (alleging that Lite-Netics sent HBL's customers communications accusing HBL of "copying" and infringement in September 2022); Filing 20 at 23 (admitting that it made such communications in September 2022). It is the September 2022 communications by Lite-Netics that the Court concludes are actionable, at least preliminarily. Thus, HBL acted within a few weeks of actionable misconduct by Lite-Netics, which is well inside the timeframes that were too long in cases cited by Lite-Netics. Filing 20 at 13. It is also far shorter than the fatal delay of a year between learning of the defendants' intent to

produce the plaintiff's products themselves and the filing of the lawsuit in *Wildhawk Investments.* *See* 27 F.4th at 597-98.

In opposition to the Motion for Preliminary Injunction, Lite-Netics reiterates its contention that HBL's delay was not weeks but months. Filing 32 at 37. Lite-Netics argues that the situation in September was no different than it was in May, and that in HBL's pleadings HBL asserted that both the May and September communications to customers were detrimental to its business and reputation. Filing 32 at 37. Lite-Netics argues that it was only in HBL's original reply brief, Filing 22, that HBL departed from that position. Filing 32 at 37. Lite-Netics also argues now that the small community in the holiday lights industry means that news travels fast, so HBL should have been immediately aware of the May correspondence, but its delay in seeking relief for four months after that demonstrates the lack of an emergency. Filing 32 at 38.

There is some merit to Lite-Netics's contention that HBL alleged injury from both the May and the September communications, which indicates that HBL could have sought emergency relief based on the May communications. Nevertheless, that argument overlooks the material difference between the two communications: It was only in the September communications that Lite-Netics accused HBL by name of "copying" and patent infringement. *See* Filing 11 at 6–7 (¶ 26) (alleging that Lite-Netics sent HBL's customers communications accusing HBL by name of "copying" and infringement in September 2022); Filing 20 at 23 (admitting that it made such communications in September 2022). Furthermore, in May and June, HBL and Lite-Netics were still in direct communication with each other apparently pursuing negotiations, even if without much hope of success. *See* Filing 11-2 (Counterclaim, Exhibit B) (April 12, 2022, letter from Lite-Netics to HBL); Filing 11-3 (Counterclaim Exhibit C) (April 19, 2022, letter from HBL to Lite-Netics); Filing 11-5 at 2–3 (Counterclaim, Exhibit E) (May 27, 2022, letter from Lite-Netics to HBL);

Filing 11-6 at 2 (Counterclaim, Exhibit F) (June 21, 2022, letter from HBL to Lite-Netics). A reasonable fact finder could conclude that HBL was not sure of the complete breakdown of those negotiations until Lite-Netics filed its lawsuit on August 31, 2022, and that it was only when Lite-Netics sent the September communications to HBL's customers expressly identifying HBL as an infringer, *see* Filing 11-7 (Counterclaim, Exhibit G), that the need for judicial intervention was reasonably apparent. Thus, the Court now reiterates its conclusion that HBL acted within a few weeks of actionable misconduct by Lite-Netics and gaining a reasonable belief that negotiations with Lite-Netics had broken down, which is well inside the timeframes that were too long in cases cited by Lite-Netics. Filing 20 at 13. It is also far shorter than the fatal delay of a year between learning of the defendants' intent to produce the plaintiff's products themselves and the filing of the lawsuit in *Wildhawk Investments. See* 27 F.4th at 597-98.

            c.   The Irreparable Injury is Not Too Speculative

In its TRO ruling, the Court also found HBL's evidence of injury to its reputation and goodwill is not merely speculative. HBL offered the affidavit of Richard Martini, its president, in which Mr. Martini avers worried customers have called him asking whether HBL will be able to meet supply commitments for the accused products and how the litigation would affect their orders and shipments. Filing 15-1 at 3 (Martini Decl., ¶ 11). Furthermore, the Court found that HBL's Magnetic Cord accused product is also patented. In the patent context, the Federal Circuit Court of Appeals has recognized that "impaired goodwill and competitive position" can "justify injunctions to prevent them before they occur (precisely because they are hard to quantify later)." *Texas Advanced Optoelectronic Sols., Inc. v. Renesas Elecs. Am., Inc*., 895 F.3d 1304, 1331 (Fed. Cir. 2018). Finally, the Court concluded, the timing of Lite-Netics's communications to HBL's customers at the height of the sales season for retailers to be purchasing stocks of holiday lights is reasonably likely to exacerbate the impact on HBL's reputation and goodwill, as customers may

reasonably be expected to choose a different vendor if they have questions about HBL's ability to perform and if they are unaware that Lite-Netics's threat to add them to this lawsuit is an empty one under the applicable law.

In opposition to the Motion for Preliminary Injunction, however, Lite-Netics reiterates its contention that HBL has shown nothing more than speculative harms. Filing 32 at 38. Lite-Netics argues Federal Circuit decisions make clear that potential loss of business is too speculative to warrant injunctive relief without evidence of actual losses. Filing 32 at 38–39. Lite-Netics argues that HBL has shown no evidence of lost customers, delayed purchases, or struggling to acquire new business because of the ongoing proceedings and instead merely speculates that customers might be put off by accusations against HBL. Filing 32 at 39; *see also* Filing 38 at 4–5. In further support of its request for a preliminary injunction, HBL has now provided the declaration of a manager for one of its customers corroborating his October 4, 2022, conversation with HBL's Richard Martini. Filing 34 at 1. HBL argues this declaration confirms that its customers felt very intimidated by Lite-Netics's threats, demonstrating the need for intervention by the Court. Filing 34 at 1–2. In reply, Lite-Netics disputes the sufficiency of the additional declaration to demonstrate irreparable harm, where HBL still has not shown that it lost any customers or struggled to acquire new ones. Filing 38 at 4–5.

Lite-Netics relies on the decision of the Federal Circuit Court of Appeals in *Koninklijke Philips N.V. v. Thales DIS AIS USA LLC*, 39 F.4th 1377 (Fed. Cir. 2022). In *Philips*, the Federal Circuit acknowledged that "[a] party seeking a preliminary injunction must establish that it is *likely* to suffer irreparable harm without an injunction. 39 F.4th at 1380 (emphasis in the original) (citing *Winter*, 555 U.S. at 22). The court then upheld that district court's conclusion that the movant for a preliminary injunction had failed to show likely irreparable harm, because it "did not present any

evidence that it lost customers, had customers delay purchases, or struggled to acquire new business because of the ongoing [International Trade Commission (ITC)] proceedings." *Id.* It observed that the movant's evidence indicated only that "the threat of an ITC exclusion order caused several customers to 'voice concerns' and express doubt regarding [the movant's] ability to deliver products," and the movant argued that it was living under the "cloud on the business" of a potential exclusion order and the potential loss of business. *Id.*

This Court believes that there are at least two reasons the analysis in *Philips* is problematic. First, notwithstanding purported acknowledgement that *Winter* requires only the *likelihood* of irreparable harm, the court in *Philips* required proof of *actual* harm in the form of customers actually lost and customer purchases actually delayed. Second, there is no indication that the court in *Philips* considered the intangible value of goodwill, where that is not even mentioned in the decision.

In contrast, both the Eighth Circuit Court of Appeals and the Federal Circuit Court of Appeals have expressly recognized that injury to reputation and goodwill are intangible injuries that may support a finding of irreparable harm for purposes of a TRO or a preliminary injunction. *See Mgmt. Registry, Inc.*, 920 F.3d at 1183; *see also Texas Advanced Optoelectronic Sols., Inc.*, 895 F.3d at 1331. Furthermore, as the Eighth Circuit Court of Appeals has explained,

> We have previously held that a district court did not err when finding that a loss of goodwill among customers was sufficient to establish a threat of irreparable harm. *Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.*, 336 F.3d 801, 805 (8th Cir. 2003). While a district court may choose to require more than a loss of goodwill to demonstrate irreparable harm, the district court ultimately has discretion to determine "whether an alleged harm requires more substantial proof." *Gen. Motors [Corp. v. Harry Brown's, LLC]*, 563 F.3d [312,] 319–20 [(8th Cir. 2009)].

*Rogers Grp., Inc. v. City of Fayetteville, Ark.*, 629 F.3d 784, 789 (8th Cir. 2010). In *Rogers*, the court found no clear error in the district court's finding of a threat of irreparable harm from loss of goodwill based on evidence that the ordinance the movant sought to enjoin would prevent the

business from expanding, bidding on larger projects, and accepting projects on short notice; that the ability to grow and accommodate its customers was critical to its commercial viability; that the ordinance restrictions would drive customers away; and that even if the movant ultimately prevailed, the lost customers would be unlikely to return. 629 F.3d at 790. The Eighth Circuit Court of Appeals has also recognized that "it might take months for a loss of goodwill to become manifest." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 742 (8th Cir. 2002). Waiting months for such evidence to materialize would then leave a movant facing complaints of undue delay or lack of diligence in seeking emergency relief, which Lite-Netics has also made here. *See Wildhawk Invs., LLC*, 27 F.4th at 597.

In contrast, in *General Motors*, when considering intangible injuries to goodwill and reputation, the district court was faced with conflicting opinions about the likely response of consumers to the circumstance sought to be enjoined, and the court found that the movant had failed to carry its burden. 563 F.3d at 319. The court explained that it had previously acknowledged that it had affirmed a preliminary injunction based on nothing more to support a claim of intangible harm than arguments from general business principles. *Id.* (citing *Med. Shoppe Int'l, Inc.*, 336 F.3d at 805, and *United Healthcare Ins. Co.*, 316 F.3d at 741). The court explained, however, that the standard of review "ma[de] it acceptable for a district court to find a likelihood of irreparable harm based on general principles, but it does not mean that it is error for the district court to require additional evidence in other cases." *Id.* at 320. Thus, the court concluded that the district court's discretion included whether to require more substantial proof of irreparable harm. *Id.*

In a situation like this involving the sale of a particularly seasonal product, this Court finds that waiting possibly months for evidence of loss of goodwill to materialize is not appropriate. *See United Healthcare Ins. Co.*, 316 F.3d at 742. Thus, HBL's reliance to some extent on business

principles—and the Court adds common sense—to demonstrate intangible and irreparable harm to its business reputation and goodwill is not fatal to its request for a preliminary injunction. *Cf. Gen. Motors*, 563 F.3d at 319 (explaining that it may be enough for a court to rely on general business principles, but the court is not prohibited from requiring more substantial evidence). Moreover, the Court concludes that there is more substantial evidence of injury to HBL's goodwill and reputation, in additional to the evidence the Court identified in its TRO ruling. As HBL argues, Rich Firneno, the Merchandising Manager for Jabo's Ace Hardware in Texas, has submitted a declaration that substantiates the likelihood of a threat to HBL's goodwill and reputation and customer orders in the absence of injunctive relief. *See* Filing 35-1 at 1–2. Not only does Mr. Firneno explain the impact of Lite-Netics's communications to customers on his own business decisions and the concerns about the impact of those communications on his own customers, Mr. Firneno points out that these concerns on his part were alleviated by the Court's entry of a TRO. Filing 35-1 at 1–2. The Court reiterates its prior conclusion that HBL has presented more than mere speculation to support its claim of a likelihood of a threat of irreparable harm. Lite-Netics did not supplement its argument on this point at the preliminary injunction hearing.

Thus, the Court reiterates its prior conclusion that the second *Winter* factor requiring irreparable harm in the absence of injunctive relief has been met in this case. *See Tumey*, 27 F.4th at 665.

### 4.   *The Balance of Equities and the Public Interest also Tip in Favor of a Preliminary Injunction*

The last two *Winter* factors are the balance of equities and whether an injunction is in the public interest. *Tumey*, 27 F.4th at 664. These factors were not discussed at the preliminary injunction hearing. The Court finds that these factors also weigh in favor of a preliminary injunction in this case, for essentially the same reasons they weighed in favor of a TRO.

a.   The Balance of Equities Still Favors a Preliminary Injunction

In its TRO ruling, the Court explained that the "balance of equities" factor balances the irreparable harm to the claimant if a TRO or preliminary injunction is not granted against the harm to the other party or others if the TRO or preliminary injunction is granted. *Wildhawk Inv., LLC.*, 27 F.4th at 593. In this case, the Court concluded that Lite-Netics has no countervailing harm if it is enjoined from making statements in various media suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. Indeed, the Court made a preliminary finding that Lite-Netics has forfeited any privilege to make these communications. The Court concluded that, as HBL contended, Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means. On the other hand, the Court concluded, HBL has established that it will suffer irreparable harm in the absence of a TRO, for all the reasons the Court has explained above. Thus, the Court concluded that the balance of equities weighed in favor of a TRO.

In its opposition to the Motion for Preliminary Injunction, Lite-Netics argues that the Court must balance Lite-Netics's loss of its statutory right to publicize and defend its patents by informing customers that it is pursuing infringers, as a result of HBL's "overbroad" injunction, against HBL's "non-existent" harm. Filing 32 at 39. Lite-Netics reiterates its contention that a preliminary injunction would have the effect of disturbing the status quo in favor of HBL poaching Lite-Netics's customers. Filing 32 at 39–40.

The Court is no more persuaded by Lite-Netics's arguments on this *Winter* factor at this stage of the proceedings than it was at the TRO stage. Any strength to Lite-Netics's arguments stems from its belief that its allegations of infringement are not "baseless." However, the Court has reiterated its conclusion that Lite-Netics's allegations are "baseless," meaning that Lite-Netics

has forfeited the privilege to make them. Also, Lite-Netics has come forward with nothing to demonstrate that HBL is illegitimately "poaching" Lite-Netics's customers or that the TRO will allow HBL to do so. Again, Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means. In contrast, the Court has reiterated its conclusion that HBL faces a likelihood of a threat of irreparable harm in the absence of injunctive relief.

This factor continues to weigh in favor of injunctive relief, at this point a preliminary injunction, while the lawsuit is pending.

### b.   The Public Interest Still Favors a Preliminary Injunction

In its TRO ruling, the Court explained that, in the context of litigation between private entities, the public interest considers such things as the public's interest in preventing fraud and enforcing contracts. *See, e.g., Jet Midwest Int'l Co., Ltd v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020) (public interest in preventing fraud); *Medicine Shoppe Int'l., Inc.*, 336 F.3d at 805 ("[W]e agree that the public interest would not be served by permitting a party to avoid contractual obligations."). The public interest is also served by maintaining consumer choice and convenience in the marketplace. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 321 (8th Cir. 2009). Finally, the public interest favors enjoining false statements in marketing. *United Indus. Corp. v. Clorox Co*., 140 F.3d 1175, 1184 (8th Cir. 1998). The Court reiterated that it had determined that HBL has at least a fair chance of succeeding on its claims that Lite-Netics tortiously interfered with HBL's business relations and defamed HBL by making false and baseless statements to customers. The Court concluded that, in such circumstances, the public interest favors enjoining such conduct, *see id.*, and not inhibiting choice in the marketplace, *see Gen. Motors Corp.*, 563 F.3d at 321, just as it favors enjoining other kinds of conduct that would distort the marketplace. *See, e.g. Jet Midwest Int'l Co., Ltd.*, 953 F.3d at 1046 (the public interest favors

preventing fraud). Thus, the Court concluded that the public interest also weighed in favor of a TRO.

In opposition to the Motion for Preliminary Injunction, Lite-Netics argues that a preliminary injunction in this case provides not benefit to the public interest. Filing 32 at 40. The crux of Lite-Netics's argument appears to be that the public interest would not be served by discouraging patent holders from pursuing their right to exclude others from practicing their inventions and their right to communicate to others about their patents. Filing 32 at 40.

The Court is not persuaded by these arguments at this juncture in the litigation. No public interest is served by allowing a patent holder to make baseless allegations of infringement against a competitor, which is what the Court finds—at least preliminarily—is what Lite-Netics is doing. *See Clorox Co.*, 140 F.3d at 1184 (finding that the public interest favors enjoining false statements in marketing). The Court also reiterates that the public interest favors not inhibiting choice in the marketplace, *see Gen. Motors Corp.*, 563 F.3d at 321, just as it favors enjoining other kinds of conduct that would distort the marketplace. *See, e.g. Jet Midwest Int'l Co., Ltd.*, 953 F.3d at 1046 (the public interest favors preventing fraud). Thus, the Court now concludes that the public interest also weighs in favor of a preliminary injunction.

In summary, HBL has now satisfied all the *Winter* factors for issuance of a preliminary injunction.

### C. Scope of the Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65(d)(1), "[e]very order granting an injunction and every restraining order must (A) state the reasons why it issued; (B) state its terms specifically; and (C) describe in reasonable detail—and not by referring to the complaint or other document— the act or acts restrained or required." Fed. R. Civ. P. 65(d). Thus, the preliminary injunction in this case—like the prior TRO—must meet these requirements.

As to the reasons for issuing the preliminary injunction, the Court will summarize its findings set out above. Fed. R. Civ. P. 65(d)(1)(A). As to the terms of the preliminary injunction and the acts it restrains, *id.* at 65(d)(1)(B), HBL states:

> HBL respectfully requests that this Court issue a temporary restraining order and preliminary injunction that restrains Lite-Netics, along with its officers, directors, shareholders, and other agents from making statements via letters, emails, Facebook, Twitter, or on any other social media, mass media, direct marketing, robocalls, press releases, blogs, or websites suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer. The Court should also require Lite-Netics to publicize this Court's Order to that effect, and to provide complete discovery to HBL of all relevant marketplace statements.

Filing 13 at 11. The Court reiterates its prior conclusion that this statement meets the requirements of Rule 65(d) and that the relief requested is appropriate in the circumstances of this case, adjusted as necessary for a preliminary injunction rather than a TRO.

On the other hand, the Court rejected HBL's suggestion in its Proposed Order that Lite-Netics be enjoined to disclose to HBL all documents and things related to Lite-Netics's marketplace communications concerning HBL's alleged "copying" and "infringement" of its patents, or an entity's risk of being sued as an HBL customer, within two days from the date of the TRO. The Court found such a request was beyond the appropriate scope of a TRO—and now reiterates that it is beyond the scope of a preliminary injunction—in this case, where it requires affirmative action. *See Tumey*, 27 F.4th at 665. Also, the relief was neither requested nor briefed in HBL's filed submissions. HBL has not reiterated a request for such language, and the Court finds no reason to revisit the issue *sua sponte*.

In its opposition to the Motion for Preliminary Injunction, Lite-Netics asserts baldly that the requested injunction is "overbroad." Filing 32 at 39. It does not explain in what respect this is so, except possibly by reiterating its contention that any injunction is improper because Lite-Netics has the right to take action to protect its patents and to inform customers that it is doing so. The

Court concludes that a preliminary injunction in the terms stated above is not "overbroad" where Lite-Netics has forfeited its right to inform customers of alleged infringement by making baseless allegations.

Thus, apart from certain terms that distinguish a TRO from a preliminary injunction, such as duration of the preliminary injunction, the Court will not change the terms of the injunctive relief.

### D.  The Bond Requirement

As the Court explained in its TRO ruling, Rule 65(c) provides, "The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c) (also excepting the United States, its officers, and its agencies from this requirement). "[T]he amount of the bond rests within the sound discretion of the trial court and will not be disturbed on appeal in the absence of an abuse of that discretion.'" *Richland/Wilkin Joint Powers Auth. v. United States Army Corps of Engineers*, 826 F.3d 1030, 1043 (8th Cir. 2016) (quoting *Stockslager v. Carroll Elec. Coop. Corp.*, 528 F.2d 949, 951 (8th Cir. 1976)). HBL argued that the small threat of harm to Lite-Netics justified the Court requiring only a minimal security bond, which it suggested in its Proposed Order should be $100. The Court agreed a minimal security bond was appropriate in this case, in light of the balance of the harms as the Court has measured them above, but it imposed a bond requirement of $1,000. No party argues that this bond is either excessive or inadequate at the preliminary injunction stage of the proceedings.

In its TRO ruling, the Court also observed that HBL's Proposed Order suggested that HBL should have fourteen days to post such a security or bond. This Court explained that it reads Rule 65(c) to require the posting of the bond as a prerequisite to the issuance of the TRO, however. *See*

Fed. R. Civ. P. 65(c) (stating that the court may issue a TRO "only if the movant gives security");
Wright & Miller, 11 *Federal Practice and Procedure* § 2954, p. 525 (describing the posting of a
bond by a successful movant as "a prerequisite to the issuance of injunctive relief."). Thus,
issuance of the TRO was be made contingent upon the posting of the required security. The Court
now concludes that the bond previously imposed and provided is sufficient to allow immediate
issuance of a preliminary injunction, provided that bond does not expire by its own terms if the
TRO is replaced by a preliminary injunction.

## III. CONCLUSION

Upon the foregoing,

IT IS ORDERED that HBL's September 30, 2022, Motion for Preliminary Injunction,
Filing 12, is granted on the terms and conditions set out in the attached Preliminary Injunction.


Dated this 27th day of October, 2022.

BY THE COURT:

_____
Brian C. Buescher
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

LITE-NETICS, LLC,

          Plaintiff/Counter-Defendant,

vs.

NU TSAI CAPITAL LLC, d/b/a HOLIDAY
BRIGHT LIGHTS,

          Defendant/Counterclaimant.

**NO. 8:22CV314**

**PRELIMINARY INJUNCTION**

The Court having considered the parties' written submission on the September 30, 2022, Motion for Preliminary Injunction by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL), and the arguments of the parties at the preliminary injunction hearing,

THE COURT FINDS, for preliminary purposes,

- that defendant/counterclaimant HBL has made sufficient showing that plaintiff/counter-defendant Lite-Netics, LLC (Lite-Netics) has engaged in tortious interference with business relations and prospective business relations, as claimed in Count IV of HBL's Counterclaim in this action, and has engaged in defamation, as claimed in Count V of HBL's Counterclaim, by sending false, baseless, and defamatory communications to businesses that Lite-Netics knew had business relationships with HBL, falsely accusing HBL of tortious conduct, that is, patent infringement and "copying" of Lite-Netics's products; threatening to include any known company using or reselling the HBL products as co-defendants in this lawsuit contrary to applicable law; and defaming HBL with false and baseless accusations of patent infringement and copying;

1

- that HBL has shown a threat of irreparable harm to its reputation and goodwill caused by Lite-Netics's conduct that is not merely speculative;

- that the balance of harms favor issuance of a preliminary injunction, because Lite-Netics will be free to pursue the marketing of its products by any other means, just not by such deceptive means, while HBL has established that it will suffer irreparable harm in the absence of a preliminary injunction; and

- that the public interest favors enjoining false statements to customers and not inhibiting choice in the marketplace, just as it favors enjoining other kinds of conduct that would distort the marketplace.

IT IS THEREFORE ORDERED that, pending disposition of this case or subsequent court order, Lite-Netics, along with its officers, directors, shareholders, and other agents, is preliminarily enjoined from making statements via letters, emails, Facebook, Twitter, or any other social media, mass media, direct marketing, robocalls, press releases, blogs, websites or otherwise suggesting "copying" by HBL, suggesting HBL customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer.

IT IS FURTHER ORDERED that Lite-Netics shall send this Order to all persons who in the past have received the marketplace communications identified above;

AND IT IS FURTHER ORDERED that, under Federal Rule of Civil Procedure 65(c), this Preliminary Injunction shall issue immediately, where HBL has previously posted a security or bond in accordance with NECivR 65.1.1 in the amount of $1,000 as security for the payment of such costs and damages as may be incurred or suffered by any party who is subsequently found to be wrongfully enjoined or restrained hereby.

Dated this 27th day of October, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge