7IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| LITE-NETICS, LLC, | |
| Plaintiff/Counterdefendant, | NO. 8:22CV314 |
| vs. | MEMORANDUM AND ORDER ON CLAIM CONSTRUCTION |
| NU TSAI CAPITAL LLC, d/b/a HOLIDAY BRIGHT LIGHTS, | |
| Defendant/Counterclaimant. | |

This case involves claims by plaintiff/counterdefendant Lite-Netics, LLC, (Lite-Netics) of alleged infringement of its patents for magnetic holiday light fixtures by defendant/counterclaimant Nu Tsai Capital LLC, d/b/a Holiday Bright Lights (HBL). Filing 31. It also involves counterclaims by HBL that Lite-Netics made "objectively baseless allegations" to HBL's clients and customers "that HBL was infringing the Asserted Patents and/or had 'copied' Lite-Netics and/or [that HBL's clients] would have to respond to HBL-product-infringement assertions as . . . added defendant[s]." *See, e.g.*, Filing 82 at 15 (¶ 29). It involves HBL's further counterclaims alleging among other things that both of Lite-Netics's patents-in-suit are invalid and not infringed. Filing 82 at 22–23 (Counterclaim Counts VII through X). This case is now before the Court after a *Markman* hearing[1] for construction of the disputed terms of the patents-in-suit and resolution of HBL's invalidity challenges to various claim terms.

---

[1] A "*Markman* hearing" is "a hearing to determine the proper construction of the patent's claims." *See Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 905–06 (2014) (citing *Markman v. Westview Instruments, Inc.*, 517 U.S. 370 (1996), as holding that claim construction is a matter of law reserved for court decision).

# I.  INTRODUCTION

## A.  Factual Background

The factual background pertinent here begins with Lite-Netics's allegation that it sells magnetic light strands used to illuminate homes and businesses during the holidays pursuant to U.S. Patent No. 7,549,779 (the '779 Patent) and U.S. Patent No. 8,128,264 (the '264 Patent) (collectively, the Asserted Patents). Filing 31 at 1 (¶ 2), 3 (¶ 10). However, both of the Asserted Patents describe the invention as "a light fixture assembly," rather than a light strand. Filing 128-1 at 2 ('779 Patent, abstract); Filing 128-2 at 2 ('264 Patent, abstract). The '264 Patent is identified as a "[c]ontinuation-in-part of . . . Pat. No. 7,549,779." Filing 128-2 at 2.

### 1.  Lite-Netics's Patents

#### a.  Descriptions of the Inventions

The Abstract to the '779 Patent describes the invention it discloses as follows:

> The present invention provides a light fixture assembly. The assembly includes a light bulb socket with an opening at one end for accommodating C7/C9 light bulbs and at least one opening at the second end. The socket includes a conductor that places a light bulb into electrical contact with electrical wires inserted through the side of the socket. The assembly also includes a base attached to the second end of the socket. The base includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor. Retaining clips on the base apply a retaining force against the socket to hold the base in place. A neodymium disc magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces.

Filing 128-1 at 2. The Abstract to the '264 Patent is similar but not identical. Deletions are shown with strike outs and additions are shown underlined:

> The present invention provides a light fixture assembly. The~~The~~In one embodiment, the assembly includes a light bulb socket with an opening at one end for accommodating C7/C9 light bulbs and at least one opening at the second end. The socket includes a conductor that places a light bulb into electrical contact with electrical wires inserted through the side of the socket. The assembly also includes a base attached to the second end of the socket. The base includes a wire clamp that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor. Retaining clips on the base apply a retaining

force against the socket to hold the base in place. A ~~neodymium disc~~strong magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces.

Filing 128-2 at 2.

In Lite-Netics's First Amended Complaint, which is its operative pleading, filed October 16, 2022, Lite-Netics provides the following figure as an example of one embodiment of a magnetic light fixture disclosed in its Asserted Patents and the following photograph of its actual product:




Filing 31 at 4 (¶ 13), 5 (¶ 17). Referring to Fig. 9A, Lite-Netics explains, "The magnetic light fixture includes a socket (8) configured to couple with a light bulb (7) at a first end and a base (3) at a second end. A magnet (1) is configured to be embedded in the base (3)." Filing 31 at 3 (¶ 13). The Asserted Patents explain that the light fixture assembly also includes "[a] plastic protective coating **2**," "two retaining clips **5**," an optional "side clip **6**," and "a copper conductor **10**." Filing 128-1 at 7 (Plaintiff's Ex. A) ('779 Patent at 3:36–37, 3:46, 3:54); Filing 128-2 at (Plaintiff's Ex. B) ('264 Patent at 3:57–59, 3:62, 4:1).

    b.  The '779 Patent Claims at Issue

The claims of the '779 Patent in which the parties have identified claim terms needing construction are shown below. Disputed claim terms, some involving disputes about constituent

claim terms, are shown in bold. One claim term that the parties initially put at issue, but on which

the parties subsequently agreed to a construction using the ordinary meaning, is shown in italics.

**1**.  A light fixture assembly, comprising:

(a) a light bulb socket with an opening at the first end for accommodating a light bulb and *at least one opening at the second end*, wherein the socket includes **a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket**;

(b) **a base attached to the second end of the light bulb socket**; and

(c) **a neodymium magnet embedded in the base wherein said magnet has a pull strength of at least five pounds**.

**2**.  The light fixture assembly according to claim **1**, wherein the **socket** accommodates C7 light bulbs.

**3**.  The light fixture assembly according to claim **1**, wherein the **socket** accommodates C9 light bulbs.

\* \* \*

**5**.  The light fixture assembly according to claim **1**, wherein the retaining clips on the base are separate from **the wire clamp** and fit through separate holes in the second end of the **socket**.

\* \* \*

**9**.  The light fixture assembly according to claim **1**, wherein the **magnet is a disc** one half inch in diameter and one eighth inch thick.

\* \* \*

**12**. The light fixture assembly according to claim **1**, wherein the **socket** and base are three quarter inch diameter.

\* \* \*

**15**. The light fixture assembly of claim **1** wherein said base comprises:

(i) **a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor**; and

(ii) retaining clips that apply a retaining force against the **socket** to hold the base in place.

Filing 128-1 at 7–8 (emphasis other than for claim numbers added).

c.   The '264 Patent Claims at Issue

The claims of the '264 Patent in which the parties have identified claim terms needing construction are shown below. Again, disputed claim terms, some involving disputes about constituent claim terms, are shown in bold. One claim term (in two claims) that the parties initially put at issue, but on which they subsequently agreed to a construction using the ordinary meaning, is shown in italics. Because that claim term is a constituent of a longer disputed claim term in both claims, it is also in bold in those claims.

**1**.  A light fixture assembly, comprising:

a light bulb **socket** with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, **wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires**;

**a base integrally attached to the second end of the light bulb socket**; and

a magnet **embedded in the base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.**

2.  The light fixture assembly of claim 1, **wherein said base comprises a *removable end piece* within which said magnet is embedded**.

* * *

**6**.  The light fixture assembly of claim **1**, wherein said base comprises:

**a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors**; and

retaining clips that apply a retaining force against the **socket** to hold the base in place.

5

* * *

8.   The light fixture assembly according to claim **6**, wherein the retaining clips on the base are separate from the wire clamp and fit through separate holes in the second end of the **socket**.

9.   The light fixture assembly according to claim **1**, wherein the **socket** accommodates C7 light bulbs.

10.   The light fixture assembly according to claim **1**, wherein the **socket** accommodates C9 light bulbs.

* * *

13.   The light fixture assembly according to claim **1** wherein the **magnet is a disc** one half inch in diameter and one eighth inch thick.

14.   The light fixture assembly according to claim **13**, wherein the **socket** and the base are three quarter inch diameter.

* * *

17.   A method for installing a string of light fixture assemblies, said method comprising the steps:

selecting a location containing a ferrous metal surface; and

attaching at least one of said light fixture assemblies to said ferrous metal surface by touching a base of said at least one of said light fixture assemblies to said ferrous metal surface, wherein **said base is integrally attached to an end of the light bulb socket** and wherein a magnet is **embedded in said base such that said magnet does not protrude outside of said base, wherein said magnet has sufficient pull force to hold said at least one of said light fixture assemblies to said ferrous metal surface while said at least one of said light fixture assemblies is connected to said string of other light fixture assemblies**.

* * *

19.   The method of claim **17**, wherein said at least one of said light fixture assemblies may be removed by hand from said ferrous metal surface by **tugging** on said light fixture assembly.

* * *

21.   The method of claim 17, **wherein said base comprises a *removable end piece* within which said magnet is embedded**.

6

\* \* \*

**26**. The method of claim **17**, wherein said **magnet is a disc** one half inch in diameter and one eighth inch thick.

Filing 128-2 at 8 (emphasis other than for claim numbers added).

    2.  *HBL's Accused Products*

HBL is marketing two products that Lite-Netics alleges infringe the Asserted Patents: a "Magnetic Cord" and a "Magnetic Clip." Filing 31 at 6 (¶ 21). The Court will briefly set out the parties' descriptions of these products.

    a.  The Magnetic Cord

HBL included its patent for the first Accused Product, its Magnetic Cord, U.S. Patent No. 11,333,309 (the '309 Patent), as Exhibit H to its Counterclaims. Filing 11-8. HBL refers to that patent again in its Amended Counterclaims, Filing 82 at 12 (¶ 14). One image of the patented product from the '309 Patent and a photo of the actual Magnetic Cord from Lite-Netics's Complaint are shown below:




Filing 11 at 2 ('309 Patent, cover page image); Filing 1 at 6 (¶ 21) (photograph of device); Filing 31 at 6 (¶ 21) (same). The '309 Patent explains that "two magnets **20** and **50** [with **50** not shown

7

in the image above] protrude from the base of a socket **10**," with "a pocket **30** shaped to receive a magnet **50**" as well as one to receive the magnet **20**, and "drain holes **40** for the socket **10**." Filing 11-8 at 7 ('309 Patent, 2:17–18, 2:24–25, 2:65). The '309 Patent explains further that "a channel between magnets **20** and **50** further helps the circulation of air when socket **10** is magnetically fixed to a surface." Filing 11-8 at 7 ('309 Patent, 2:59–61). Although HBL's product is called a "Magnetic Cord," as these images and the explanations demonstrate, the only parts of the product that are magnetic and stick to a metal surface are the magnets in the base of each light fixture.

      b.   The Magnetic Clip

HBL acknowledges that Lite-Netics's Complaint includes the following photograph of HBL's Magnetic Clip, shown with a light fixture. Filing 31 at 7 (¶ 21) (image); Filing 13 at 10 (acknowledging that Lite-Netics includes photographs of the accused products in its Complaint). Lite-Netics includes with the Second Declaration of Shawn Genenbacher a photograph of unmounted HBL Magnetic Clips. Filing 33-1 at 11 (¶ 19). These photographs are shown below, with colored arrows inserted by Mr. Genenbacher omitted from the second photograph.



**C7/C9 Magnetic Clip**
AC-MAGCLP-250
*These magnetic intermediate base socket caps slip on easily to convert plastic light string sockets to magnetic ones.*



## B.  Procedural Background

This case has already generated several decisions in this Court and one in the Federal Circuit Court of Appeals.[2] Among other things, those rulings involved this Court granting HBL's request for a Preliminary Injunction enjoining Lite-Netics from making public statements suggesting "copying" by HBL, suggesting that HBL's customers will be burdened as additional defendants in this or any lawsuit, or suggesting that HBL is a patent infringer, after the Court found that Lite-Netics's allegations of infringement were "baseless." Filing 43, *published at Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 637 F. Supp. 3d 668 (D. Neb. 2022). Also among those decisions was the decision of the Federal Circuit Court of Appeals vacating this Court's preliminary injunction. Filing 70, *published at Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335 (Fed. Cir. 2023). However, for present purposes, the pertinent procedural background focuses on the parties' claims and counterclaims and the proceedings leading to this decision on claim construction and invalidity.

### 1.  The Parties' Pleadings

Lite-Netics's First Amended Complaint, Filing 31, is its operative pleading. Count I of Lite-Netics's First Amended Complaint asserts that HBL has directly infringed, induced infringement, and contributed to infringement of one or more claims of the '779 Patent. Filing 31 at 8-10 (¶¶ 27–39). Count II of its First Amended Complaint again asserts direct infringement,

---

[2] The decisions, in chronological order, are the following: *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 6151898 (D. Neb. Oct. 7, 2022) (memorandum and order regarding defendant/counterclaimant's motion for temporary restraining order and temporary restraining order); *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 637 F. Supp. 3d 668 (D. Neb. 2022) (memorandum and order regarding defendant/counterclaimant's motion for preliminary injunction and preliminary injunction), amended, No. 8:22CV314, 2022 WL 16798803 (D. Neb. Nov. 8, 2022), and vacated and remanded, 60 F.4th 1335 (Fed. Cir. 2023); *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2022 WL 18106436 (D. Neb. Nov. 10, 2022) (memorandum and order regarding plaintiff/counter-defendant's motion to stay preliminary injunction pending appeal); *Lite-Netics, LLC v. Nu Tsai CapitaL LLC*, 678 F. Supp. 3d 1115 (D. Neb. 2023) (memorandum and order regarding defendants' motion to dismiss); *Lite-Netics, LLC v. Nu Tsai Cap. LLC*, No. 8:22CV314, 2023 WL 7166155 (D. Neb. Oct. 31, 2023) (memorandum and order regarding plaintiff's motion to dismiss counterclaims).

inducing infringement, and contributing to infringement by HBL of one or more claims of the '264 Patent. Filing 31 at 10–12 (¶¶ 40–52). One of the principal differences between the original Complaint and the First Amended Complaint is that the latter expressly alleges that HBL's direct infringement was "under literal infringement, the doctrine of equivalents, or both," where its original Complaint contained no allegations of infringement under the doctrine of equivalents. Filing 31 at 8 (¶ 29); Filing 31 at 10 (¶ 42).

In HBL's Answer to Amended Complaint and Counterclaims, HBL reiterated five of its original counterclaims and withdrew one. As in HBL's original Counterclaim, Count I of the Amended Counterclaims alleges a federal claim of unfair competition and false advertising under 15 U.S.C. § 1125(a), Filing 82 at 15; Count II alleges a claim of unfair competition under the Nebraska Consumer Protection Act (NCPA), Neb. Rev. Stat. § 59-1602, Filing 82 at 16; Count III alleges a claim of deceptive trade practices in violation of the Nebraska Uniform Deceptive Trade Practices Act (NUDTPA), Neb. Rev. Stat. §§ 87-302, 87-303, Filing 82 at 17; Count IV alleges a claim of tortious interference with business relations and prospective business relations, Filing 82 at 18; and Count V alleges a claim of defamation, Filing 82 at 20. As in HBL's original Counterclaim, the first five counterclaims in the Amended Counterclaim are premised on allegations that Lite-Netics made "objectively baseless allegations" to HBL's clients and customers "that HBL was infringing the Asserted Patents and/or had 'copied' Lite-Netics and/or [that HBL's clients] would have to respond to HBL-product-infringement assertions as . . . added defendant[s]." Filing 82 at 15 (¶ 29), 16 (¶ 38), 18 (¶ 45), 18–19 (¶ 51), and 20 (¶ 60). This pleading omits the previously pleaded Count VI alleging bad faith patent infringement communications under Colo. Rev. Stat. § 6-112-102 (2018). Filing 82 at 21 (retaining only the caption for the cause of action).

This pleading also includes several new counterclaims. Count VII seeks declaratory judgment of non-infringement of Lite-Netics's '779 patent. Filing 82 at 21. Count VIII seeks declaratory judgment of non-infringement of Lite-Netics's '264 patent. Filing 82 at 21. Count IX seeks declaratory judgment of invalidity of Lite-Netics's '779 patent. Filing 82 at 22. Count X seeks declaratory judgment of invalidity of Lite-Netics's '264 patent. Filing 82 at 22. Count XI seeks declaratory judgment of equitable estoppel as to Lite-Netics's '779 patent. Filing 82 at 23. Count XII (improperly numbered as another Count XI) seeks declaratory judgment of equitable estoppel as to Lite-Netics's '264 patent. Filing 82 at 24.

### 2. *The Claim Construction Proceedings*

After litigating other matters, the parties eventually submitted a Joint Rule 26(f) Report, Filing 90, setting out among other things a schedule for the parties' preparations for the *Markman* hearing on claim construction. Filing 90 at 9–13 (§ VI.G.–K.). Pursuant to that schedule, on January 19, 2024, the parties filed their Joint Claim Construction and Prehearing Statement. Filing 113. In that filing, the parties notified the Court that they had agreed on the construction of two claim terms, Filing 113 at 1, and attached proposed constructions of 23 disputed terms with lists of supporting evidence in a chart entitled Parties' Proposed Constructions for U.S. Patent Nos. 7,549,779 ("779 Patent") and 8,128,264 ("264 Patent") and Supporting Evidence (Chart of Proposed Constructions). Filing 113-1. Some of the disputed claim terms appear in both patents.

On March 4, 2024, Lite-Netics filed its Opening Claim Construction Brief stating its constructions in turn of all 23 claim terms, albeit not numbered in the same order in which they appeared in the parties' Chart of Proposed Constructions. Filing 127. On March 25, 2024, HBL filed its Responsive Brief on Claim Construction. Filing 129. Unlike Lite-Netics, HBL arranged its discussion of the constructions of the disputed terms by "grouping and presenting issues" rather than addressing claim terms in either the numerical order set out in the Chart of Proposed

Constructions or the numerical order set out in Lite-Netics's Opening Brief. Filing 129 at 9. However, in its "seven issue groups," HBL does at least identify the section or sections of Lite-Netics's Opening Claim Construction Brief that each "issue group" addresses. Filing 129 at 9; *see also* Filing 129 at 12 (identifying the first "issue group" as "Claiming a Short Circuit" and identifying "[s]ections where raised in Lite-Netics' brief" as "V.H., V.I."). On April 3, 2024, Lite-Netics filed its Reply Claim Construction Brief, addressing HBL's "issue groups" in turn. Filing 133. On April 5, 2024, the parties filed their Joint Claim Construction Chart listing the undisputed and disputed claim terms, this time with the disputed claim terms unnumbered but in yet another order. Filing 134.

On April 9, 2024, the Court entered an Order Setting Requirements for *Markman* Hearing. Filing 135. Among other requirement, that Order stated,

> 2.    The Court sees no reason why this matter cannot be submitted on documentary evidence and affidavits; therefore, the hearing will be on arguments and written submissions only. Any party who believes that live testimony is required to present its case on claim construction must file a motion not later than April 15, 2024, requesting live witnesses, demonstrating good cause for live testimony, and indicating the estimated time required to hear the testimony. If the Court allows live witnesses, the Claim Construction Hearing may have to be continued. If live witnesses are allowed, the party or parties calling witnesses must submit witness lists not less than seven (7) days before the hearing.

Filing 135 at 1 (¶ 2).

Lite-Netics filed but subsequently withdrew a request for the Court to hear live testimony of its expert via videoconference. Filing 136 (Motion); Filing 137 (Motion to Withdraw Motion). On April 22, 2024, Lite-Netics filed a Joint Exhibit List. Filing 139. That same day, Lite-Netics also filed a Motion for Leave to File Supplemental Rebuttal Evidence in Support of Claim Construction, identifying the "rebuttal evidence" as a supplemental declaration of its expert. Filing 140 at 2 (¶ 4). The Court granted that Motion, Filing 141, and the supplemental declaration was filed the next day, Filing 142, as well as an Amended Joint Exhibit List, Filing 143.

Prior to the *Markman* hearing, the Court had a staff member email the parties a copy of a chart much like the one found at the end of this decision, setting out the disputed claim terms and the parties' proposed constructions, but without the Court's constructions. The Court requested that the parties use this chart when they discussed a disputed claim term in their arguments at the *Markman* hearing, specifically identifying the page in this chart where the claim term appears. The goal was to ensure that during the arguments all parties would be looking at the same claim term language in the same context. On May 6, 2024, the Court held the *Markman* hearing. Filing 146 (Text Minute Entry). The parties' arguments were spirited and informative. The Court now sets out in this Memorandum and Order the Court's constructions of the disputed terms of the Asserted Patents and its resolution of certain related issues.

## II. LEGAL ANALYSIS

### A. Preliminary Matters

The Court finds that before considering the construction of claim terms, it must address three preliminary matters. The first is the impact of the Federal Circuit's decision vacating this Court's preliminary injunction on the Court's construction of claim terms. The second is whether this decision will address "indefiniteness" and the impact of a determination of "indefiniteness" of any claim term, or whether these matters should be addressed in subsequent proceedings. The third issue, much like the second, is whether this decision will address "inoperability" and "nonsense results" and the impact of a determination of "inoperability" or a "nonsense result" of any claim term, or whether these matters should be addressed in subsequent proceedings.

#### 1. *The Impact of the Federal Circuit's Decision Vacating the Preliminary Injunction*

The decision of the Federal Circuit Court of Appeals vacating this Court's preliminary injunction in this case was not the focus of the summary of the procedural background above.

Nevertheless, the Federal Circuit's decision has cast a shadow over the parties' arguments about disputed claim constructions. For example, Lite-Netics asserts that the Federal Circuit rejected some of the claim constructions that HBL reasserts here in holding that Lite-Netics's contrary constructions were not "baseless." *See, e.g.*, Filing 127 at 12, 15, 16–17, 19. In contrast, HBL argues, "The Federal Circuit kept the door open to this Court issuing a formal claim construction in this matter." Filing 129 at 32. Consequently, the Court must address the extent to which the Federal Circuit's decision vacating this Court's preliminary injunction is controlling in this claim construction ruling. *See Lite-Netics, LLC v. Nu Tsai Cap. LLC*, 60 F.4th 1335 (Fed. Cir. 2023) (vacating the preliminary injunction). The short answer to that question is, not at all.

At the beginning of its decision, the Federal Circuit stated, "We hold that the district court abused its discretion in issuing the preliminary injunction because the applicable speech-protective legal standards are not met." 60 F.4th at 1337–38. That holding was not that this Court's tentative constructions of the claim terms were wrong as a matter of law, which is the standard of review for a district court's claim constructions. *See SharkNinja Operating LLC v. iRobot Corp*., No. 2023-1151, 2024 WL 1132219, at *2 (Fed. Cir. Mar. 15, 2024) ("Claim construction is ultimately a question of law that we review de novo."); *see also BlephEx, LLC v. Myco Indus., Inc*., 24 F.4th 1391, 1404 (Fed. Cir. 2022) ("Of course, findings of fact and legal conclusions predicated on the record developed at the preliminary injunction stage are not binding on the court at trial." (citing *Outside the Box Innovations, LLC v. Travel Caddy, Inc*., 695 F.3d 1285, 1302 (Fed. Cir. 2012))). Thus, from the very start, the Federal Circuit signaled that it was not reviewing claim constructions.

HBL's motion for preliminary injunction relied on its state-law claims, and the Federal Circuit took pains to explain that what HBL had to show for those claims to survive preemption by federal patent law was that Lite-Netics's assertions of infringement were in "bad faith." *Lite-*

*Netics*, 60 F.4th at 1343. The Federal Circuit explained that "a bad faith standard cannot be satisfied in the absence of a showing that the claims asserted were objectively baseless." *Id.* (citations omitted). Still more importantly, the Federal Circuit recognized, "An incorrect allegation of patent infringement is not necessarily objectively baseless." *Id.* at 1344. The Federal Circuit then stated, "Because there was an objectively reasonable basis for many of Lite-Netics's infringement allegations, the district court abused its discretion in finding that Lite-Netics could not have 'realistically expect[ed] success on the merits' and, therefore, acted in bad faith." *Id.* at 1344–45. Thus, the Federal Circuit again made clear that it did not need to determine whether any claim construction offered by the parties or relied on by this Court was right or wrong to resolve the appeal of the decision granting the preliminary injunction.

Furthermore, the Federal Circuit plainly stated that the scope of its holding was limited. It explained, "For the reasons set forth next, we hold that the district court abused its discretion at least in finding that Lite-Netics's infringement allegations with respect to the '779 patent are objectively baseless. . . . We need not and do not address other issues." *Id.* One specific example of an issue that the Federal Circuit did not address was "infringement of the '264 patent, with its requirement that the magnet 'does not protrude outside of said base.'" *Id.* at 1344 n.2. The Federal Circuit then explained that the preliminary injunction was largely based on three legal conclusions with respect to the '779 patent. *Id.* at 1345. However, the Federal Circuit concluded,

> Lite-Netics's position on all three of those disputes has not been shown, at this stage of the litigation (before, *e.g.*, full claim-construction proceedings or possible expert reports on infringement), to be objectively baseless. That conclusion requires vacatur of the preliminary injunction, without finally resolving the underlying disputes about claim construction, prosecution history estoppel, or other issues.

*Lite-Netics*, 60 F.4th at 1345. Thus, the Federal Circuit restricted its analysis to whether Lite-Netics's constructions were "objectively baseless," without addressing whether those constructions were correct. Just as clearly, the Federal Circuit anticipated that the issues of claim

construction would be revisited in their entirety after "full-claim construction proceedings," *i.e.*, after a *Markman* hearing. *Id.*

The Federal Circuit's holdings on each of the issues that it considered also made clear that its holdings were limited to whether Lite-Netics's arguments and constructions were "at least reasonable," not whether they were correct (or whether HBL's constructions were wrong). First, the Federal Circuit found that Lite-Netics's argument that the '779 Patent's references to "a magnet" could encompass two magnetic pieces was "at least reasonable." *Id.* at 1345. It then drove home the point about the limits of its conclusion by stating,

> Here, none of the features of the claims or specification relied on by the district court, *see Lite-Netics*, —— F. Supp. 3d at ——, 2022 WL 15523245, at *15–20, sufficiently indicate otherwise, at least for purposes of the inquiry into whether Lite-Netics's position was objectively baseless.

*Lite-Netics*, 60 F.4th at 1345–46. This statement made clear that this holding was in the context of a determination of whether Lite-Netics's position was objectively baseless, not whether Lite-Netics's claim constructions were correct or whether this Court's reading of the claims or specification was wrong.

As to the issue of whether two magnets could infringe a single magnet under the doctrine of equivalents, the Federal Circuit stated,

> There is nothing unreasonable about the allegation that HBL's two half-disk magnets satisfy the function-way-result formulation for equivalence with what we now assume, for purposes of this doctrine-of-equivalents analysis, to be the single (single-piece) magnet claimed by the '779 patent. Moreover, as set out above, the specification lacks language—whether a statement of purpose, a raising and rejection of the possibility of more than one magnet, or other language—that would make it clear that use of two or more magnets together having the required pull is "the opposite of, or inconsistent with," *Augme [Technologies, Inc. v. Yahoo! Inc.]*, 755 F.3d [1326,] 1335 [(Fed. Cir. 2014)], the '779 patent's limitations.

*Lite-Netics*, 60 F.4th at 1347. Much as Lite-Netics might now like this statement to be definitive, the Federal Circuit then stated, "The district court's discussion of the specification does not

identify anything sufficient to make Lite-Netics's equivalence assertion baseless." *Id.* Again, the
Federal Circuit did not state that nothing in the specification was sufficient to foreclose a two-
magnet equivalence as a matter of law. Likewise, when it considered the two-magnet equivalency
issue in light of the prosecution history, the Federal Circuit stated,

> We go no further here than to say that HBL has not shown in this court that, during
> prosecution, Lite-Netics made amendments or statements concerning the number
> of magnets (as opposed to the pull strength required, *see* J.A. 238) that make
> prosecution history estoppel so clearly applicable that it is objectively baseless for
> Lite-Netics to assert infringement under the doctrine of equivalents.

*Lite-Netics*, 60 F.4th at 1347.

As to infringement by HBL's Magnetic Clip, the Federal Circuit noted that this Court
rejected Lite-Netics's contention that external pressure was sufficient for the Magnetic Clip to be
"attached" to the bottom of the socket, because this Court "understood 'attached' to mean
'something more than "touching,"'—something along the lines of fixed or fastened." *Id.* at 1348.
The Federal Circuit explained, "Even if a claim-construction analysis may ultimately support [the
district court's] interpretation, Lite-Netics's view is not objectively baseless." *Id.* The same is true
of the Federal Circuit's conclusion on whether Lite-Netics had disclaimed infringement by the
Magnetic Clip:

> The district court also deemed Lite-Netics's allegation of infringement
> regarding the Magnetic Clip to be objectively baseless because it concluded that, in
> the '779 patent specification, Lite-Netics had disclaimed "clips" and "external
> 'clips' that attach to the electrical cord." *Lite-Netics*, —— F.Supp.3d at ——, 2022
> WL 15523245, at *14–15. This too was error. It is, at the least, reasonable not to
> find a disclaimer in the specification that would exclude the Magnetic Clip.

*Lite-Netics*, 60 F.4th at 1348.[3]

---

[3] This Court believes that the Federal Circuit misunderstood this Court's conclusions about the extent to which
Lite-Netics disclaimed "clips." *Lite-Netics*, 60 F.4th at 1349. However, the Court will address that issue in this decision
only if it becomes necessary to do so.

Thus, the Court now reiterates its conclusion in its ruling on HBL's Motion to Dismiss that, contrary to Lite-Netics's assertions, the Federal Circuit's determination that this Court abused its discretion in finding that three specific assertions of infringement of the '779 Patent were objectively baseless does not impose any construction of the pertinent claim terms of the '779 Patent (or any claim of the '264 Patent) as "law of the case." *See* Filing 81 at 12–13 (citing *Momenta Pharms., Inc. v. Teva Pharms. USA Inc.*, 809 F.3d 610, 619 (Fed. Cir. 2015), which states, "For the [law-of-the-case] doctrine to apply, the issue must have actually been decided. Findings of fact and fact-intensive conclusions of law made by a court in the preliminary injunction context are not binding."). Therefore, just as this Court did with HBL's Motion to Dismiss, this Court will consider claim construction unfettered by the Federal Circuit's decision on the Court's preliminary injunction order. Filing 81 at 13. "Unfettered" does not mean that this Court will disregard all guidance that decision may provide on the issues now presented, however. Filing 81 at 13.

### 2. Addressing "Indefiniteness" and Its Impact

In addition to disputing the construction of various claim terms, HBL contends that some of the disputed claim terms are "indefinite," making the Asserted Patents invalid. Filing 129 at 8. At the *Markman* hearing, the Court raised two preliminary questions regarding "indefiniteness." First, the Court asked, "If I find a claim term is indefinite, does that mean that the entire limitation, the entire claim, or the entire patent in which the indefinite claim term appears is invalid?" Second, the Court asked, "[D]o the parties anticipate that I will determine the scope of invalidity, if any, resulting from indefiniteness as part of my claim construction ruling, or do they anticipate that issue will be determined in subsequent proceedings, such as proceedings on motions for summary judgment or a motion for partial summary judgment?" Because HBL had raised the "indefiniteness" issue, the Court asked for HBL's answer to these questions first.

18

HBL's response to the first question was that "indefiniteness" is determined on a claim-by-claim basis. HBL added that if claim **1** of a patent is indefinite, then that indefiniteness "will propagate" to any claims dependent from claim **1** and invalidate all of them. In this case, HBL argues that in the '779 Patent, if claim **1** is indefinite, then the entire patent would be indefinite because all the other claims in that patent are dependent from claim **1**. HBL's answer to the second question was that courts "typically" reach the invalidity question in a claim construction proceeding if indefiniteness is raised. HBL acknowledged that there might be exceptions, but that courts typically issue rulings on invalidity based on indefiniteness in a claim construction order.

Lite-Netics stated that it did not disagree with HBL's statements with respect to the law regarding invalidation of a claim based on indefiniteness. Nevertheless, Lite-Netics argued that where there had been no oral hearing, and the Court relied on the testimony of experts—which Lite-Netics acknowledged probably was not necessary to determine indefiniteness in this case—Lite-Netics should have the opportunity to supplement the record further before the Court decides the indefiniteness issues. Lite-Netics then clarified that its argument was that supplementation of the record would be appropriate depending on the grounds on which the Court made an indefiniteness determination because indefiniteness might not be a mere matter of looking at the claim terms. Lite-Netics gave as an example the issue of whether the term "pull force" was indefinite because that was an issue over which the experts were "quibbling," and the determination would be a "battle of experts" based on credibility, rather than on a paper record. When pressed, Lite-Netics admitted that there was no requirement to hold an in-person hearing, but that it would be helpful to do so when experts contradict each other.

As to the Court's first question, the Court agrees with the parties that indefiniteness of a claim term invalidates the entire claim in which the indefinite claim term appears, but it may have

a broader impact. In *Robert Bosch, LLC v. Snap-On Inc.*, 769 F.3d 1094 (Fed. Cir. 2014), the

Federal Circuit held that two claim terms in one claim were indefinite. 769 F.3d at 1101. It then

stated, "Since these terms are found in the only independent claim of the '313 patent, we conclude

that all claims in the '313 patent are invalid." *Id.* at 1101–02; *see also Synchronoss Techs., Inc. v.

Dropbox, Inc.*, 987 F.3d 1358, 1368 (Fed. Cir. 2021) (holding that because a claim term was

indefinite, the asserted claims of the patent in question were invalid); *Berkheimer v. HP Inc.*, 881

F.3d 1360, 1364 (Fed. Cir. 2018) (holding that because a claim term was indefinite, the

independent claim and claims that depended from it were invalid). Thus, if a claim term found in

an independent claim is indefinite, the independent claim and all the claims that are dependent

from it are invalid.

Next, the Court turns to its second question about when it should determine the impact of

the indefiniteness of any claim term. The Federal Circuit has explained, "Indefiniteness, like claim

construction, is a question of law that can involve underlying factfindings based on extrinsic

evidence," and like claim construction, the Federal Circuit "review[s] the overall determination

[of indefiniteness] de novo and any underlying factual determinations for clear error." *Janssen

Pharms., Inc. v. Teva Pharms. USA, Inc.*, 97 F.4th 915, 936–37 (Fed. Cir. 2024) (citing *Eli Lilly

& Co. v. Teva Parenteral Meds., Inc.*, 845 F.3d 1357, 1370 (Fed. Cir. 2017)). Indeed, the Federal

Circuit has also stated, "Definiteness is a matter of claim construction, which is a legal

determination we review de novo." *ClearOne, Inc. v. Shure Acquisition Holdings, Inc.*, 35 F.4th

1345, 1349 (Fed. Cir. 2022). Consequently, where indefiniteness is a matter of claim construction,

there is no doubt that the Court can determine indefiniteness of any claim terms and the resulting

invalidity of any claim or claims of the patent in which they appear in the context of this claim

construction ruling.

Lastly, as to this issue, the Court indicated at the *Markman* hearing that Lite-Netics was already given an opportunity to supplement the record with another declaration from its expert. Also, Lite-Netics was aware of HBL's indefiniteness arguments based on HBL's briefing of claim constructions, and Lite-Netics had a full and fair opportunity to respond. Thus, the Court finds no reason to delay a determination of indefiniteness of any claims or a determination of invalidity based on indefiniteness to allow further supplementation of the record.

### 3. "Inoperability" and "Nonsense"

A third preliminary issue was suggested by Lite-Netics's arguments that the Court should view with skepticism any of HBL's constructions of claim terms that render the claimed invention "inoperable" (or "non-functional"). *See, e.g.*, Filing 127 at 30–32. Lite-Netics also asserted that certain of HBL's constructions of claim terms are "absurd" or "nonsensical" because they result in the claimed invention being "inoperable" (or "non-functional"). Filing 133 at 5, 7. HBL expressly raised the issue of "inoperability" as well, but HBL added an assertion that a result of "inoperability" is invalidity of the patent. Filing 129 at 18 (asserting that if claims are properly construed by the Court to be "inoperative," then the Court must find them invalid).

It appears to the Court that there are at least two kinds of "inoperable" or "nonsensical" constructions. First, the Federal Circuit has explained, "A claim construction that renders asserted claims facially nonsensical cannot be correct." *Neville v. Found. Constructors, Inc.*, 972 F.3d 1350, 1357 (Fed. Cir. 2020) (quoting *Becton, Dickinson & Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010)). Second, the Federal Circuit has explained that "a court may not rewrite a claim even if giving a disputed claim its plain meaning would lead to a 'nonsensical result.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1301 (Fed. Cir. 2014) (citing *Chef Am., Inc. v. Lamb–Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004)). Where a claim properly construed produces a nonsensical result, "the claim must be invalidated . . . ." *Multilayer*

*Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d 1350, 1362 (Fed. Cir. 2016) (quoting *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1357 (Fed. Cir. 1999)). It is clear to the Court that HBL contends that what is at issue is "nonsensical results" from proper construction, and consequent invalidity, while Lite-Netics contends that what is at issue is "facially nonsensical" constructions that must be rejected. The Court concludes that what kind of "nonsense" is at issue is a matter that is best decided in the course of claim construction, below.

At this point in the ruling, that Court concludes that it can determine whether properly construed claims result in "inoperability" and the kind of "nonsensical results" warranting a determination of invalidity of a patent in these claim construction proceedings. The Court reaches this conclusion for essentially the same reasons that the Court concluded above that it could decide the questions of indefiniteness and the resulting invalidity of a patent in these claim construction proceedings. The Court also concludes that it can make the determinations concerning "inoperability" and "nonsense results" now, notwithstanding HBL's intimations in its brief that invalidity resulting from inoperability might be decided in later proceedings. *See* Filing 129 at 8 n.2 ("HBL raises the 'claiming a short' issue here solely as one of claim construction. Later proceedings would evaluate its impact on noninfringement and invalidity."), 18 ("[O]nce the claims are properly construed, the Court must later deem them invalid as inoperative. . . ."). "Inoperability" and "nonsensical results" are matters of claim construction, *see Chef Am.*, 358 F.3d at 1373–74, just as "indefiniteness" is. Also, as with invalidity resulting from "indefiniteness," invalidity resulting from "inoperability" or "nonsensical results" appears to be automatic, so that further proceedings are unnecessary. Finally, the parties raised these issues and had full and fair opportunities to submit evidence and argument on them in the claim construction briefing and at the *Markman* hearing.

Therefore, the Court can determine these "inoperability" and "nonsense results" issues and any resulting invalidity of any claim or claims of the patents in these claim construction proceedings.

### B. Applicable Standards

Because this ruling addresses disputes about construction, alleged indefiniteness, and alleged inoperability of various claim terms, three separate albeit related legal standards are involved in this ruling. The Court will set out first the standards for patent claim construction, then the standards for determining indefiniteness, and finally the standards for determining inoperability.

#### 1. Standards for Patent Claim Construction

As the Federal Circuit recently explained,

> Claim construction is ultimately a question of law that we review de novo. *Intel Corp. v. Qualcomm Inc*., 21 F.4th 801, 808 (Fed. Cir. 2021). "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention[,] which the patentee is entitled ... to exclude'" others from practicing. *Phillips v. AWH Corp*., 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[W]e look to the words of the claims themselves ... to define the scope of the patented invention.").

*SharkNinja Operating LLC v. iRobot Corp*., No. 2023-1151, 2024 WL 1132219, at *2 (Fed. Cir. Mar. 15, 2024); *but see Chewy, Inc. v. Int'l Bus. Machines Corp*., 94 F.4th 1354, 1359 (Fed. Cir. 2024) (explaining that claim construction is reviewed de novo, "except for necessary subsidiary facts based on extrinsic evidence, which we review for clear error" (citing *Teva Pharms. USA, Inc. v. Sandoz, Inc*., 574 U.S. 318, 325–27 (2015))).

In construing patent claims, a court may consider both "intrinsic" and "extrinsic" evidence. *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023).

23

Intrinsic evidence includes the patent's claims, specification, and prosecution history. *Cont'l Cirs. LLC v. Intel Corp.*, 915 F.3d 788, 795 (Fed. Cir. 2019). Extrinsic evidence is "secondary to the intrinsic evidence" and "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Id.* at 799 (quoting *Phillips*, 415 F.3d at 1317). "If the meaning of a claim term is clear from the intrinsic evidence, there is no reason to resort to extrinsic evidence." *Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1287 (Fed. Cir. 2021).

*Grace Instrument Indus.*, 57 F.4th at 1008.

### a. Language of the Claims

Claim construction necessarily begins with the language of the claims. *SharkNinja Operating*, 2024 WL 1132219, at *2; *Grace Instrument Indus., LLC v. Chandler Instruments Co., LLC*, 57 F.4th 1001, 1008 (Fed. Cir. 2023) ("We begin by considering the language of the claims themselves." (citing *Phillips*, 415 F.3d at 1314)). In looking at the language of the claims, courts "generally give words of a claim their ordinary meaning in the context of the claim and the whole patent document." *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1377 (Fed. Cir. 2024) (internal quotation marks and citation omitted).

By invoking "ordinary meaning," the Federal Circuit seems to invite district courts to resort to dictionaries, even though they are "extrinsic" evidence of "secondary" importance. *Grace Instrument Indus.*, 57 F.4th at 1008. The Federal Circuit clarified the role of dictionaries in the patent construction process almost two decades ago in its en banc decision in *Phillips v. AWH Corporation*:

> In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words. In such circumstances, general purpose dictionaries may be helpful. In many cases that give rise to litigation, however, determining the ordinary and customary meaning of the claim requires examination of terms that have a particular meaning in a field of art. Because the meaning of a claim term as understood by persons of skill in the art is often not immediately apparent, and because patentees frequently use terms idiosyncratically, the court looks to those sources available to the public that show

24

> what a person of skill in the art would have understood disputed claim language to mean. Those sources include the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art.

*Phillips*, 415 F.3d at 1314 (internal quotation marks and citations omitted). The en banc court acknowledged a prior decision that had relied on a "presumption in favor of the dictionary definition of [a] claim term," and "[i]n effect . . . limit[ed] the role of the specification in claim construction to serving as a check on the dictionary meaning of a claim term if the specification requires the court to conclude that fewer than all the dictionary definitions apply, or if the specification contains a sufficiently specific alternative definition or disavowal." *Id.* at 1320 (citing *Texas Digital Systems, Inc. v. Telegenix, Inc.*, 308 F.3d 1193, 1202 (Fed. Cir. 2002)). The en banc court then explained, "The main problem with elevating the dictionary to such prominence is that it focuses the inquiry on the abstract meaning of words rather than on the meaning of claim terms within the context of the patent." *Id.* at 1321. Hence, the en banc court concluded that the role of dictionaries is this:

> As we said in *Vitronics [Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir. 1996)], judges are free to consult dictionaries and technical treatises
>
>> at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.
>
> [*Vitronics*, 90 F.3d] at 1584 n. 6.

*Phillips*, 415 F.3d at 1322–23; *accord Grace Instrument Indus.*, 57 F.4th at 1008 ("A court also should consider the patent's prosecution history, and may rely on dictionary definitions, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" (quoting *Phillips*, 415 F.3d at 1322-23)).

   b.   The Role of the Specification

Returning to the use of "intrinsic" evidence in claim construction, "claims must be read in view of the specification, of which they are a part." *Grace Instrument Indus.*, 57 F.4th at 1008 (quoting *Phillips*, 415 F.3d at 1315).

> [T]he specification is the "single best guide to the meaning of a disputed term," *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996), and "is, thus, the primary basis for construing the claims," *Phillips*, 415 F.3d at 1315 (citation and internal quotation marks omitted).

*Grace Instrument Indus.*, 57 F.4th at 1008. Indeed, "[u]sually, it is dispositive." *Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1043 (Fed. Cir. 2019) (quoting *Phillips*, 415 F.3d at 1313).

More specifically, "the specification particularly . . . informs the determination of claim meaning in context, including by resolving ambiguities." *Promptu Sys. Corp. v. Comcast Corp.*, 92 F.4th 1372, 1377 (Fed. Cir. 2024). The specification may also redefine the meaning of a claim term for purposes of the patent.

> As our en banc opinion in *Phillips* explained, a "claim term may be clearly redefined without an explicit statement of redefinition," and "[e]ven when guidance is not provided in explicit definitional format, the specification may define claim terms by implication such that the meaning may be found in or ascertained by a reading of the patent documents." 415 F.3d at 1320–21.

*Grace Instrument Indus.*, 57 F.4th at 1010. The exemplary figures in the specification should also be considered to determine the scope of what is protected. *See Lanard Toys Ltd. v. Dolgencorp LLC*, 958 F.3d 1337, 1342 (Fed. Cir. 2020) (explaining that the district court "followed our claim construction directives to a tee" when it "began its claim construction analysis by reproducing the five exemplary figures from the patent and noting its reliance on those drawing").

The specification describes the invention, so it is important to consider both what it describes and what it does not.

> "When the specification 'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the

26

patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'" *Microsoft Corp. v. Multi-Tech Sys., Inc.*, 357 F.3d 1340, 1347 (Fed. Cir. 2004) (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001)).

*Bradium Techs. LLC v. Iancu*, 923 F.3d 1032, 1043 (Fed. Cir. 2019); *see also Seabed Geosolutions (US) Inc. v. Magseis FF LLC*, 8 F.4th 1285, 1288 (Fed. Cir. 2021) ("The specification describes mounting the geophone inside the housing as a key feature of the invention. By contrast, it says nothing about the geophone being gimbaled or non-gimbaled. Given that context, a skilled artisan would understand the claim term 'geophone internally fixed within [the] housing' merely specifies where the geophone is mounted and has nothing to do with gimbaling.").

On the other hand, the Federal Circuit has described "reading a limitation from the written description into the claims" as "one of the cardinal sins of patent law." *Phillips*, 415 F.3d at 1320 (quoting *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1340 (Fed. Cir. 2001)); *see also Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014) ("[W]e do not read limitations from the embodiments in the specification into the claims."); *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988) ("Where a specification does not *require* a[n extraneous] limitation, that limitation should not be read from the specification into the claims." (emphasis in the original)); *but see Callicrate v. Wadsworth Mfg., Inc.*, 427 F.3d 1361, 1369 (Fed. Cir. 2005) (holding that it was error for the district court to read out a limitation clearly required by the claim language and specification). The same is true of consideration of exemplary figures. *See Curver Luxembourg, SARL v. Home Expressions Inc.*, 938 F.3d 1334, 1341 (Fed. Cir. 2019) ("While we agree that courts typically look to the figures to define the invention of the design patent, it is inappropriate to ignore the only identification of an article of manufacture just because the article is recited in the design patent's text, rather than illustrated in its figures."); *Duncan Parking Techs., Inc. v. IPS Grp., Inc.*, 914 F.3d

27

1347, 1361 (Fed. Cir. 2019) (explaining that the district court erred by "relying on the preferred

embodiment and the figure to limit the scope of the claimed invention" to a preferred embodiment)

### c.   The Role of Prosecution History

Like the specification, the prosecution history "informs the determination of claim meaning

in context, including by resolving ambiguities." *Promptu Sys. Corp.*, 92 F.4th at 1377. It may also

prescribe a narrower construction than the claim language may otherwise suggest. *See Weber, Inc.*

*v. Provisur Techs., Inc.*, 92 F.4th 1059, 1069 (Fed. Cir. 2024) ("Our case law does 'not support

prescribing a more particularized meaning unless a narrower construction is required by the

specification or prosecution history.'" (quoting *3M Innovative Props. Co. v. Tredegar Corp.*, 725

F.3d 1315, 1329 (Fed. Cir. 2013)). Specifically, "[t]he prosecution history 'can often inform the

meaning of the claim language by demonstrating how the inventor understood the invention and

whether the inventor limited the invention in the course of prosecution, making the claim scope

narrower than it would otherwise be.'" *Actelion Pharms. LTD v. Mylan Pharms. Inc.*, 85 F.4th

1167, 1173 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1317).

Indeed, the prosecution history may show that a patentholder disclaimed the scope that

might be suggested by the ordinary meaning of the claim language.

> To determine whether [a patentholder] disclaimed or otherwise surrendered claim
> scope that comes within the claim language, on all the evidence of a relevant
> artisan's understanding of that language, we consider whether, despite the apparent
> ordinary meaning evident from the intrinsic evidence, [the patentholder] "act[ed]
> with sufficient clarity" before the [examiner] to "disclaim ... [the] plain meaning or
> prescribe a special definition." *World Class Technology [Corp. v. Ormco Corp.]*,
> 769 F.3d [1120,] 1123 [(Fed. Cir. 2014)]. This inquiry is related to but distinct from
> the inquiry into what the prosecution history shows about a relevant artisan's
> understanding of the claim language in context.

*K-fee Sys. GmbH v. Nespresso USA, Inc.*, 89 F.4th 915, 923 (Fed. Cir. 2023). The prosecution

history may also estop a patentholder from asserting too broad a scope to infringement under the

doctrine of equivalents:

> If a patentee surrenders some scope during prosecution, that territory isn't available later as a doctrine-of-equivalents battleground. *Amgen Inc. v. Coherus BioSciences Inc.*, 931 F.3d 1154, 1159 (Fed. Cir. 2019). Scope surrender often occurs through a claim amendment, but it can also result from arguments—that is, if the prosecution history "evince[s] a clear and unmistakable surrender of subject matter." *Id.* The relevant inquiry is "whether a competitor would reasonably believe that the applicant had surrendered the relevant subject matter." *Id.* at 1159–60 (quoting *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1368 (Fed. Cir. 2007)). Whether prosecution-history estoppel applies is a question of law. *Id.* at 1159.

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1146 (Fed. Cir. 2021).

### d.  The Role of Experts

Both parties have offered expert opinions in support of their claim constructions, so the Court considers next the role of such extrinsic evidence. *See Grace Instrument Indus.*, 57 F.4th at 1008 (identifying expert testimony as extrinsic evidence). The Federal Circuit has "a long line of cases recognizing that expert testimony can 'shed light on' the meaning of a specification's disclosure without being tantamount to a 'rewrite' of the specification, but only when some actual disclosure exists in the specification." *Sisvel Int'l S.A. v. Sierra Wireless, Inc.*, 82 F.4th 1355, 1367 (Fed. Cir. 2023). In other words, expert testimony may assist in "read[ing] the existing disclosures in the specification for all they 'would convey to one skilled in the art.'" *Id.* at 1369. "That does not allow an expert to create new structure or imply structure from background knowledge," however. *Id.* Similarly, "a court should discount any expert testimony that is clearly at odds with the claim construction mandated by . . . the written record of the patent." *Sequoia Tech., LLC v. Dell, Inc.*, 66 F.4th 1317, 1325 (Fed. Cir. 2023) (quoting *Phillips*, 415 F.3d at 1318).

### 2.  Standards for "Definiteness" and "Indefiniteness"

The standards for determining "indefiniteness" are similar to the general standards for claim construction. Indeed, as pointed out above in § II.A.2, the Federal Circuit has stated, "Definiteness is a matter of claim construction, which is a legal determination we review de novo." *ClearOne, Inc.*, 35 F.4th at 1349. As the Federal Circuit has also explained,

Under 35 U.S.C. § 112, ¶ 2 (2006), a patent specification "shall conclude
with one or more claims particularly pointing out and distinctly claiming the subject
matter which the applicant regards as his invention." Patent claims that fail to meet
the "particularly pointing out and distinctly claiming" requirement are invalid for
indefiniteness. When "claims, read in light of the specification delineating the
patent, and the prosecution history, fail to inform, with reasonable certainty, those
skilled in the art about the scope of the invention," they are indefinite. *Nautilus,
Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901, 134 S.Ct. 2120, 189 L.Ed.2d 37
(2014).

*Maxell, Ltd. v. Amperex Tech. Ltd.*, 94 F.4th 1369, 1372 (Fed. Cir. 2024). Further,

[t]his [indefiniteness] standard "mandates clarity, while recognizing that absolute
precision is unattainable." [*Nautilus*, 572 U.S.] at 910, 134 S.Ct. 2120. Words of
degree are not "inherently indefinite," but "the court must determine whether the
patent provides some standard for measuring that degree." *Biosig Instruments, Inc.
v. Nautilus, Inc.*, 783 F.3d 1374, 1378 (Fed. Cir. 2015) (internal quotation marks
omitted).

*Ironburg Inventions Ltd. v. Valve Corp.*, 64 F.4th 1274, 1284 (Fed. Cir. 2023).

One difference between ordinary claim construction and claim construction to determine

indefiniteness is that "[i]ndefiniteness must be proven by clear and convincing evidence." *Maxell*,

94 F.4th at 1372 (quoting *Sonix Technology Co. v. Publications International, Ltd.*, 844 F.3d 1370,

1377 (Fed. Cir. 2017)). To put it more precisely, "any fact critical to a holding on indefiniteness . . .

must be proven by the challenger by clear and convincing evidence." *Ironburg Inventions Ltd.*, 64

F.4th at 1284–85 (quoting *Grace Instrument Indus.*, 57 F.4th at 1008). On the other hand, if the

district court's indefiniteness determination rests on factual findings that the patentholder has not

shown to be clearly erroneous, the Federal Circuit will affirm. *Janssen Pharms., Inc.*, 97 F.4th at

936.

### 3. *Standards for "Inoperable" and "Nonsense" Constructions*

As the Court mentioned above, there appear to be at least two kinds of "inoperable" or

"nonsensical" constructions. First, Lite-Netics is correct that the Federal Circuit has explained, "A

claim construction that renders asserted claims facially nonsensical cannot be correct." *Neville v.*

*Found. Constructors, Inc*., 972 F.3d 1350, 1357 (Fed. Cir. 2020) (quoting *Becton, Dickinson &
Co. v. Tyco Healthcare Grp., LP*, 616 F.3d 1249, 1255 (Fed. Cir. 2010)). The question then
becomes what the *Neville* court meant by a "facially nonsensical" construction.

In *Neville*, the Federal Circuit invoked this principle to reject a reading of a claim term that
made one structure, an "end plate," an indistinguishable part of another structure, a "protrusion."
*Id.* The Federal Circuit reasoned that "an object cannot protrude from itself." *Id.* Thus, it rejected
such a reading in which "there is no meaningful difference between the 'protrusion' and 'end
plate,' since any object could be arbitrarily partitioned into a portion labeled as an 'end plate' and
a remaining 'protrusion.'" *Id.* The Federal Circuit also found that nothing in the specification
suggested that "the protrusion could be an indistinguishable part of the end plate from which it
protrudes," which was a meaning it found was contrary to the plain language of the terms. *Id.*

Similarly, in *Becton*, on which *Neville* relied, the Federal Circuit rejected one party's
assertion that two terms, a "spring means" and "a hinged arm," could be the same structure,
because that rendered the asserted claim terms "nonsensical." *Becton*, 616 F.3d at 1255. The
Federal Circuit explained,

> Independent claim 1 of the '544 patent describes the spring means as being
> "connected to" the hinged arm and independent claim 24 describes it as "extending
> between" the hinged arm and a mounting means. If the hinged arm and the spring
> means are one and the same, then the hinged arm must be "connected to" itself and
> must "extend between" itself and a mounting means, a physical impossibility. A
> claim construction that renders asserted claims facially nonsensical "cannot be
> correct." *Schoenhaus v. Genesco, Inc*., 440 F.3d 1354, 1357 (Fed. Cir. 2006); *see
> Bd. of Regents v. BENQ Am. Corp*., 533 F.3d 1362, 1370 (Fed. Cir. 2008) (refusing
> to adopt a claim construction that "would effect [a] nonsensical result").

*Becton*, 616 F.3d at 1255 (footnote omitted). Thus, "facially nonsensical" constructions, which
courts must try to avoid, are physically impossible ones that make a claim inoperable.

On the other hand, "a court may not rewrite a claim even if giving a disputed claim its plain
meaning would lead to a 'nonsensical result.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc*., 753

F.3d 1291, 1301 (Fed. Cir. 2014) (citing *Chef Am., Inc. v. Lamb–Weston, Inc.*, 358 F.3d 1371,

1373 (Fed. Cir. 2004)). "[W]here . . . claims are susceptible to only one reasonable interpretation

and that interpretation results in a nonsensical construction of the claim as a whole, the claim must

be invalidated . . . ." *Multilayer Stretch Cling Film Holdings, Inc. v. Berry Plastics Corp.*, 831 F.3d

1350, 1362 (Fed. Cir. 2016) (quoting *Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350,

1357 (Fed. Cir. 1999)). When that situation arises, the Federal Circuit's "settled practice" is that

courts "construe the claim as written, not as the patentees wish they had written it." *Chef Am., Inc.*,

358 F.3d at 1374.

The Federal Circuit's decision in *Chef America* demonstrates this "nonsensical result"

principle. In *Chef America*, a patent claim required "heating the resulting batter-coated dough to a

temperature in the range of about 400° F. to 850° F." 358 F.3d at 1373. The Federal Circuit stated,

> These are ordinary, simple English words whose meaning is clear and
> unquestionable. There is no indication that their use in this particular conjunction
> changes their meaning. They mean exactly what they say. The dough is to be heated
> to the specified temperature. Nothing even remotely suggests that what is to be
> heated is not the dough but the air inside the oven in which the heating takes place.
> Indeed, the claim does not even refer to an oven.
>
> The problem is that if the batter-coated dough is heated to a temperature
> range of 400° F. to 850° F., as the claim instructs, it would be burned to a crisp.
> Instead of the "dough products suitable for freezing and finish cooking to a light,
> flaky, crispy texture," '290 patent, col. 2, ll. 11–12, which the patented process is
> intended to provide, the resultant product of such heating will be something that, in
> the words of one of the attorneys in this case, resembles a charcoal briquet. To avoid
> this result and to insure that the patented process can accomplish its stated
> objective, Chef America urges us to interpret the claim as if it read "heating the ...
> dough at a temperature in the range of," *i.e.*, to apply the heating requirement to the
> place where the heating takes place (the oven) rather than the item being heated
> (the dough).
>
> This court, however, repeatedly and consistently has recognized that courts
> may not redraft claims, whether to make them operable or to sustain their validity.
> *See, e.g., Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1349 (Fed. Cir.
> 2002); *Elekta Instrument S.A. v. O.U.R. Scientific Int'l, Inc.*, 214 F.3d 1302, 1308–
> 09 (Fed. Cir. 2000); *Process Control Corp. v. Hydreclaim Corp.*, 190 F.3d 1350,
> 1357 (Fed. Cir. 1999); *Rhine v. Casio, Inc.*, 183 F.3d 1342, 1345 (Fed. Cir. 1999);

*Quantum Corp. v. Rodime, PLC*, 65 F.3d 1577, 1584 (Fed. Cir. 1995); *Becton Dickinson & Co. v. C.R. Bard, Inc.*, 922 F.2d 792, 799 n. 6 (Fed. Cir. 1990). Even "a nonsensical result does not require the court to redraft the claims of the ['290] patent. Rather, where, as here, claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated." *Process Control Corp.*, 190 F.3d at 1357. "Where, as here, the claim is susceptible to only one reasonable construction, the canons of claim construction cited by [Chef America] are inapposite, and we must construe the claims based on the patentee's version of the claim as he himself drafted it." *Id.*

Thus, in accord with our settled practice we construe the claim as written, not as the patentees wish they had written it. As written, the claim unambiguously requires that the dough be heated to a temperature range of 400° F. to 850° F.

*Chef Am.*, 358 F.3d at 1373–74. Thus, in *Chef America* the construction that produced a "nonsensical result," *i.e.*, an inoperable result, was precisely what the patentee claimed, so that the construction rendering the claim inoperable had to be adopted. *See also Source Vagabound Sys.*, 753 F.3d at 1301 ("Finally, Source argues that Hydrapak's proposed construction 'would render the entirety of claim 1 nonsensical,' and 'Source read[s] the claim to avoid a nonsensical result.' However, Source should have known it could not prevail because a court may not rewrite a claim even if giving a disputed claim its plain meaning would lead to a 'nonsensical result.'" (record citations omitted, citing *Chef Am.*, 358 F.3d at 1373)).

In short, the Court must reject a construction of a claim that is "facially nonsensical" in the sense of claiming an impossibility, as in *Neville* and *Becton*, but the Court must accept a construction that produces a "nonsensical result" rendering the invention inoperable when that construction is dictated by the plain language of the claim, as in *Chef America*. Furthermore, in the *Chef America* situation, the result is an invalid claim. 358 F.3d at 1373-74; *see also Multilayer Stretch Cling Film Holdings, Inc.*, 831 F.3d at 1362 ("[W]here . . . claims are susceptible to only one reasonable interpretation and that interpretation results in a nonsensical construction of the claim as a whole, the claim must be invalidated. . . ." (citation omitted)).

33

### C.  Agreed Claim Constructions

The parties eventually agreed on the construction of two claim terms that they had initially put at issue in this case. Specifically, they have agreed that these claim terms should be given their plain and ordinary meaning. Filing 134-1 at 1. In the '779 Patent, the parties have agreed on the construction of the term "at least one opening at the second end," which is shown in italics in context in claim **1**, limitation (a):

> **1.**  A light fixture assembly, comprising:
>
> (a) a light bulb socket with an opening at the first end for accommodating a light bulb and *at least one opening at the second end*, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket

Filing 128-1 at 7 (Plf.'s Ex. A, '779 Patent, 4:52–58). In the '264 Patent, the parties have agreed on the construction of "a removable end piece," which is shown in italics in context in both claim **2** and claim **21**:

> **2.**  The light fixture assembly of claim **1**, wherein said base comprises a *removable end piece* within which said magnet is embedded.
>
> * * *
>
> **21**. The method of claim **17**, wherein said base comprises *a removable end piece* within which said magnet is embedded.

Filing 128-2 at 8 (Plf.'s Ex. B, '264 Patent, 5:33–35 and 6:42–44, respectively). The Court adopts the parties' agreed constructions of these terms.

### D.  Disputed Claim Constructions

The list of disputed claim constructions is much longer, and the proper constructions are often hotly contested. Contrary to either party's approach, the Court will consider the terms in the order in which they appear in the '779 Patent, noting where the same or similar terms also appear

in the '264 Patent, then consider remaining disputed terms in the order in which they appear in the '264 Patent. This course is particularly appropriate where the '264 Patent is a continuation-in-part of the '779 Patent. Filing 128-2 at 2. Although the Court has sometimes adopted the construction of a disputed term offered by one of the parties, it has also sometimes departed from either party's construction of a disputed term.

      1.  *Disputed Claim Terms of the '779 Patent*

          a.  "a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket"

This first disputed claim term appears in the '779 Patent, claim **1**, limitation (a). It is also the first invocation of the claim construction principles concerning "nonsensical" claim terms. This claim term is shown in bold in context in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim 1<br>1.  A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes **a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket** | Plain and ordinary meaning | a single conductor that places a light bulb inserted into the first end in electrical contact with each of at least two electrical wires inserted through the socket |

Filing 134-1 at 16–17.

      Lite-Netics argues that no construction of this term is required and that HBL's proposed construction is wrong because it would render the device non-functional. Filing 127 at 31. Relying on its expert's opinion, Lite-Netics argues that a person of ordinary skill in the art would understand that this claim term indicates that some wires entering the socket contact one of the socket's conductors. Filing 127 at 31 (citing Filing 128-3 at 45 (¶¶ 99–100) (Plf.'s Ex. C, Smith

35

Report)). Lite-Netics argues further that courts should be skeptical of a construction that renders a claimed invention inoperable, as HBL's would. Filing 127 at 31. HBL argues that the parties differ on whether this claim term claims a conductor contacting all wires of the electrical cord—that is, both "hot" and "ground," or both "positive" and "negative" wires—which would create a short circuit, or instead claims something else. Filing 129 at 13. HBL points out that in the specification, every embodiment illustrated or described shows the relevant conductor simultaneously making electrical contact with both wires of the cord, creating a short circuit. Filing 129 at 13. In reply, Lite-Netics argues that there is no requirement that the conductor be in contact with all wires, just that it be in contact with at least two wires. Filing 133 at 8. Lite-Netics then asserts that the way both parties' products work is that the hot "wire" and the ground "wire" each comprises a plurality of wires (*i.e.*, strands of wire), so that the conductor contacts multiple wires. Filing 133 at 9. Lite-Netics labels HBL's short-circuit interpretation "far-fetched." Filing 133 at 9.

The Court finds it unnecessary to look beyond the claims of the '779 Patent to determine the proper construction of this challenged claim term. *See SharkNinja Operating*, 2024 WL 1132219, at *2 (explaining the construction begins with the language of the claims); *Grace Instrument Indus.*, 57 F.4th at 1008 (same). Instead, the Court concludes that what is at issue here is the kind of "nonsensical result" described in *Chef America*, which means that the claim is invalid.

As in *Chef America*, the claim term uses "ordinary, simple English words whose meaning is clear and unquestionable." 358 F.3d at 1373. There is no indication that their use in this particular conjunction changes their meaning; instead, they mean exactly what they say. *Id.* "[A] conductor" places a light bulb "in electrical contact with electrical wires." We can even suppose that there is a plurality of conductors rather than just one conductor, if "a" means "one or more" in this context,

36

because the description of Figure 5 indicates that not all conductors are necessarily shown in the exemplary figures. Figure 5 is shown below:



**FIG. 5**

The pertinent description states, "On the inside of the socket are two copper conductors 10 (only one of which is illustrated in FIG. 5)." Filing 128-1 at 7 (3:53–54). However, nothing in the plain language of the claim term suggests that each such conductor is in contact with only one wire, as would be required to avoid a short circuit. Lite-Netics does not assert such a construction based on plain language.

Instead, Lite-Netics argues based on its expert's testimony that a person of ordinary skill in the art would understand that this claim term indicates that some wires entering the socket contact one of the socket's conductors. Filing 127 at 31. Lite-Netics attempts to save itself from this admission that the claim means multiple wires in contact with one conductor, which would result in a short circuit, by asserting that the way both parties' products work is that the hot "wire" and the ground "wire" each comprises a plurality of wires (*i.e.*, strands of wire), so that the conductor contacts multiple wires. Filing 133 at 9. Both an expert's testimony and the parties' actual products are extrinsic evidence of at best secondary importance. *See Grace Instrument Indus.*, 57 F.4th at 1008. Indeed, Lite-Netics has cited no authority for construing the claims of a

patent in light of the patentee's or a competitor's product. More to the point, nothing in the claim language or the specification—the intrinsic evidence—suggests that a multi-strand wire is intended or that the meaning of multiple wires contacting a conductor is that multiple strands of a wire composed of such strands contact a conductor. *See Chef Am.*, 358 F.3d at 1373 ("Nothing even remotely suggests that what is to be heated is not the dough but the air inside the oven in which the heating takes place. Indeed, the claim does not even refer to an oven."). Thus, it is Lite-Netics's "multi-wire" construction that is far-fetched, not HBL's "short circuit" construction.

Much like the problem in *Chef America*, which was that the result of the plain meaning of the words used was dough burned to a crisp, 358 F.3d at 1373, the problem here is that a conductor in contact with two wires would cause a short circuit, instead of lighting up the light bulb. The "nonsensical result" does not mean that the Court must fabricate an "operable result" from extrinsic evidence by finding that a person of ordinary skill in the art would read this language in such a way as to avoid a short circuit. Rather, the Court may not redraft the claim to make it operable. *Id.* at 1374. In this case, the claim is susceptible to only one reasonable interpretation, while Lite-Netics offers instead an interpretation with no source in the claim language or the specification and with no merit except that it says what the patentee wishes he had written. *Id.* As in *Chef America*, the only reasonable interpretation here results in a nonsensical construction of the claim as a whole, so the claim must be invalidated. *Id.*

The kind of "nonsense" at issue in this claim is not that the claim is "facially nonsensical," when read in the way the Court has construed it, such that the Court's reading cannot be correct. *See Neville*, 972 F.3d at 1357 ("A claim construction that renders asserted claims facially nonsensical cannot be correct." (quoting *Becton*, 616 F.3d at 1255)). There is nothing physically impossible about a conductor being in contact with two or more wires creating a short circuit. *See*

38

*id.* (indicating that a "facially nonsensical" construction is one that results in physical impossibility). In fact, a short circuit is the inevitable result of a conductor being in contact with two or more wires.

Thus, as to this claim term, the Court agrees with Lite-Netics that the "plain and ordinary meaning" is the correct construction, but the Court agrees with HBL that the "plain and ordinary meaning" results in a short circuit and an inoperable claim, so that the claim must be invalidated. *Chef Am.*, 358 F.3d at 1374. Furthermore, because all the other claims in the '779 Patent depend from claim **1**, they are also invalid. The Court now adds its construction of this term to the chart:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1** 1.   A light fixture assembly, comprising: (a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes **a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket** | Plain and ordinary meaning | a single conductor that places a light bulb inserted into the first end in electrical contact with each of at least two electrical wires inserted through the socket | Plain and ordinary meaning resulting in a short circuit  This claim is inoperable, so that Claim **1** of the '779 Patent is invalid, and all the other claims of the '779 Patent are invalid because they depend from Claim **1**. |

The Court's conclusion that all claims of the '779 Patent are invalid for inoperability makes it unnecessary for the Court to construe any other claim terms. Nevertheless, the Court will continue with its construction of disputed claim terms.

b.   "Socket"

The next disputed claim term is "socket," which also appears in the '779 Patent, claim **1**, in limitation (a). Filing 128-1 at 7 (Defendant's Ex. A, '779 Patent, 4:52–58). It also appears in the

'779 Patent in claims **2**, **3**, **5**, **12**, and **15**, and in the '264 Patent in claims **1**, **6**, **8–10**, and **14**. It suffices for purposes of this claim construction ruling to show the disputed term in the context of the '779 Patent, claim **1**, limitation (a), where it appears twice. Thus, this term is shown in bold in context in the first column of the following chart with the parties' proposed constructions—or at least their dispute—in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the **socket** includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the **socket**<br><br>*See also* '779 Patent, claims **2**, **3**, **5**, **12**, and **15**, and in the '264 Patent in claims **1**, **6**, **8–10**, and **14** | Not indefinite | Indefinite |

[Filing 134-1 at 16](#)–17.

Lite-Netics asserts that the claims refer to a "socket" or a 'light bulb socket" meaning the same thing. [Filing 127 at 35](#). Lite-Netics asserts that a person of ordinary skill in the art would not be confused by the term "socket" in the claims, citing its expert's report. [Filing 127 at 35](#). HBL argues that the term "socket" is indefinite for lack of antecedent basis. [Filing 129 at 47](#). Specifically, HBL argues that independent claim **1** of each of the Asserted Patents introduces the term "a light bulb socket" and later refers to "the light bulb socket," but the Asserted Patents then also confusingly use the term "socket" in claim **1** and the dependent claims. [Filing 129 at 47](#). HBL contends that the problem is that the Asserted Patents involve strings of lights each with a "socket" for accommodating a light bulb, so it is not clear which of the many "sockets" in a light string is

indicated. Filing 129 at 47. In reply, Lite-Netics asks, why would "the socket" not refer to the "a light bulb socket" mentioned earlier in the same claim element? Filing 133 at 22.

This is not a situation in which "claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). Therefore, the claims including this disputed term are not indefinite. *Id.*

Starting with the language of the claims, *see SharkNinja Operating*, 2024 WL 1132219, at *2; *Grace Instrument Indus.*, 57 F.4th at 1008, the claimed invention is not a string of lights, but "a light fixture assembly," which may be part of a string of lights. *See* Filing 128-1 at 7–8 ('779 Patent) (4:51–6:17) (never mentioning a string of lights in the claims); Filing 128-2 ('264 Patent) (5:31–32) (mentioning in claim **1** that the claimed light fixture assembly "is connected to a string of other light fixture assemblies"), (6:19–21) (claiming in claim **17** a method for installing a string of light fixture assemblies, but not claiming the string of light fixture assemblies), (6:31–32) (claiming in claim **17** that in the claimed method "at least one of said light fixture assemblies is connected to said string of light fixture assemblies," but not claiming the string of light fixture assemblies). Furthermore, each claim uses "socket" in the context of a single "light fixture assembly," not in the context of a string of lights. *See, e.g.*, Filing 128-1 at 7 (Plf.'s Ex. A, '779 Patent, 4:52–58). Still further, in independent claim **1** of each Asserted Patent, "socket" is used alone after stating that the "light fixture assembly" comprises "a light bulb socket." *See, e.g.*, Filing 128-1 at 7 (4:52–58). In these circumstances, there can be no confusion about which "socket" is indicated.

The same is true from the important guidance provided by the specification. *Grace Instrument Indus.*, 57 F.4th at 1008 (stating that the specification is the "single best guide to the

meaning of a disputed term," and that "claims must be read in view of the specification, of which they are a part" (citations omitted)). The Abstract to each of the Asserted Patents states, "The present invention provides a light fixture assembly," not that the invention provides a string of light fixture assemblies, and states that the light fixture assembly comprises (in at least one embodiment) "a light bulb socket." Filing 128-1 at 2 ('779 Patent, Abstract); Filing 128-2 at 2 ('264 Patent, Abstract). The same is true of the Summary of the Invention in each Asserted Patent, Filing 128-1 at 6 (2:6–27); Filing 128-2 at 6 (2:7–38). A "string of lights" is mentioned only in the Background of the Invention in the '779 Patent, Filing 128-1 at 6 (1:11–2:2), but not in the rest of the specification or the claims, *see* Filing 128-1 at 6–8 (2:4–6:17). Likewise, in the '264 Patent, "string of lights" in not mentioned in the specification after the Background of the Invention. *See* Filing 128-2 at 6–8 (2:5–5:17).

The Court concludes that "socket" is not indefinite. In each claim, it refers to "a light bulb socket" of "a light fixture assembly" in independent claim **1** of the Asserted Patent in question. Thus, the Court now adds its construction of this term to the chart:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.  A light fixture assembly, comprising: (a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the **socket** includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the **socket**<br><br>*See also* '779 Patent, claims **2**, **3**, **5**, **12**, and **15**, and in the '264 Patent in claims **1**, **6**, **8–10**, and **14** | Not indefinite | Indefinite | a light bulb socket of a light fixture assembly in independent claim **1** |

c.  "Attached"

The next disputed construction in the '779 Patent is "attached" in claim **1**, limitation (b).

Filing 134-1 at 3–4. The claim term also appears in other disputed claim terms in claims **1** and **17**

of the '264 Patent, specifically, in "integrally attached." *See* Filing 134-1 at 5–7. The Court will

construe "integrally attached" separately when it turns to claim terms that appear only in the '264

Patent. The term now at issue is shown in bold in context in the '779 Patent in the first column of

the following chart with the parties' proposed constructions in the second and third columns.

43

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base **attached** to the second end of the light bulb socket | joined in close association | connected or joined to something in a manner that is more than merely pressing into or touching |

Filing 134 at 3–4.

Lite-Netics observes that the parties agree that "attached" requires being connected or joined but that they dispute whether more is required. Filing 127 at 17. Lite-Netics argues that Figure 1 of both patents, shown below, shows that the "base **3**" is joined in close association with the "socket **8**" such that the base is pressed against the socket. Filing 127 at 17.



FIG. 1

Lite-Netics notes that the specification describes the base as "engaging" the light socket and being "mounted" to the bottom of the socket and that a person of ordinary skill in the art would understand "joined in close association" to be consistent with those words, again citing its expert's report. Filing 127 at 18. Lite-Netics argues that caselaw supports the construction of "attached" as not requiring more than touching or pressing and including both direct and indirect connection. Filing 17 at 19.

44

Somewhat strangely, in the Court's view, HBL contends that the parties' dispute is really over what attaches "to" what. Filing 129 at 35. HBL contends that its construction recognizes that the claim demands that the "base" that embeds the magnet must be attached to "the second end" of the light socket. Filing 129 at 35. More to the point, HBL argues that Lite-Netics is using its construction as a "Trojan horse" to slip in a concept of "indirect" attachment. Filing 129 at 35. HBL also argues that the specification describes direct attachment, that is, a permanent fixation via retaining clips that go inside the opening at the second end during manufacture. Filing 129 at 37.

In reply, Lite-Netics asserts that HBL is mischaracterizing the parties' dispute about this term, because their dispute is not about where the base and socket are joined, but how they are joined. Filing 133 at 15. Lite-Netics also points out that HBL does not define what more than pressing into or touching is required by "attached." Filing 133 at 16.

The Court finds neither party's construction satisfactory. Defining "attached" as "joined in close association" as Lite-Netics does begs the question, joined how? That is the very issue according to Lite-Netics's reply brief, *see* Filing 133 at 15 ("The actual dispute is . . . *how* the base and socket are joined." (emphasis in the original)), but Lite-Netics's construction provides no answer. The Court also finds it odd that Lite-Netics has selected the definition of "attached" from vocabulary.com indicating an intangible kind of attachment between, for example, art schools attached to universities. *See* Filing 128-5 at 2. At the same time, Lite-Netics ignores the more apt definition of physical attachment in the same source, which is, "Something that's *attached* is connected to something else. If your rain coat has an *attached* hood, for example, it's fastened to the coat." Filing 128-5 at 2 (emphasis in the original); *see also* Filing 128-4 at 2 (Merriam-Webster definition of "attached" as "connected or joined to something"). HBL's argument is problematic

as well because the issue for construction of "attached" plainly is not where the attachment occurs, *see* Filing 129 at 35, but how the attachment occurs or is made. HBL's construction, Filing 134 at 3–4, also simply begs the question, what is "a manner that is more than merely pressing into or touching"?

Although starting with the language of the claims is appropriate, *see SharkNinja Operating,* 2024 WL 1132219, at *2; *Grace Instrument Indus.,* 57 F.4th at 1008, doing so as to this claim term provides little assistance in arriving at the correct construction. The word "attached" appears in claim **1**, limitation (b), but nowhere else in the claims of the '779 Patent.

At first blush, the specification also seems to provide little guidance on the meaning of "attached," even though the specification is the "single best guide to the meaning of a disputed term." *Grace Instrument Indus.,* 57 F.4th at 1008. The Abstract states baldly that "[t]he assembly also includes a base attached to the second end of the socket." Filing 128-1 at 2 (Abstract). The Summary of the Invention states exactly the same thing. Filing 128-1 at 6 (2:11–12). The word does not appear again until claim **1**, limitation (b), of the '779 Patent. Filing 128-1 at 7 (4:59). However, these rare instances of use of the term without any elaboration or explanation suggest that the ordinary meaning of the term is intended; certainly, there is no hint from its rare appearance that an idiosyncratic meaning was intended. *See Phillips,* 415 F.3d at 1314 (recognizing that the inventor may give terms of a patent idiosyncratic meanings).

Nevertheless, the Court finds more guidance from the Figures and the Detailed Descriptions of Figures than at first appears. However, that guidance leads the Court to a quite different conclusion about the meaning of "attached" in the '779 Patent from the one Lite-Netics reaches. Figures 1, 2, and 5 of the '779 Patent are below:



FIG. 1                    FIG. 2                    FIG. 5

[Filing 128-1 at 3](). Figure 1 shows more than just that the "base **3**" is joined in close association with the "socket **8**" such that the base is pressed against the socket. The Detailed Description explains, "The base **3** also includes two retaining clips **5** for engaging the light socket **8** and holding the base in place." [Filing 128-1 at 7]() (3:38–39). Thus, how the retaining clips **5** "engage," that is, "attach" to, the light socket **8** is not merely by touching, but by engaging the inside of the light socket with enough force to "hold[ ] the base in place." Furthermore, the Detailed Description of Figure 5 explains in part, "The socket **8** includes two slots **11**, which accommodate the retaining clips **5** on the base **3** [shown in Figure 2]. Inside the socket **8** is a retaining tab **12**. The retaining tab **12** applies a retaining force against the ends of the retaining clips **5** when the assembly base **3** is mounted to the bottom of the socket **8**." Filing 128-1 at 7 (3:58–62). Thus, the interaction of physical components of the assembly base and the socket is how the assembly base and the socket are "attached" to each other.

Figures 6, 7, and 8 of the '779 Patent concern an "alternate assembly" of the claimed invention. They are shown below:

47



FIG. 6          FIG. 7          FIG. 8

Filing 128-1 at 4. The Detailed Description of Figure 6 explains that it shows "a detailed cross section view of the assembly base containing the magnet in accordance with an alternate embodiment of the present invention," and explains "the primary difference being the shape of the retaining clips **25** and wire clamp **24**." Filing 128-1 at 7 (4:1–6). It adds, "In this embodiment, the retaining clips **25** are molded from the sides of the wire clamp **24**, as shown." Filing 128-1 at 7 (4:6–8). The Detailed Description also explains, "FIG. **7** is a bottom plan view of the alternate assembly base showing the bottom end of the wire clamp **24** and the side retaining clips **25** in accordance with the alternate embodiment of the present invention." Filing 128-1 at 7 (4:14–17). Finally, the Detailed Description explains, "FIG. **8** is a detailed cross section view of the light socket in accordance with the alternate embodiment of the present invention. In this embodiment, the socket **28** has a single, central slot **27** to accommodate the wire clamp **24**. The retaining clips **25** engage the inside surface of the socket **29** when inserted through the slot **27**." Filing 128-1 at 7 (4:18–23). Because the "retaining clips **25** engage the inside surface of the socket **29**," the retaining clips **25** necessarily pass through the central opening **27**, and the retaining clips of the alternate assembly base become engaged inside the socket **29** in at least a semipermanent way; this is how the alternate assembly base is "attached" to the socket. Again, in this embodiment, the interaction

48

of physical components of the alternate assembly base and the socket is how the assembly base and the socket are "attached" to each other.

Moreover, construing the claim in light of the specification, it is important to consider both what the specification describes and what it does not. *See Bradium Techs.*, 923 F.3d at 1043 ("When the specification 'makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question.'" (quoting *Microsoft Corp.*, 357 F.3d at 1347, in turn quoting *SciMed Life Sys.*, 242 F.3d at 1341)). What is included and clearly intended in the '779 Patent as a particular feature is a base physically engaging or mounted to a socket with a retaining force created by the interaction of the components of the base and the socket. In both the first embodiment shown in Figures 1, 2, and 5, and the alternate embodiment shown in Figures 6, 7, and 8, the "attachment" is "direct"—a base physically engaging or mounted to a socket with a retaining force created by the interaction of their components—not an "indirect" attachment. Whatever an "indirect" attachment might be, it must be some external force that causes the base and the socket to "touch," but that feature is deemed outside of the reach of the claims of the '779 Patent even if the word "attached" in the claim language of the patent, read without reference to the specification, might be considered broad enough to encompass the feature in question. *Bradium*, 923 F.3d at 1043.

Hence, guided by the specification, the Court construes "attached" in claim **1** of the '779 Patent to mean "directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items." The Court now adds its construction of the disputed term "attached" to the chart:

49

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.  A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base **attached** to the second end of the light bulb socket | joined in close association | connected or joined to something in a manner that is more than merely pressing into or touching | directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items |

       d.  "a base attached to the second end of the light bulb socket"

The next claim term in the '779 Patent with a disputed construction is the entirety of limitation (b) of claim **1**, which includes the term "attached" that the Court has just construed. The term is shown in bold in context in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1.  A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) **a base attached to the second end of the light bulb socket** | a structure comprising one or more components joined in close association to the second end of the light bulb socket | a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching |

Filing 134-1 at 4–5.

Lite-Netics asserts that the parties have already addressed "attached." Filing 127 at 28. However, Lite-Netics does not explain in its Opening Brief why the other language in this term requires construction, let alone why Lite-Netics's construction is correct. *See generally* Filing 127 at 28–29. Similarly, HBL offers no explanation of its construction of this term after stating its proposed construction. Filing 129 at 31.

Notwithstanding the lack of arguments, the Court readily concludes that construing this term in the way either party suggests simply substitutes that party's proposed construction of "attached," but the Court rejected both parties' proposed constructions of "attached" just above. Furthermore, all that Lite-Netics's construction adds is a construction of "a base" as "a structure comprising one or more components." Filing 134-1 at 4–5. Lite-Netics's construction of "a base" is so vague that it could refer to almost any part of the '779 Patent, such as a "light bulb socket," but "a base" is repeatedly identified in the '779 Patent as a different structure from "a light bulb socket."

It follows from the parties' lack of reasonable constructions that this disputed term should be construed as a specific application of the Court's construction of "attached." Thus, the Court's construction of the disputed claim term "a base attached to the second end of the light bulb socket" is set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) **a base attached to the second end of the light bulb socket** | a structure comprising one or more components joined in close association to the second end of the light bulb socket | a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching | a base directly engaged or mounted to the second end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket |

      e.   "a neodymium magnet"

      The construction of the next claim term in the '779 Patent is hotly contested, as it was at the time the Court issued its preliminary injunction ruling. It is "a neodymium magnet" as claimed in the '779 Patent, claim **1**, limitation (c). The term is shown in bold in context in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) **a neodymium magnet** embedded in the base wherein said magnet has a pull strength of at least five pounds. | one or more neodymium components having a magnetic field | A single permanent magnet made from an alloy of neodymium, iron, and boron ($Nd_2Fe_{14}B$) with a unitary structure, taking on, as such single magnet, characteristics noted later in the claim regarding pull strength |

Filing 134-1 at 3.

Lite-Netics contends that the parties' primary dispute about this claim term is whether "a . . . magnet" can include multiple components, as Lite-Netics contends, or if it instead must be a "single permanent magnet . . . with a unitary structure," as HBL asserts. Filing 127 at 9. The dispute arises not least because Lite-Netics's patented product has only a single magnet, while HBL's accused Magnetic Cord has two magnets. Lite-Netics also argues that the construction should not be restricted to a particular chemical composition as long as neodymium is present in the magnet. Filing 127 at 10. HBL offers no argument to support inclusion of the specific chemical composition of the magnet, but HBL does argue that the "pull strength of at least five pounds" should be part of the construction of the term "a neodymium magnet." *See* Filing 129 at 39–44.

The Court will not include in its construction a particular chemical composition for "a neodymium magnet," because the parties' briefing shows that the chemical composition is not a disputed aspect of the construction of "a neodymium magnet." Likewise, the Court will not at this time construe "a neodymium magnet" to include any limitation or statement of pull strength, as HBL urges. The "pull strength" term is itself a claim term with a disputed construction. *See* Filing 134-1 at 24–24. Thus, the Court will consider here only the issue concerning the number of magnets that can be part of the construction of "a neodymium magnet," although the Court will entertain HBL's argument that the existence of the "pull strength" limitation signals that the proper construction of "a neodymium magnet" is a single magnet.

i. The Parties' Arguments

As to the issue concerning the number of magnets, Lite-Netics asserts that the magnet, regardless of the number of pieces, still has a magnetic field that acts to attach the light socket assembly to a metal surface, again citing its expert's report. Filing 127 at 9. Lite-Netics argues that the intrinsic evidence does not limit "a magnet" to a single piece of material or a "unitary structure"

and that a person of ordinary skill in the art would understand that fact, citing only the extrinsic evidence of its expert's report and dictionary definitions that it reads as focusing on the "magnetic field" rather than the number of pieces. Filing 127 at 10. Lite-Netics then argues that the specification is consistent with the dictionary definitions because it describes the base of the apparatus as a "magnetic base." Filing 127 at 11 (citing 128-1 at 7 (3:3) ("The present invention provides a magnetic base. . . ."). Lite-Netics next argues that HBL's expert agreed that a single wire can be comprised of multiple strands and that the same logic applies to magnets. Filing 127 at 11. Indeed, Lite-Netics points out that HBL's expert stated in deposition that he thinks of magnets in terms of "a magnetic circuit," which can be comprised of multiple magnets. Filing 127 at 12. Lite-Netics asserts that the Federal Circuit rejected HBL's attempt to read into the claims a one-magnet limitation as shown in the specification. Filing 127 at 12 (citing *Lite-Netics*, 60 F.4th at 1346). Lite-Netics also argues that it would be a "cardinal sin" to limit the claims based on examples in the specification. Filing 127 at 13.

HBL's first argument on this issue is that the Federal Circuit held only that Lite-Netics's "multiple magnet" theory was not "objectively baseless," so that this Court remains free to reject that theory as a matter of claim construction. Filing 129 at 39. HBL then cites decisions from the Federal Circuit recognizing circumstances in which "a" or "an" is properly construed in the singular in light of intrinsic evidence. Filing 129 at 40. HBL argues that this Court correctly found in its preliminary injunction ruling that this case presented such circumstances. Filing 129 at 40. HBL argues that its expert testified that breaking a magnet into two pieces and holding the pieces together would be "two magnets." Filing 129 at 41. As to Lite-Netics's reliance on a single reference to a "magnetic base" in the specification, HBL argues that that phrase only refers back to the repeated references to a single magnet. Filing 129 at 41. HBL then argues that various cases

on which Lite-Netics relies are distinguishable. Filing 129 at 42–43. Furthermore, HBL argued in its brief and reiterated in more detail at the *Markman* hearing that the requirement that the "magnet" must exceed a named pull strength signals a single magnet. Filing 129 at 43 (citing Filing 130-17).

In reply, Lite-Netics again invokes the Federal Circuit's rejection of a "single magnet" theory on appeal of this Court's preliminary injunction ruling, then argues that HBL has not pointed to any basis to continue to argue that "a magnet" cannot include multiple pieces of magnet. Filing 133 at 18–19. Lite-Netics again relies on the Federal Circuit's comments in rejecting HBL's single-magnet theory. Filing 133 at 19 (citing *Lite-Netics*, 60 F.4th at 1346).

## ii. The Court's Construction

The Court reiterates that Lite-Netics goes too far when it asserts that the Federal Circuit's decision is controlling on the one magnet v. multiple magnets issue. *See also* § II.A. (explaining that the Court is "unfettered" by the Federal Circuit's decision vacating this Court's preliminary injunction). First, the Federal Circuit explained, "On the record before us, we see no basis for deeming objectively unreasonable an assertion that two such pieces would be understood by a relevant artisan as a single 'magnet,' whether as a matter of claim construction or as a matter of application." *Lite-Netics*, 60 F.4th at 1345. Thus, this part of the Federal Circuit's decision emphasized that it was in the context of determining whether Lite-Netics's "multiple magnet" theory was "objectively baseless," not whether it was the correct or "controlling" construction. The Federal Circuit also observed that in the circumstances then presented, "we conclude that the district court's determination of objective baselessness of the assertion of literal infringement [by two magnets] rests on incorrect legal principles and cannot stand." *Id.* at 136. Again, what the Federal Circuit pointed out were reasons that Lite-Netics's construction was not "objectively baseless," not reasons that it was correct or "controlling" as a matter of law.

That said, this issue is one where this Court cannot disregard all guidance that the Federal Circuit's decision provides. *See, supra*, § II.A.1. (explaining that "[u]nfettered" by the Federal Circuit's decision "does not mean that this Court will disregard all guidance that decision may provide on the issues now presented"). In its preliminary injunction ruling, this Court cited prior cases of the Federal Circuit that explained that there are some "extremely limited" exceptions to the rule "that an indefinite article 'a' or 'an' in patent parlance carries the meaning of 'one or more' in open-ended claims containing the transitional phrase 'comprising.'" *Convolve, Inc. v. Compaq Computer Corp.*, 812 F.3d 1313, 1321 (Fed. Cir. 2016) (quoting *KCJ Corp. v. Kinetic Concepts, Inc.*, 223 F.3d 1351, 1356 (Fed. Cir. 2000)). Those exceptions arise when a patentee "'evince[s] a clear intent' to limit 'a' or 'an' to 'one.'" *Id.* (quoting *Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342 (Fed. Cir. 2008)).

However, the Federal Circuit's decision on appeal of the preliminary injunction ruling in this case clearly indicates that this case did not present such an exception, at least on the record then presented. First, the Federal Circuit observed, "[D]ecisions of this court lend strong support to the proposition that, 'in patent parlance, at least in an open-ended 'comprising' claim, use of 'a' or 'an' before a noun naming an object is understood to mean to 'one or more' unless the context sufficiently indicates otherwise." *Lite-Netics*, 60 F.4th at 1345 (like this Court, citing *inter alia Convolve*, 812 F.3d at 1321; *Balwin Graphic Sys.*, 512 F.3d at 1342; and *KCJ Corp.*, 223 F.3d at 1356). Furthermore, the Federal Circuit said, "Here, none of the features of the claims or specification relied on by the district court sufficiently indicate[s] otherwise, at least for purposes of the inquiry into whether Lite-Netics's position was objectively baseless." *Id.* at 1345–46. The Federal Circuit also opined on appeal in this case, "There is no 'present invention' or other specification language that restricts the invention to a single (or single-piece) magnet, and there

are no structural limitations in the claims that implicitly demand such a configuration." *Id.* at 1346.
Another statement in the Federal Circuit's decision relating to this issue also gives the Court pause.
The Federal Circuit stated, "Importantly, and more generally, nothing in the '779 patent indicates
that the evident purpose of the magnet on the socket base (to attach the light string to a metal
surface) can be achieved only, or with specified effectiveness, through a single (or single-piece)
magnet, rather than a plurality of magnets collectively having the specified pull force." *Lite-Netics*,
60 F.3d at 1346.

Thus, while the Court's consideration of the intrinsic record of the Asserted Patents at the
preliminary injunction stage led this Court to the conclusion that this case involves an exception
to the "a" or "an" means "one or more" rule, that conclusion is no longer tenable in light of the
Federal Circuit's decision—at least if it is based only on the same evidence available at the
preliminary injunction stage of the case. The question now is whether HBL has pointed out in its
claim construction brief and at the *Markman* Hearing additional evidence that was not before the
Federal Circuit on the appeal of this Court's preliminary injunction ruling that leads to a different
conclusion than the Federal Circuit reached.

HBL identifies one kind of evidence that was not before the Federal Circuit as proof that
two separated magnets cannot possibly have a particular and single "pull strength" characteristic.
Filing 129 at 43; *contra Lite-Netics*, 60 F.3d at 1346 (suggesting that "a plurality of magnets
collectively" could have "the specified pull force"). In its brief, HBL argued that the fact that the
"magnet" must exceed a named pull strength standing alone signals a single magnet. Filing 129 at
43. HBL argues that the evidence shows that a combination of magnets lacks any single strength
characteristic because many variables can alter magnetic strength of the combination, including
gap-distance between magnet pairs and the relative orientation of the magnets. Filing 129 at 43

(citing Filing 130-17). In the cited exhibit, K&J Magnetics, Inc., measured the pull strength of pairs of magnets using different gap-distances and different pole orientations. *See* Filing 130-17 at 5–6. For each tested gap-distance in a single pole orientation, the resulting pull force was different. Filing 130-17 at 6. Those pull forces were also different from the pull forces for pairs of magnets at the same gap-distances but a different pole orientation. Filing 130-17 at 6. The second new piece of evidence, according to HBL, is its expert's testimony that a magnet broken in two and held together does not result in a single magnet, but in two magnets. Filing 130-6 at 21 (70:25–71:4) ("Q If I take that same—the original magnet and I hit it—hit it and [it] splits into two pieces, just two pieces, I hold those two pieces together, is that still one magnet? A No. It's two magnets."). because a pair of magnets—or a plurality of magnets—will not have a single "pull strength" or "pull force," HBL argues that the statement of a specified "pull strength," like other portions of the specification, demonstrates that a single magnet is claimed in the '779 Patent.

The Court does not find either kind of new evidence sufficient to depart from the general rule that "in patent parlance," at least in an open-ended "comprising" claim, use of "a" or "an" before a noun naming an object is understood to mean "one or more." *Lite-Netics*, 60 F.4th at 1345. To be sure, the problems of determining pull force for multiple magnets is relevant to the "definiteness" of the "pull force" terms, as discussed below in § II.D.1.g. However, those problems do not "'evince a clear intent' to limit 'a' or 'an' to 'one.'" *Convolve, Inc.*, 812 F.3d at 1321 (quoting *Baldwin Graphic Sys.*, 512 F.3d at 1342). Nor does HBL's expert's testimony that a magnet broken in two and held together does not result in a single magnet, but in two magnets. Filing 130-6 at 21 (70:25–71:4).

Thus, taking guidance from the Federal Circuit's decision on the appeal of this Court's preliminary injunction ruling, the Court concludes that the correct construction of "a neodymium

magnet" is "one or more neodymium magnets." *Lite-Netics*, 60 F.3d at 1345–46 ("[D]ecisions of this court lend strong support to the proposition that, 'in patent parlance,' at least in an open-ended 'comprising' claim, use of 'a' or 'an' before a noun naming an object is understood to mean to [sic] 'one or more' unless the context sufficiently indicates otherwise. Here, none of the features of the claims or specification relied on by the district court sufficiently indicate[s] otherwise. . . ."). The Court's construction of "a neodymium magnet" is set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) **a neodymium magnet** embedded in the base wherein said magnet has a pull strength of at least five pounds. | one or more neodymium components having a magnetic field | A single permanent magnet made from an alloy of neodymium, iron, and boron ($Nd_2Fe_{14}B$) with a unitary structure, taking on, as such single magnet, characteristics noted later in the claim regarding pull strength | One or more magnets made from an alloy of neodymium |

> f.   "embedded in the base"

The next claim term in the '779 Patent with a disputed construction is "embedded in the base," which immediately follows "a neodymium magnet" in limitation (c) of claim **1**. Similar claim terms appears in the '264 Patent in claims **1** and **17**. *See* Filing 128-2 at 8 (5:28) ("embedded in the base"), 6 ("embedded in said base"). The parties have not suggested that the different context or slightly different language of the claim term in the '264 Patent requires a different construction.

Therefore, the claim term is shown in bold in context in the '779 Patent in the first column of the
following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) a neodymium magnet **embedded in the base** wherein said magnet has a pull strength of at least five pounds.<br><br>*See also* '264 Patent, Claims **1**, and **17** | fixed firmly and deeply in a surrounding mass of the base | enclosed firmly in the surrounding base that fits into a socket end |

Filing 134-1 at 10; *see also* Filing 134-1 at 10–13 (similar claim terms in claims **1** and **17** of the
'264 Patent).

     Lite-Netics does not explain the merits of its own construction of this claim term. *See* Filing
127 at 23. Instead, Lite-Netics's argument concerning this claim term is that HBL's construction
improperly adds that the base "fits into a socket end." Filing 127 at 23. Lite-Netics asserts that
HBL's construction commits the "cardinal sin" of reading a limitation from the written description
into the claims. Filing 127 at 23. Lite-Netics continues by arguing that none of the embodiments
has a base that fits entirely into the socket end, and the claims do not require that the base fit into
the socket end. Filing 127 at 23. HBL responds that the claim term "embedded in the base"
combines with the claim term "a base attached to the second end of the light socket" to explain
where the magnet is located in a claimed configuration. Filing 129 at 32. Whatever the importance
of the location of the magnet might be to HBL's arguments about non-infringement, the claim term

presently at issue does not include any language related to the location of the base and only refers to the location of the magnet as "embedded in the base." *See* Filing 134-1 at 10. Like Lite-Netics, HBL does not explain its own construction. Filing 129 at 32–35. In reply, Lite-Netics argues HBL has used construction of this claim to inject issues that are irrelevant to this claim term. Filing 133 at 16–17.

Not only have the parties provided no bases for their proposed constructions of this disputed claim term, the claims and the specification provide the Court with little guidance on construction of this claim term. *See SharkNinja Operating*, 2024 WL 1132219, at *2 (explaining that construction starts with the language of the claim); *Grace Instrument Indus.*, 57 F.4th at 1008 (stating that the specification is the "single best guide to the meaning of a disputed term," and that "claims must be read in view of the specification, of which they are a part" (citations omitted)). The Abstract and the Summary of the Invention both state in pertinent part, "A neodymium disc magnet is embedded in the base, thereby allowing the assembly to be mounted magnetically to metal surfaces." Filing 128-1 at 2, 6 (2:19–22). That statement explains the purpose of embedding the magnet but not what "embedded" means.

The exemplary figures and their Detailed Descriptions provide some clarification of the construction of "embedded," however. Figures 2 and 3 are shown below:



FIG. 2                    FIG. 3

61

The Detailed Description of Figure 2 states, "The assembly base **3** is constructed of plastic or similar material and has an embedded neodymium magnet **1**." Filing 128 at 7 (3:14–15). This language provides little guidance on what "embedded" means, but Figure 2 itself suggests that "embedded" means that the "neodymium magnet **1**" is surrounded by the "assembly base **3**," but not completely enclosed or enveloped within the "assembly base **3**." *See* https://www.merriam-webster.com/dictionary/enveloped (Merriam-Webster Dictionary defining "envelope" as "to enclose or enfold completely with or as if with a covering"). Similarly, the Detailed Description explains "[a] plastic protection coating **2** is placed over the face of the magnet [**1**]"[4] that is a separate component from the "assembly base **3**," suggesting that it is not the "assembly base **3**" that covers the magnet. Filing 128-1 at 7 (3:36–37); *see also* Filing 128-1 at 5 (Figures 9A and 9B showing the "plastic protective coating" as **2** and **22** respectively).

The Detailed Description of Figures 2 and 3 also states and the Figures show that the embedded "magnet **1**" is located "flush with the surface of the assembly base **3**, allowing only the face of the magnet to be exposed," where Figure 3 is "the plan view of the base" illustrating "[t]he exposed face of the magnet." Filing 128-1 at 7 (3:33–35). This further suggests that the magnet is not completely enclosed within the "assembly base 3." Even so, the Court concludes that the doctrine of claim differentiation counsels against construing "embedded" in such a way that the magnet must be "flush with the surface." Specifically, no such limitation appears in claim **1** of the '779 Patent, Filing 128-1 at 7 (4:62–63), while dependent claim **10** claims, "The light fixture assembly according to claim **1**, wherein the magnet is embedded flush with the surface of the base facing away from the light bulb." Filing 128-1 at 8 (5:18–20). Neither party has attempted to rebut

---

[4] The magnet is erroneously identified as "magnet **3**" in the quoted statement about the plastic protective coating, but elsewhere in the same paragraph of the Detailed Description, Filing 128-1 at 7 (3:33–37), and in Figure 2, the magnet is **1** and the assembly base is **3**.

the presumption that the scope of claim **10**, specifically claiming that the magnet is "flush with the surface of the base," is different from the scope of claim **1**, which makes no mention of the magnet being "flush with the surface of the base."[5] *See, e.g., Google LLC v. EcoFactor, Inc*., 92 F.4th 1049, 1059 (Fed. Cir. 2024) ("[T]he doctrine of claim differentiation only creates a rebuttable presumption that each claim in a patent has a different scope; it is a guide, not a rigid rule of claim construction."). The Court concludes that these references in the specification do not demonstrate an intent to give "embedded" some idiosyncratic meaning; rather, the specification raises the inference that the ordinary meaning of "embedded" is intended.

Where no idiosyncratic meaning is evident, the Court turns to extrinsic evidence in the form of dictionary definitions for guidance on ordinary meaning. *Grace Instrument Indus*., 57 F.4th at 1008 ("A court . . . may rely on dictionary definitions, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" (quoting *Phillips*, 415 F.3d at 1322-23)). The Merriam-Webster Dictionary defines "embedded," in the pertinent sense, as "enclosed closely in or as if in a matrix : set firmly into a mass or material." *See* https://www.merriam-webster.com/dictionary/embedded. Similarly, the Oxford English Dictionary defines "embedded," as an adjective, in the sense that is pertinent here, to mean something that is "fixed firmly in a surrounding solid mass." *See* https://www.oed.com/search/dictionary/?scope=Entries&q=embedded. Thus, the dictionary meanings of "embedded" are consistent with the usage of the term in the specification, as discussed above. The dictionary definitions also suggest the accuracy of the parties' proposed constructions to the extent that the parties' proposed constructions state that something is "fixed firmly" or

---

[5] The Court has not found and the parties have not pointed to anything in the patent that prevents the magnet in claim **1** from being recessed below the surface of the base or extending beyond the surface of the base yet still being "embedded."

"enclosed firmly" in the base. The parties' constructions are also consistent with the dictionary definitions to the extent that they refer to "fixed (or enclosed) firmly in the surrounding mass" where the "surrounding mass" is specified in the parties' constructions to be "the base."

On the other hand, Lite-Netics has cited nothing suggesting the further requirement it adds to its construction, which is that something must be "fixed . . . deeply in the surrounding mass." Whether something is "deeply" embedded in the base is not apparent from either the claim language, the specification, or extrinsic evidence of dictionary definitions. Thus, a requirement that the magnet be "fixed deeply" in the base is not a part of the proper construction of this claim term.

The Court's construction is set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) a neodymium magnet **embedded in the base** wherein said magnet has a pull strength of at least five pounds.<br><br>*See also* '264 Patent, Claims **1**, and **17** | fixed firmly and deeply in a surrounding mass of the base | enclosed firmly in the surrounding base that fits into a socket end | fixed or enclosed firmly in the surrounding mass of the base |

g.  "wherein said magnet has a pull strength of at least five pounds"

The next claim term of the '779 Patent with a disputed construction, or at least a dispute about definiteness, is "wherein said magnet has a pull strength of at least five pounds" in claim **1**, limitation (c). The parties hotly contest the construction of this term at least to the extent that they dispute whether it can be construed at all or is instead indefinite. As the Court indicated above in § II.D.1.e., this "pull strength" claim term has implications for indefiniteness when "a neodymium magnet" is construed as one or more magnets. The term is shown in bold in context in the first column of the following chart with the parties' proposed constructions or other contentions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **1**<br>1.  A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) a neodymium magnet embedded in the base **wherein said magnet has a pull strength of at least five pounds**. | Not indefinite<br><br>wherein the magnetic field produced by the one or more neodymium components provides a resulting pull force of at least five pounds as measured using tests known by one with skill in the art for determining pull force | Indefinite |

Filing 134-1 at 24–25.

Lite-Netics's entire argument concerning this disputed claim term is devoted to why HBL's position that the term is indefinite is wrong, with no explanation of why Lite-Netics's construction is correct. Filing 127 at 35–40. As to the issue that Lite-Netics addresses, Lite-Netics argues that HBL relies on the lack of a description in the intrinsic record of a methodology to measure the pull strength of the magnet. Filing 127 at 36. Lite-Netics contends however that this claim term does

65

not require a person to measure pull strength when practicing the claimed invention. Filing 127 at 36. Lite-Netics argues that claim terms do not become indefinite just because variables may affect the terms. Filing 127 at 36. Furthermore, Lite-Netics argues that there is no dispute that magnets can be purchased from distributors based on a listed pull strength. Filing 127 at 36. Lite-Netics argues that a person of ordinary skill in the art would know how to select a magnet with the required pull strength without knowing how the distributor measured it. Filing 127 at 36, 38. In the alternative, Lite-Netics argues that if the claim term did require measuring a pull strength, a person of ordinary skill in the art would know how to do so by using trade association standards or by using available software. Filing 127 at 37.

HBL responds that it never contended that this claim term would require that a person would actually measure pull strength when practicing the claimed invention; rather, HBL asserts that its point is that determination of infringement of a device that is already in existence is fatally impossible. Filing 129 at 21. HBL argues that claim **1** of the '779 Patent is indefinite because it includes a claim parameter for which the patent and the prosecution history provide no guidance for a person of ordinary skill in the art to measure and determine the pull strength of magnets with reasonable certainty. Filing 129 at 21. Whether or not the claim requires a person of ordinary skill in the art to measure or confirm the strength of a magnet is irrelevant, HBL argues, because indefiniteness concerns whether it is possible to determine if a claim limitation is met. Filing 129 at 21–22. Likewise, HBL argues that the hearsay marketing information from a distributor is not part of the intrinsic record of the Patent and, moreover, such material does not address relevant parameters or list a pull strength without disclaimers. Filing 129 at 22. HBL points out that its expert has shown that measurement of pull strength could occur in several ways with different results. Filing 129 at 23.

In reply, Lite-Netics reiterates that there are various potential solutions to the problem of determining the pull strength of a magnet. Filing 133 at 12.

As mentioned above in § II.B.2., "[w]hen 'claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention,' they are indefinite." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). The following explanation by the Federal Circuit of when a claim is indefinite is particularly pertinent here, in light of HBL's arguments:

> This court has held that claim scope is not reasonably certain where a claimed characteristic can be measured in multiple ways, those different measurements "would typically yield a different result" when applied to the same sample, and the intrinsic record fails to provide reasonable certainty about which measurement was intended by the claims. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 789 F.3d 1335, 1341, 1345 (Fed. Cir. 2015).

*Janssen Pharms., Inc.*, 97 F.4th at 936–37.

The Court finds that this claim term presents precisely the situation that the Federal Circuit explained in *Janssen Pharmaceuticals* would make a claim indefinite. Lite-Netics does not dispute that pull strength of a magnet can be measured in different ways, that is, using different methodologies. Also, HBL has pointed to its expert's report as demonstrating different ways of measuring magnet pull strength; those different ways of measuring pull strength "would typically yield different results" when applied to the same magnet; and the intrinsic record fails to provide reasonable certainty about which measurement was intend by the claims. *Id.* More specifically, HBL's expert, Dr. Omerod, explained in his report,

> There are many reasonable ways for a person of ordinary skill in the art to measure pull force of a particular magnet. Pull force measurements may have substantial differences depending on the testing method, the characteristics of the object that the magnet is attracted to, and the environment where the measurement is being conducted. The thickness and curvature of the object, the environmental temperature, and the presence of air gaps between the magnet and the object may all have a significant impact on pull force.

67

Filing 130-3 at 18 (¶ 37) (Def.'s Ex. C (Report of Dr. Ormerod)); *see also* Filing 130-3 at 18–32 (¶¶ 38–64) (explaining the bases for these opinions). Although an expert's report is extrinsic evidence, and therefore "secondary" to intrinsic evidence, *see Grace Instrument Indus.*, 57 F.4th at 1008, it is precisely the lack of intrinsic evidence that shows the indefiniteness of this claim term. Whether a person of ordinary skill in the art could find extrinsic information about the purported pull strength of magnets from distributors or could use available software to determine pull strength according to a certain methodology or methodologies, as Lite-Netics contends, simply does not remedy the failure of the intrinsic evidence to define the claim with sufficient definiteness.

The indefiniteness problem is magnified if "a magnet" means "one or more magnets." The Court pointed out in § II.D.1.e. that the record now includes evidence from the measurement by K&J Magnetics, Inc., of the pull strength of pairs of magnets and different gap-distances and different pole orientations. *See* Filing 130-17 at 5–6. For each tested gap-distance in a single pole orientation, the resulting pull force was different. Filing 130-17 at 6. Those pull forces were also different from the pull forces for pairs of magnets at the same gap-distances but a different pole orientation. Filing 130-17 at 6. Thus, a pair of magnets—or a plurality of magnets—will not have a single "pull strength" or "pull force"; the statement of a specified "pull strength" for a plurality of magnets is indefinite for all the reasons it is indefinite for a single magnet plus the additional lack of definition of the gap-distances and pole orientations and other variables that must be considered to determine the pull force of a plurality of magnets.

Hence, claim **1** of the '779 Patent is invalid for indefiniteness. *Maxell*, 94 F.3d at 1372 ("Patent claims that fail to meet the 'particularly pointing out and distinctly claiming' requirement are invalid for indefiniteness."). Furthermore, because all the other claims in the '779 Patent

depend from claim **1**, they are also invalid. The Court's construction of "wherein said magnet has a pull strength of at least five pounds" is set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **1** <br> 1.   A light fixture assembly, comprising: <br> (a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket; <br> (b) a base attached to the second end of the light bulb socket <br> (c) a neodymium magnet embedded in the base **wherein said magnet has a pull strength of at least five pounds**. | Not indefinite <br><br> wherein the magnetic field produced by the one or more neodymium components provides a resulting pull force of at least five pounds as measured using tests known by one with skill in the art for determining pull force | Indefinite | Indefinite <br><br> This claim is indefinite, so that Claim **1** of the '779 Patent is invalid, and all the other claims of the '779 Patent are invalid because they depend from Claim **1.** |

The Court's conclusion that all claims of the '779 Patent are invalid on the basis that the only independent claim is indefinite—like its conclusion in § II.D.1.a. of invalidity of the only independent claim for inoperability—makes it unnecessary to construe any other claim terms of that Patent. Nevertheless, as the Court did after the prior invalidity determination, the Court will continue with its construction of disputed claim terms of the '779 Patent.

h.   "the wire clamp"

The next claim term of the '779 patent with a disputed construction, or at least a dispute about definiteness, is "the wire clamp" in claim **5**. The term is shown in bold in context in the first column of the following chart with the parties' proposed constructions or other contentions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim 5<br>5.  The light fixture assembly according to claim 1, wherein the retaining clips on the base are separate from **the wire clamp** and fit through separate holes in the second end of the socket | Not indefinite<br><br>a wire clamp | Indefinite |

Filing 134-1 at 27–28.

Lite-Netics states that it is not clear why HBL believes that this claim term is indefinite, but if the problem is purportedly lack of antecedent basis, then such a typographical error can be corrected by the Court through "judicial correction" by substituting "a" instead of "the." Filing 127 at 41–42. Lite-Netics argues that there is no reasonable debate about the meaning of the term because the claims reference only one wire clamp, and the prosecution history does not suggest otherwise. Filing 127 at 42. In short, Lite-Netics argues that any perceived inconsistency is a harmless grammatical error. Filing 127 at 42. HBL responds that the basis for its indefiniteness argument is indeed the lack of antecedent basis. Filing 129 at 42. HBL explains that the problem is that dependent claim **5** introduces the term "the wire clamp" without antecedent basis where claim **1**, the independent claim from which claim **5** depends, never uses the term "a wire clamp." Filing 129 at 42. HBL argues that this is not merely a typographical error that the Court can correct. Filing 129 at 42. In reply, Lite-Netics argues that HBL does not dispute that the Court can correct this claim term to read "a wire clamp." Filing 133 at 22. Lite-Netics then argues that the "wire clamp" **4** is shown in Figure 2 as connected to the base of the light fixture assembly. Filing 133 at 23.

The Court will begin with the question of whether this claim term is indefinite. If necessary, the Court will then consider whether the problem is merely a grammatical one amenable to judicial

correction. *See CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (explaining when "judicial correction" is appropriate). Again, the standard for indefiniteness is this: "When 'claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention,' they are indefinite." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901).

The Federal Circuit has also described the effect of lack of an antecedent basis on indefiniteness, as follows:

> The requirement of antecedent basis is a rule of patent drafting, administered during patent examination. The Manual of Patent Examining Procedure states that "[o]bviously, however, the failure to provide explicit antecedent basis for terms does not always render a claim indefinite." MPEP § 2173.05(e) (8th ed. Rev.2, May, 2004). In *Slimfold Manufacturing Co. v. Kinkead Industries, Inc.*, 810 F.2d 1113, 1117 (Fed.Cir.1987) the court held that "the missing antecedent clause, the absence of which was not observed by the examiner of the original patent or by [the alleged infringer] in its reissue protest documents, did not fail to inform the public during the life of the ['274] patent of the limits of the monopoly asserted." The *Slimfold* court held that addition of the missing antecedent basis during reissue was not a substantive change.

> Whether this claim, despite lack of explicit antecedent basis for "said zinc anode," nonetheless has a reasonably ascertainable meaning must be decided in context. In prosecuting the '709 patent, the examiner made several objections to the claims, but the claims were not rejected or objected to on the ground of lack of antecedent basis. In *Bose Corp. v. JBL, Inc*., 274 F.3d 1354, 1359 (Fed.Cir.2001) the court held that despite the absence of explicit antecedent basis, "If the scope of a claim would be reasonably ascertainable by those skilled in the art, then the claim is not indefinite." Moreover, we noted in *Slimfold* that an antecedent basis can be present by implication. *Slimfold*, 810 F.2d at 1116. *See Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1319 (Fed.Cir.2005).

*Energizer Holdings, Inc. v. Int'l Trade Comm'n*, 435 F.3d 1366, 1370–71 (Fed. Cir. 2006). Thus, even if an antecedent basis for this claim term is lacking, that does not necessarily make the claim term fatally indefinite, if the context provides the necessary clarification of the scope of the claim. *Id.*

In the '779 Patent, the context provided by the specification makes plain what "the wire clamp" is, despite the absence of that claim term from independent claim **1** from which claim **5** depends, such that the scope of the claim is reasonably ascertainable by a person of ordinary skill in the art.[6] *Maxell*, 94 F.4th at 1372; *Energizer Holdings*, 435 F.3d at 1370–71. The specification contains references to a "wire clamp" that is included in the "base" and "holds the electrical wires in contact with the conductor." *See, e.g.*, Filing 128-1 at 2 (Abstract), 6 (2:13–15), 7 (3:39–42). The "wire clamp" is also repeatedly shown in the Figures, as pointed out in the Detailed Description. Filing 128-1 at 3 (FIG. 2) and 7 (3:39–42) (identifying the "wire clamp **4**"); Filing 128-1 at 4 (FIG. 6) and 7 (4:6) (identifying "the wire clamp **24**"); Filing 128-1 at 4 (FIG. 7) and 7 (4:15) (identifying "the wire clamp **24**").[7] In this case, the lack of an antecedent basis in claim **1** does not make the claim term "the wire clamp" fatally indefinite. *Energizer Holdings*, 435 F.3d at 1370. Instead, as a straightforward matter of claim construction, in which the specification provides "the best guide" to the meaning of claim terms, *Grace Instrument Indus.*, 57 F.4th at 1008, and "[u]sually, it is dispositive," *Bradium Techs. LLC*, 923 F.3d at 1043, the Court finds that the claim term does not require "judicial correction" because it means "a wire clamp included in the base that holds the electrical wires in contact with the conductor." *See, e.g.*, Filing 128-1 at 2 (Abstract), 6 (2:13–15), 7 (3:39–42).

Of course, this construction still suffers from the "short circuit" problem discussed in § II.D.1.a., where the Court construed "a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket" according to its plain and ordinary meaning even though the result was a short circuit. Thus, while not invalid for

---

[6] Claim **1** also contains no reference to "the retaining clips," but HBL did not contend that claim term in claim **5** was indefinite.

[7] All three of these figures, Figures 2, 6, and 7, appear above in § II.D.1.c. of this decision.

indefiniteness, this claim term is invalid as inoperable. *Chef Am.*, 358 F.3d at 1374. No claim depends from claim **5**, so the invalidity of claim **5** does not invalidate any other claim.

Hence, the Court's construction of "the wire clamp" is set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **5**<br>5.  The light fixture assembly according to claim 1, wherein the retaining clips on the base are separate from **the wire clamp** and fit through separate holes in the second end of the socket | Not indefinite<br><br>a wire clamp | Indefinite | a wire clamp included in the base that holds the electrical wires in contact with the conductor<br><br>This claim is not indefinite, but it is inoperable, so that Claim **5** of the '779 Patent is invalid |

     i.   "magnet is a disc"

The penultimate claim term of the '779 Patent with a disputed construction is "magnet is a disc" in claim **9**. Filing 134-1 at 18–19. This claim term also appears in the '264 Patent in claims **13** and **26**. Filing 134-1 at 19. The parties have not argued that the context of this claim term in the two claims of the '264 Patent changes its construction. Thus, the term is shown in bold in context in claim **9** of the '779 Patent in the first column of the following chart with the parties' proposed constructions or other contentions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '779 Patent, Claim **9**<br>9.  The light fixture assembly according to claim 1, wherein the **magnet is a disc** one half inch in diameter and one eighth inch thick.<br><br>*See also* '264 Patent, Claims **13** and **26** | the one or more neodymium components are mounted to form a cylindrical shape that is shorter than it is wide | the single magnet is a thin circular object |

Filing 134-1 at 18–19. In this chart, the underlining shows a change from Lite-Netics's proposed construction in the parties' original Joint Claim Construction and Preliminary Statement, Filing 113 at 21.

Lite-Netics asserts that the parties agree that "disc" relates to a "circular" (*i.e.*, cylindrical) shape, but they dispute whether the magnet can be multiple pieces. Filing 127 at 34. Lite-Netics adds that a person of ordinary skill in the art would understand the meaning of the term "magnet is a disc" without construction, but Lite-Netics has nevertheless proposed a construction. Filing 127 at 34. HBL argues that Lite-Netics's introduction of the term cylindrical improperly broadens the term "disc" beyond its plain and ordinary meaning. Filing 129 at 52. In HBL's view, an object having a "cylindrical shape" would capture, for example, long cylinders which are not discs. Filing 129 at 52. In reply, Lite-Netics professes confusion about any difference between describing a disc as "a thin circular object" and a "cylindrical shape." Filing 133 at 21. Nevertheless, Lite-Netics states that it "is agreeable with amending its construction for this term, as indicated in the chart above, to include a limitation that the cylindrical shape is 'shorter than it is wide.'" Filing 133 at 21. Because a "disc" is a three-dimensional object, Lite-Netics argues that "cylindrical" is more accurate than "circular." Filing 133 at 21. However, Lite-Netics argues that the term "disc" does not require construction to understand the disputed claim term. Filing 133 at 21.

The Court has already settled the construction of "magnet" as meaning one or more magnets. *See* § II.D.1.e. Thus, what remains in dispute is the meaning of "disc." Looking to the specification as "the best guide" to the meaning of claim terms, *Grace Instrument Indus.*, 57 F.4th at 1008, the Court notes that the Summary of the Invention indicates that the "neodymium disc magnet," in the preferred embodiment, "is ½ inch diameter and ⅛ inch thick." Filing 128-1 at 6 (2:20–23). A similar description, "the magnet **1** is a disc ½ inch diameter x ⅛ inch thick," is used

for the preferred embodiment in the Detailed Description, although the Detailed Description acknowledges that "[o]ther shapes, sizes and thicknesses can be used." Filing 128 at 7 (3:16–17). This description is consistent with Lite-Netics's proposed language that the disc is "shorter than it is wide." *See* Filing 133 at 21.

Because there is no hint of an idiosyncratic meaning of "disc" in the specification or claims, the Court turns to the ordinary meaning of that term. The Oxford English Dictionary defines "disc" in the pertinent sense as "A thin circular plate of any material." *See* https://www.oed.com/dictionary/disc_n?tab=meaning_and_use#6673809 (definition I.4.a.). Similarly, the Merriam-Webster Dictionary, which describes "disc" as a variant spelling of "disk," defines the term in the pertinent sense as "a thin circular object." *See* https://www.merriam-webster.com/dictionary/disc (definition 4). Presumably, it is the inclusion of "thin" in both definitions that implies a three-dimensional form. In light of these authorities, the specification, and the Court's prior construction of "a magnet," the Court arrives at the construction of "magnet is a disc" set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **9** <br> 9.  The light fixture assembly according to claim 1, wherein the **magnet is a disc** one half inch in diameter and one eighth inch thick. <br><br> *See also* '264 Patent, Claims **13** and **26** | the one or more neodymium components are mounted to form a cylindrical shape <u>that is shorter than it is wide</u> | the single magnet is a thin circular object | one or more magnets form a thin circular shape |

> j.  "a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor"

The last claim term in the '779 Patent that requires construction is "a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with

the conductor" in claim **15**. Filing 134-1 at 18.[8] The Court sets out the term in bold in context in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| 779 Patent, Claim **15**<br>15. The light fixture assembly of claim 1 wherein said base comprises:<br>(i) **a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor** | Plain and ordinary meaning | a wire clamp that fits through the opening in the second end of the socket and holds each of at least two electrical wires in contact with a single conductor |

Filing 134-1 at 18.

Lite-Netics asserts that HBL again offers a construction of this claim term that would render the device non-functional. Filing 127 at 33. On the other hand, Lite-Netics contends that a construction of this claim term is not necessary. Filing 127 at 33. HBL argues that this claim term requires construction consistent with its proposed constructions of "a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket." Filing 129 at 45. HBL argues that this term adds "a wire clamp . . . holds" the electrical wires in contact with a single conductor, which its proposed construction addresses. Filing 129 at 45. In reply, Lite-Netics reiterates that this claim term requires no additional construction. Filing 133 at 20–21.

The Court's construction of this claim term will account for its prior constructions of constituent claim terms. Specifically, in § II.D.1.a., the Court construed "a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the

---

[8] There is a similar term in claim **6** of the '264 Patent. Filing 134-1 at 17–18 ("a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors"). However, the Court concludes that claim term must be construed separately in § II.D.2.g.

socket" to have its "plain and ordinary meaning resulting in a short circuit," which renders the

claim inoperable and invalid. In § II.D.1.h., the Court construed "a wire clamp" to mean "a wire

clamp included in the base that holds the electrical wires in contact with the conductor." What is

new (or different) in this claim term is actually that the "wire clamp" now "fits through the opening

in the second end of the socket." The parties both appear to rely on the ordinary meaning of those

terms, as informed by the specification, and the Court will do the same.

One result of the incorporation of constituent claim terms that have already been construed

is that this claim term is inoperable and invalid. No other claim depends from claim **15**, however.

The Court's construction of this claim term is set out in the fourth column of the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '779 Patent, Claim **15**<br>15.  The light fixture assembly of claim 1 wherein said base comprises: (i) **a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor**. | Plain and ordinary meaning | a wire clamp that fits through the opening in the second end of the socket and holds each of at least two electrical wires in contact with a single conductor | a wire clamp included in the base that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor resulting in a short circuit<br><br>Claim **15** of the '779 Patent is inoperable, so that Claim **15** of the '779 Patent is invalid. |

## 2. *Remaining Disputed Claim Terms of the '264 Patent*

The Court has considered the disputed claim terms in the order in which they appear in the

'779 Patent, noting where the claim terms also appear in the '264 Patent. The Court now turns to

the construction of the remaining disputed terms of the '264 Patent in the order in which they

appear in that Patent.

a. "wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires"

The first claim term of the '264 Patent that requires construction is "wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires" in claim **1**, first limitation. The term is set out in bold in context in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim 1<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, **wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires** | Plain and ordinary meaning | wherein the socket includes two conductors that each places [sic] a light bulb inserted into the first end in electrical contact with each of at least two electrical wires: |

Filing 134-1 at 15–16.

Once again, Lite-Netics argues that HBL seeks to change the meaning of this claim term to make the device non-functional by adding "each" with respect to the conductors and the electrical wires, which would result in a short circuit. Filing 127 at 29. Lite-Netics reiterates that a person of ordinary skill in the art would recognize that no short circuit was intended and choose a different interpretation, while patent law disfavors a construction that would render the invention non-functional and nonsensical. Filing 127 at 30. HBL argues that although the wording of this claim is slightly different from the one construed in § II.D.1.a. above ("a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket"), this claim term also claims a short circuit. Filing 129 at 19. HBL recognizes that a difference between the claim term now at issue and the one previously construed is that this claim

term requires "two conductors" (instead of "a conductor") placing the bulb "in electrical contact" with "electrical wires." Filing 129 at 19. In HBL's view, "adding a second conductor only doubles the problem." Filing 129 at 19. Lite-Netics argues in reply that this claim term does not require both conductors to be in contact with all wires. Filing 133 at 9.

As with the similar claim term of the '779 Patent discussed in § II.D.1.a., the Court finds it unnecessary to look beyond the claims of the '779 Patent to determine the proper construction of this challenged claim term. *See SharkNinja Operating*, 2024 WL 1132219, at \*2 (explaining that construction begins with the language of the claims); *Grace Instrument Indus.*, 57 F.4th at 1008 (same). Instead, the Court concludes that once again what is at issue here is the kind of "nonsensical result" described in *Chef America*, which means that the claim is invalid.

As in *Chef America*, the claim term uses "ordinary, simple English words whose meaning is clear and unquestionable." 358 F.3d at 1373. There is no indication that the use of the words in this particular conjunction changes their meaning; instead, they mean exactly what they say. *Id.* The difference between this claim term and the one at issue in § II.D.1.a. is that this claim term expressly states that there are two conductors, while the Court had to assume a plurality of conductors in the claim term in § II.D.1.a. However, as in § II.D.1.a., nothing in the plain language of the claim term suggests that each such conductor is in contact with only one wire, as would be required to avoid a short circuit. The Court is no more persuaded by Lite-Netics's present arguments to avoid the inevitable short circuit than it was in § II.D.1.a. As in *Chef America*, the problem is that if the "two conductors" are "in electrical contact with said electrical wires," rather than each conductor in contact with just one of "said electrical wires," the result is a short circuit, instead of the light bulb lighting. *Cf. Chef Am.*, 358 F.3d at 1373 (the result was dough burned to a crisp). This "nonsensical result" does not mean that the Court must fabricate an "operable result"

from extrinsic evidence and read this language in such a way as to avoid a short circuit. Instead, *Chef America* makes clear that the Court may not redraft the claim to make it operable. *Id.* at 1374. In this instance, the claim is susceptible to only one reasonable interpretation, while Lite-Netics offers instead an interpretation with no source in the claim language or the specification and with no merit except that it says what the patentee wishes he had written. *Id.* Here as in *Chef America*, the only reasonable interpretation results in a nonsensical construction of the claim as a whole, so the claim must be invalidated. *Id.* Furthermore, because claim **1** of the '264 Patent is inoperable as invalid, claims **2** through **16**, which depend from claim **1**, are also invalid.

Thus, the Court now adds its construction of this term to the chart:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, **wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires** | Plain and ordinary meaning | wherein the socket includes two conductors that each places a light bulb inserted into the first end in electrical contact with each of at least two electrical wires: | Plain and ordinary meaning resulting in a short circuit<br><br>Claim **1** of the '264 Patent is inoperable, so that Claim **1** of the '264 Patent is invalid, and claims **2** through **16**, which depend from claim **1**, are also invalid.[9] |

---

[9] The parties have not identified claim terms in all the claims **2** through **16** of the '264 Patent as at issue. Of the claims with terms at issue, claims **2**, **6**, **9**, **10**, and **13** directly depend from claim **1**. Claim **8** directly depends from claim **6** and thus indirectly depends from claim **1**, while claim **14** directly depends from claim **13** and thus indirectly depends from claim **1**. Claim **17** is an independent claim, while claims **19**, **21**, and **26** depend from that independent claim.

b.   "integrally attached"

The next claim of the '264 Patent that still requires construction is "integrally attached" in claims **1** and **17**. Although the context of the claim term is slightly different in the two claims, the parties have not argued that the differing context makes any difference to the construction of the claim term. Consequently, the term is set out in bold in its context in claim **1** of the '264 Patent in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claims **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires,<br>wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base **integrally attached** to the second end of the light bulb socket<br><br>*See also* '264 Patent, Claim **17** | joined in close association so as to create a unified whole | attached (see above) as part of original construction and not as an optional accessory |

Filing 134-1 at 5–6.

Lite-Netics argues that the parties already addressed the term "attached," so that what is now at issue is their dispute about how the word "integrally" modifies that term. Filing 127 at 20. Lite-Netics asserts that its construction comes from dictionary definitions of "integrate" and is also based on intrinsic evidence, while Lite-Netics asserts that HBL's construction adds a limitation ("as part of original construction and not as an optional accessory") that is unsupported by either intrinsic evidence or dictionary definitions. Filing 127 at 20. Lite-Netics acknowledges that "integrally" does not appear in the specification of either the '264 Patent or the '779 Patent. However, Lite-Netics explains that the word "integral" was added to the claims of the '264 Patent

in the prosecution of the Patent to distinguish the Hofer prior-art reference. Filing 127 at 20.
Specifically, Lite-Netics argues that the socket and base of Hofer, when attached, appear to be
separate and distinct, rather than forming something uniform and whole. Filing 127 at 21. Lite-
Netics argues that parts of the specification describe embodiments in which portions of the base
can be removably joined (so they can be replaced), demonstrating that those parts do not have to
be part of the original construction. Filing 127 at 22.

HBL argues that Lite-Netics's construction adds nothing because Lite-Netics does not
explain what "to create a unified whole" means. Filing 129 at 37. HBL also argues that disclaimers
over Chou in the prosecution history reinforce that a "clip on" accessory is not "integrally
attached." Filing 129 at 37. Thus, HBL contends that only its construction gives effect to the role
played by the addition of the word "integrally." Filing 129 at 38. HBL explains that "integral"
imparts information about a combination's original construction, because it means "formed as a
unit with another part," so that "integrally attached" means attached as part of original
construction. Filing 129 at 38. HBL also argues that the applicant distinguished Hofer, which had
a separately attachable piece with the magnet, by noting that the '264 Patent's then-new claim
amendment "mak[es] the base integral with the light socket" to further "the advantage of minimal
encumbrance." Filing 129 at 38. HBL also argues that the applicant distinguished Chou's separate
piece, called a "fixing seat," that cups a light assembly base by arguing "the fixing seat disclosed
in Chou is not integral with the base of the lamp but is in the form of a clip on holder." Filing 129
at 39.

In reply, Lite-Netics explains that "unified whole" comes from the dictionary definitions
of "integrate" and that it refers to items that, when attached, do not appear separate and distinct
but united or unified into a whole. Filing 133 at 17.

The Court has already rejected the parties' constructions of "attached" in § II.D.1.c., instead construing the term to mean "directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items." Thus, the question is how "integrally" modifies that construction. Although the specification may ordinarily be "the best guide" to the meaning of claim terms, *Grace Instrument Indus.*, 57 F.4th at 1008, it is not helpful here, because neither "integrally attached" nor any word derived from "integral" or "integrate" is to be found in the specification of the '264 Patent. Instead, the word "integrally" first appears without elaboration or definition in claim **1** and reappears in claim **17** still with no elaboration or definition. *See* Filing 128-2 at 8 (5:26) and (6:26), respectively. Thus, the language of the claims, *see SharkNinja Operating*, 2024 WL 1132219, at *2; *Grace Instrument Indus.*, 57 F.4th at 1008, is as unhelpful as the Court found the specification.

Turning to intrinsic evidence from the prosecution history, Lite-Netics points to Figure 8 from the Hofer prior art and the way in which it was distinguished. Figure 8 of Hofer is shown below:



Filing 128-11 at 139. The prosecution history explains, "Hofer discloses attaching a magnet 106d . . . to a male connection member," but "Hofer does not disclose or suggest a magnet

83

embedded within the base 102 of the miniature lamp, but rather teaches away from the present invention by disclosing a means for <u>attaching</u> a magnet <u>externally</u> to the base of the lamp." Filing 128-11 at 1167–68 (underlining in the original). The prosecution history explains the purpose of the "integrally attached" language added to the claimed invention in the '264 Patent as follows:

> By embedding the magnet into the base of the lamp and making the base integral with the light socket as is claimed by the present invention, the advantage of minimal encumbrance of the light structure is furthered. Hofer discloses the advantage of a minimal encumbrance: "It will be noted from a comparative view in Figures 2 and 4 that the miniature light 104 is only minimally encumbered by the connection member 106, in that there is no intermediary device." (Column 4, Lines 66,67 - Column 5, Lines 1-2.) Yet, in spite of the desire to have a minimally encumbered lamp, Hofer does not disclose embedding a magnet within the base of the lamp. This provides a non-obvious, significant advantage over Hofer that is not taught or suggested in the prior art.

Filing 128-11 at 168. Thus, the purpose of the amendment adding "integrally" to "attached" was to indicate that the base attached to the light socket with minimal encumbrance of the light structure—that is, with minimal encumbrance to the light structure as a whole.

HBL acknowledges this purpose of the amendment adding "integrally" to "attached." Filing 129 at 38 (citing the identical part of the prosecution history, albeit from Filing 130-13 at 9). However, HBL suggests that this "supports HBL's construction, since an optional accessory does not further this 'minimal encumbrance' advantage." Filing 129 at 38. The Court disagrees with HBL's reading. It is the "integral attachment" of the base to the light socket that minimally encumbers the light structure as a whole—as the prosecution history quoted above explains—not whether the base and the light socket were attached as part of the original construction and not whether the base was an optional accessory.

Resorting to extrinsic dictionary definitions to understand the ordinary meaning of "integrally," the Court finds that, as Lite-Netics points out, the Merriam-Webster dictionary defines "integrate," a verb, as "to form, coordinate, or blend into a functioning or unified whole :

84

UNITE"; "to incorporate into a larger unit"; and "to unite with something else."
https://www.merriam-webster.com/dictionary/integrate; *see also* Filing 128-6 at 2 (Merriam-
Webster definition). As HBL contends, the same dictionary defines "integral," as an adjective, in
the sense of "a seat with integral headrest," as "formed as a unit with another," *see*
https://www.merriam-webster.com/dictionary/integrally; *see also* Filing 130-12 at 2 (Merriam-
Webster definition). The forms of the word the parties identify are not the forms of the word in the
claim term at issue, however: the term is "integrally," an adverb. The Oxford English Dictionary
defines "integrally," as an adverb, as "In an integral manner; as a whole, in its entirety; completely,
entirely, wholly." *See* https://www.oed.com/search/dictionary/?scope=Entries&q=integrally. The
Oxford English Dictionary also defines "integral"—as in "in an integral manner"—to mean "Said
of a part or parts: Belonging to or making up an integral whole." *Id.*

Hence, relying on the dictionary definitions and prosecution history above, *see Grace
Instrument Indus.*, 57 F.4th at 1008 ("A court . . . may rely on dictionary definitions, 'so long as
the dictionary definition does not contradict any definition found in or ascertained by a reading of
the patent documents.'" (quoting *Phillips*, 415 F.3d at 1322-23)), and the Court's prior
construction of "attached," the Court concludes that the proper construction of "integrally
attached" is "directly engaged or mounted together with a retaining force created by the physical
interaction of the components of the items so as to make up a unified whole." The Court recognizes
that HBL argues that Lite-Netics does not explain what "to create a unified whole" means. Filing
129 at 37. Nevertheless, the Court concludes that this language drawn directly from the ordinary
definitions of "integrally" as an adverb demonstrate that this is the appropriate construction of this
claim term.

Thus, the Court now adds its construction of this term to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim 1<br>1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; a base **integrally attached** to the second end of the light bulb socket<br><br>*See also* '264 Patent, Claim **17** | joined in close association so as to create a unified whole | attached (see above) as part of original construction and not as an optional accessory | directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items so as to make up a unified whole |

    c.  "a base integrally attached to the second end of the light bulb socket"

The next claim term of the '264 Patent requiring construction is "a base integrally attached to the second end of the light bulb socket" in claim **1** and the only slightly different claim term "said base is integrally attached to an end of the light bulb socket" in claim **17**. Filing 134-1 at 7–10. The Joint Claim Construction Chart also indicates that the definiteness of the shorter claim term "a base integrally attached to the second end" in claim **1** is disputed. Filing 134-1 at 28–29. The parties have not argued that the context or slightly different language of the similar claim term in claim **17** changes the construction of the claim term. Thus, the disputed claim term is set out in bold in its context in claim **1** of the '264 Patent in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; | Bracketed part:<br>Not indefinite<br><br>a base joined in close association to a second end so as to create a unified whole | Bracketed part:<br>Indefinite |
| **[a base integrally attached to the second end] of the light bulb socket**<br>(Brackets added).<br>*See also* '264 Patent, Claim **17** | Entire claim term:<br><br>a structure comprising one or more components that is integrally attached to a second end of the light bulb socket | Entire claim term:<br><br>a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching as part of the light assembly's original construction |

Lite-Netics contends that as to the "indefiniteness" of the bracketed part of the claim term, if the reason for purported indefiniteness is lack of antecedent basis, where the claim term uses the word "the" before "second end," that typographical error can be corrected through judicial correction. Filing 127 at 42. Lite-Netics asserts that there is no reasonable debate about the meaning of the term "second end" where the claims reference only one light bulb socket and the prosecution history does not suggest otherwise. Filing 127 at 42.

HBL asserts lack of antecedent basis for the bracketed part because claim **1** introduces the term "the second end" without antecedent basis. Filing 129 at 48. HBL contends that the Court cannot judicially correct this issue as a mere typographical error, because it remains unclear what "light bulb socket" with a "second end" is at issue. Filing 129 at 48. As to the entire claim term, HBL also asserts that when this claim term is coupled with the "embedded in the base" claim term they answer the question of where the magnet is located in the claimed construction. Filing 129 at 32. HBL makes this argument, even though neither claim term mentions a magnet at all. HBL's

construction of this claim term simply includes its proposed definition of "integrally attached."

Filing 129 at 31.

In reply to HBL's indefiniteness argument concerning the bracketed part of this claim term,

Lite-Netics asserts that HBL has not identified any other term in the claims that "the second end"

could refer to, so judicial correction is appropriate. Filing 133 at 23. As to the entire claim term,

Lite-Netics argues that there is no need to do any additional construction where it has already

addressed "attached" and "integrally attached." Filing 133 at 16.

The Court notes that Lite-Netics does not explain why "a base" means "a base" when it

appears in the bracketed part of the claim term, Filing 127 at 42, but it means "a structure

comprising one or more components" when it appears in the entire claim term, Filing 127 at 28.

However, the Court concludes—as it did when confronted with the latter construction above in

§ II.D.1.d.—that Lite-Netics's construction of "a base" as "a structure comprising one or more

components" is so vague that it could refer to almost any part of the '264 Patent, such as a "light

bulb socket," but "a base" is repeatedly identified in the '264 Patent as a different structure from

"a light bulb socket." *Cf.* § II.D.1.d.

As to indefiniteness of the bracketed part of the disputed claim term, this is not a situation

in which "claims, read in light of the specification delineating the patent, and the prosecution

history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the

invention." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). Therefore, the claims in

which this disputed term "a base integrally attached to the second end" appears are not indefinite.

*Id.* Indeed, the Court finds it unnecessary to look beyond the language of the claims. *See*

*SharkNinja Operating*, 2024 WL 1132219, at *2 (explaining the construction begins with the

language of the claims); *Grace Instrument Indus.*, 57 F.4th at 1008 (same). Claim **1** claims "[a]

88

light fixture assembly comprising," first, "a light bulb socket with an opening at a first end for accommodating a light bulb." Filing 128-2 at 8 (5:19–22). The reference to a "first end" of "a light bulb socket" would necessarily suggest to a person of ordinary skill in the art—or anyone with even a basic understanding of three-dimensional objects other than spheres—that "a light bulb socket" also has a "second end." Indeed, in the second claim limitation, "a base integrally attached to the second end" is appended to "of the light bulb socket." Filing 128-2 at 8 (5:26–27). There is consequently reasonable certainty from the claim language that the light bulb socket referred to in the second limitation of claim **1** is the same light bulb socket referred to in the second limitation, this time referring to its "second end" rather than its "first end," and there is no indefiniteness. *See Maxell*, 94 F.4th at 1372 (indicating that claims, read in light of the specification delineating the patent, and the prosecution history, are not indefinite if they inform, with reasonable certainty, those skilled in the art about the scope of the invention).

In § II.D.1.d., the Court construed "a base attached to the second end of the light bulb socket" by incorporating its construction of "attached" in § II.D.1.c., which is "a base directly engaged or mounted to the second end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket." The only difference between that claim term and the present claim term is that the base is "integrally attached." The Court also construed "integrally attached" just above in § II.D.2.b. as "directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items so as to make up a unified whole." From the constructions of these constituent claim terms, it follows that "a base integrally attached to the second end of the light bulb socket" is construed as "a base directly engaged or mounted to the second end of the light

89

bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket so as to make up a unified whole."

Thus, the Court now adds its construction of "a base integrally attached to the second end of the light bulb socket" to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **1** 1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; **[a base integrally attached to the second end] of the light bulb socket** (Brackets added) *See also* '264 Patent, Claim **17** | Bracketed part:<br><br>Not indefinite<br><br>a base joined in close association to a second end so as to create unified whole<br><br>Entire claim term:<br><br>a structure comprising one or more components that is integrally attached to a second end of the light bulb socket | Bracketed part:<br><br>Indefinite<br><br><br><br>Entire claim term:<br><br>a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching as part of the light assembly's original construction | Bracketed part:<br><br>Not indefinite<br><br><br><br>Entire claim term:<br><br>a base directly engaged or mounted to the second end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket so as to make up a unified whole |

Similarly, it follows from the evidence discussed above that the slightly different claim term in claim **17**—"said base is integrally attached to an end of the light bulb socket"—is construed as "said base is directly engaged or mounted to an end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket so as to make up a unified whole."

    d.  "embedded in the base such that said magnet does not protrude
       outside of said base"

The next claim term of the '264 patent that requires construction is "embedded in the base such that said magnet does not protrude outside of said base" in claims **1** and **17**. Filing 134-1 at 13–15. The construction of this claim term is another hotly contested issue. The parties do not assert that the slightly different language of the claim term in claim **17** ("embedded in said base such that said magnet does not protrude outside of said base") has any impact on the proper construction of the disputed claim term. Consequently, the disputed claim term is set out in bold in its context in claim **1** of the '264 Patent in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim 1<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base integrally attached to the second end of the light bulb socket; and<br>a magnet **embedded in the base such that said magnet does not protrude outside of said base**, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.<br>*See also* '264, Claim **17** | fixed firmly and deeply in the surrounding mass of the base such that said one or more components having a magnetic field become part of the base | [a single magnet is][10] enclosed firmly in the surrounding base that fits into a socket end, such that no portion of the magnet extends outside the volume of the base in any direction (radial or axial) |

Filing 134-1 at 13–14.

---

[10] The Court finds the bracketed part of HBL's construction is extraneous because it is not part of the claim term presently at issue.

At the preliminary injunction stage of the litigation, Lite-Netics asserted that "does not protrude" just means "not completely outside of the base." *See* Filing 43 at 38 (citing Filing 32 at 29). Lite-Netics now argues for a slightly different construction (that the magnet "become[s] part of the base"), which Lite-Netics asserts is based on the intrinsic record, namely the applicant's remarks in relation to the claim amendment adding "such that said magnet does not protrude outside of said base." Filing 127 at 24. Lite-Netics explains that the reason for the amendment was to overcome Hofer, in which the magnet was not embedded in the base of the lamp, and Chou, which uses a fixing seat that is first screwed to a surface, then a light fixture is pressed into it to secure the fixture to the surface. Filing 127 at 24. Lite-Netics points out that even if the fixing seat were magnetized, it would still be completely external to the lamp base. Filing 127 at 26. Lite-Netics argues that the applicant's corresponding amendment (*i.e.*, that the magnet does not protrude outside the base) indicates that the magnet is "embedded in the base" such that it is part of the base rather than being a wholly external magnet attachment that fits over the base. Filing 127 at 26. Lite-Netics argues that HBL has chosen the narrowest possible interpretation of the term as meaning "no portion of the magnet extends outside the volume of the base in any direction (radial or axial)." Filing 127 at 24. Lite-Netics contends that HBL's proposed construction would rule out a preferred embodiment, because the top of the magnet in that embodiment is "exposed," which Lite-Netics contends is the same as "outside the volume of the base" in which it is embedded, citing Figure 1 of the '264 Patent. Filing 127 at 26–27. Figure 1 of the '264 Patent is shown below, with the exposed magnet (unnumbered) in "base **3**" at the top of the figure:



*FIG. 1*

Filing 128-2 at 3.

HBL argues that the Court correctly concluded in its preliminary injunction ruling that "does not protrude" means "the magnet does not protrude from the base in any direction. . . ." Filing 129 at 28. HBL argues that Lite-Netics's new construction of "does not protrude" as "part of the base" and not "wholly external" is really no different from its construction at the preliminary injunction phase of the case, which was "not completely outside of the base." Filing 129 at 28. HBL contends that its construction is consistent with dictionary definitions of "protrude," while Lite-Netics offers no competing definitions. Filing 129 at 28. HBL also contends that its expert has testified that the seating of a magnet may be important to a person of ordinary skill in the art. Filing 129 at 29–30. HBL then disputes Lite-Netics's argument that HBL's construction would exclude a preferred embodiment shown in Figure 1, arguing instead that the exposed top surface of the magnet described as flush with the surface of the base does not extend outside the volume of the base. Filing 129 at 31.

Lite-Netics argues that HBL ignores the principle that a distinguished reference is still relevant to what the added claim language means. Filing 133 at 14. Thus, Lite-Netics contends that the distinguished references support its proposed construction of "does not protrude." Filing 133 at 14.

93

The Court reiterates that it construed "a . . . magnet" in § II.D.1.3. to mean one or more magnets (*i.e.*, a plurality of magnets). The Court has also already construed "embedded in the base" in § II.D.1.f. Thus, what remains to be construed is "such that said magnet [or plurality of magnets] does not protrude outside of said base." Second, the Court notes that Lite-Netics's current construction of "does not protrude outside of said base" as "such that [a magnet] become[s] part of the base" all but ignores the "does not protrude" requirement. Even a lay person, let alone a person of ordinary skill in the art, can imagine any number of ways that a "protruding" component could "become part of the base." For example, in Figure 6, "the retaining clips **25** and wire clamp **24**" are protruding components or protruding parts of the "assembly base **23**." Filing 128-1 at 7 (4:1–6) (Detailed Description of Figure 6).



*FIG. 6*

Filing 128-2 at 4. Thus, "does not protrude" must mean something more than just "such that [a magnet] become[s] part of the base."

However, perhaps more to the point, the Court's examination of the language of the claims and the specification history provides few opportunities to discover the meaning of "such that said magnet does not protrude outside of said base," even though such intrinsic evidence usually provides important guidance. *See SharkNinja Operating*, 2024 WL 1132219, at *2 (explaining that construction starts with the language of the claim); *Grace Instrument Indus.*, 57 F.4th at 1008 (stating that the specification is the "single best guide to the meaning of a disputed term," and that

"claims must be read in view of the specification, of which they are a part" (citations omitted)).
"Protrude" appears once in the Background to the Invention—not even in the Detailed Description
of the invention—in the following part of the description of the Dougan prior art:

> The main body of the clip is a flexible, V-shaped member which is compressed and
> wedged between the fascia and soffit of a house. When installed, the lights protrude
> perpendicularly below the fascia and are clearly visible, while the wedge shaped
> members are substantially hidden from view by the fascia.

Filing 128-2 at 6 (1:43–48). In that passing reference, the patentholder appears to use "protrude"
to mean extend into view beyond something else. The only other times "protrude" appears in the
'264 Patent are in claims **1** and **17**.

On the other hand, a preferred embodiment described in the specification has a magnet
"flush with the surface of the assembly base **3**, allowing only the face of the magnet **55** to be
exposed." Filing 128-2 at 7 (3:54–56) (describing Figures 1 and 2). This part of the specification
strongly suggests that "does not protrude" means "does not extend beyond the surface of the
assembly base **3**," which is shown as surrounding the magnet in Figure 6 above, and also
surrounding the magnet in a different embodiment in Figures 1 and 2 below:



FIG. 1

FIG. 2

Filing 128-2 at 3. Lite-Netics argues that HBL's construction of "does not protrude" as "such that no portion of the magnet extends outside the volume of the base in any direction (radial or axial)" rules out this same preferred embodiment. Filing 127 at 26–27. Lite-Netics describes this embodiment as including an "exposed" magnet that is consequently "outside the volume of the base" in which it is embedded. Filing 127 at 26–27. Again, the specification describes this embodiment as having a magnet "flush with the surface of the assembly base **3**, allowing only the face of the magnet **55** to be exposed." Filing 128-2 at 7 (3:54–56). However, the "exposed" magnet is not "outside the volume of the base"; rather, it is surrounded by and hence within the volume of the base, just as the coffee in a coffee cup is surrounded by and within the volume of the cup, even though the surface of the coffee is exposed.

The Court turns to prosecution history to attempt to discern the meaning of this claim term. *See Actelion Pharms. LTD*, 85 F.4th at 1173 ("The prosecution history can often inform the meaning of the claim language by demonstrating how the inventor understood the invention. . . ." (internal quotation marks and citation omitted)). Lite-Netics is correct that the amendment adding the disputed claim term was to overcome Hofer's invention, shown on the left below, and Chou's invention, shown on the right below:



Filing 128-11 at 167 (Hofer); Filing 128-12 at 2 (Chou). Lite-Netics is correct that the application

stated, "Hofer does not disclose or suggest a magnet embedded within the base 102 of the miniature

lamp, but rather teaches away from the present invention by disclosing a means for <u>attaching</u> a

magnet <u>externally</u> to the base of the lamp." Filing 128-11 at 167–68 (underlining in the original).

The applicant distinguished Chou, in the part Lite-Netics argues is significant, as follows:

> Chou does not teach a base that is comprised of a removable end piece in which the magnet is embedded. In fact, the base of the lamp holder has nothing embedded in it. The "fixing seat" 21 is not part of the base, but rather is used to attach the base to a wall and protrudes outside the base 12, thus teaching away from the present invention.

Filing 128-11 at 141. While these parts of the prosecution history help explain the "embedded"

language of the disputed claim term because they show no magnet embedded in the base and are

distinguished on that basis, they actually do little or nothing to explain the "does not protrude"

language. These prior art examples show magnets that are "entirely outside of" the base; because

they show magnets that are not "embedded" in the base, they do nothing to clarify what is meant

by a magnet "embedded in the base" that "does not protrude" from the base.

Finally, as to this claim term, the Court turns to the external evidence of dictionary

definitions for the ordinary meaning of "protrude." *See Grace Instrument Indus.*, 57 F.4th at 1008

("A court . . . may rely on dictionary definitions, 'so long as the dictionary definition does not

contradict any definition found in or ascertained by a reading of the patent documents.'" (quoting

*Phillips*, 415 F.3d at 1322-23)). The Oxford English Dictionary defines "protrude" to mean "[t]o

project from or extend beyond the surrounding surface or parts; to stick out. Frequently with from."

*See* https://www.oed.com/search/dictionary/?scope=Entries&q=protrude. Similarly, the Merriam-

Webster Dictionary defines "protrude" to mean "to jut out from the surrounding surface or

context." *See* https://www.merriam-webster.com/dictionary/protrude. Both definitions refer to

something that is surrounded by but extends beyond a surface. Those definitions are also consistent

with a preferred embodiment of the '264 Patent that describes a magnet as "flush with the surface of the assembly base **3**, allowing only the face of the magnet **55** to be exposed," <u>Filing 128-2 at 7</u> (3:54–56), which the Court recognized above strongly suggests that "does not protrude" means "does not extend beyond the surface of the assembly base **3**," as shown in Figures 1 and 2 above.

Thus, the Court now adds its construction of "embedded in the base such that said magnet does not protrude outside of said base" to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **1** 1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; a base integrally attached to the second end of the light bulb socket; and a magnet **embedded in the base such that said magnet does not protrude outside of said base**, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies. *See also* '264, Claim **17** | fixed firmly and deeply in the surrounding mass of the base such that said one or more components having a magnetic field become part of the base | [a single magnet is][11] enclosed firmly in the surrounding base that fits into a socket end, such that no portion of the magnet extends outside the volume of the base in any direction (radial or axial) | fixed or enclosed firmly in the surrounding mass of the base such that the magnet does not extend beyond the surrounding surface of the base |

e. "wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies"

The next claim term of the '264 Patent that must be construed is "wherein said magnet has

sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture

---

[11] Again, the Court finds the bracketed part of HBL's construction is extraneous because it is not part of the claim term presently at issue.

assembly is connected to a string of other light fixture assemblies" in claim **1**. Filing 134-1 at 25–26. **S**imilar language is in claim **17**, which states "wherein said magnet has sufficient pull force to hold said at least one of said light fixture assemblies to said ferrous metal surface while said at least one of said light fixture assemblies is connected to said string of other light fixture assemblies." Filing 134-1 at 26–27. The parties do not assert that the slightly different language and context of the two claims has any impact on the proper construction of the disputed claim terms, so only the disputed claim term from claim **1** is set out in bold in its context in the first column of the following chart with the parties' assertions about the definiteness or indefiniteness of the claim term in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base integrally attached to the second end of the light bulb socket; and<br>a magnet embedded in the base such that said magnet does not protrude outside of said base, **wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies**.<br>*See also* '264 Patent, Claim **17** | Not indefinite | Indefinite |

Filing 134-1 at 25–27.

Lite-Netics argues that, like "wherein said magnet has a pull strength of at least five pounds," the current "pull force" claim term—which Lite-Netics asserts is an "implementation specific requirement"—is not indefinite. Filing 127 at 40. Lite-Netics argues that regardless of the

implementation, based on this claim term, a person of ordinary skill in the art would need to select a magnet with sufficient pull force to hold the light fixture to a ferrous object when in use. Filing 127 at 40. Furthermore, Lite-Netics argues that a person of ordinary skill in the art would know that the magnet should be selected to hold up the assembly when in use, and the "sufficient" term does not make the claim term indefinite. Filing 127 at 40. Lite-Netics also contends that HBL's expert indicated that a person of ordinary skill in the art would know how to account for differences in various factors in making the selection. Filing 127 at 41. Finally, Lite-Netics asserts that a person of ordinary skill in the art would be able to source an appropriate magnet from a company that performs implementation-specific magnetic testing. Filing 127 at 41.

HBL argues that the same conclusion of indefiniteness applies to this claim term for overlapping reasons as applied to the "pull strength of at least five pounds" claim term in the '779 Patent. Filing 129 at 26. HBL argues that this term is also indefinite because the intrinsic record fails to provide any accompanying guidance for those skilled in the art to determine the claim term's scope. Filing 129 at 26. HBL contends that the specification provides only ambiguous statements about the pull force required. Filing 129 at 26. HBL argues that the ability of a person of ordinary skill in the art to select a very large magnet so that he or she knows the pull strength requirement is met is an explanation that avoids the actual standards for definiteness. Filing 129 at 26.

In reply, Lite-Netics argues that a person of ordinary skill in the art can account for the implementation-specific factors through available models and information. Filing 133 at 13.

The Court need not belabor its analysis of this "indefiniteness" dispute. As with the "pull strength" claim term discussed in § II.D.1.g., the Court finds that these claim terms present precisely the situation that the Federal Circuit explained in *Janssen Pharms., Inc.*, would make a

claim indefinite. 97 F.4th at 936–37. If anything, the "pull strength" language in these claim terms is even more vague, making them even less able to "inform, with reasonable certainty, those skilled in the art about the scope of the invention,' [so] they are indefinite." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). Lite-Netics has pointed to nothing in the intrinsic or extrinsic evidence that convinces the Court otherwise. Because these "pull strength" claim terms are indefinite, they are also invalid. *Maxell*, 94 F.4th at 1372; *Synchronoss Techs.*, 987 F.3d at 1368; *Berkheimer*, 881 F.3d at 1364; *Robert Bosch*, 769 F.3d at 1101.

The indefinite term appears in both independent claims **1** and **17** of the '264 Patent, rendering all dependent claims indefinite and invalid, as well. Therefore, the Court's conclusions as to these "pull strength" claim terms are set out in the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court's Construction |
|---|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base integrally attached to the second end of the light bulb socket; and<br>a magnet embedded in the base such that said magnet does not protrude outside of said base, **wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies**.<br><br>*See also* Claim **17**. | Not indefinite | Indefinite | Indefinite<br><br><br><br>Claims **1** and **17** of the '264 Patent are invalid for indefiniteness, and all other claims of the '264 depend from either claim **1** or claim **17**, rendering the entire patent invalid. |

f. "wherein said base comprises a removable end piece within which said magnet is embedded"

The next claim term of the '264 Patent that requires construction is "wherein said base comprises a removable end piece within which said magnet is embedded," which appears in identical language in claim **2** and claim **21**. The disputed claim term is set out in bold in its context in claim **2** in the first column of the following chart with the parties' proposed constructions for the claim terms in the second and third columns.

103

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim **2**<br>2. The light fixture assembly of claim 1, **wherein said base comprises a removable end piece within which said magnet is embedded**.<br><br>*See also* '264 Patent, Claim **21** | wherein said base comprises a removable end piece within which said one or more components creating a magnetic field are fixed firmly and deeply in a surrounding mass | the base that fits into a socket end in its original construction has a removable end piece within which a single magnet is enclosed firmly |

Filing 134-1 at 25–27.

Lite-Netics argues that combining the various constituent claim terms already construed into a larger claim term does not add a new meaning, so that there is no reason to construe the larger claim term separately. Filing 127 at 27–28. HBL contends that construction is required because Lite-Netics's composite construction imports various errors from Lite-Netics's proposed constructions of constituent terms. Filing 129 at 45.

The parties have agreed that the "removable end piece" claim term within this disputed claim term is construed according to its plain and ordinary meaning. Filing 134-1 at 1. The Court has construed "said magnet" or "a magnet" to mean "one or more magnets" in § II.D.1.e. The Court has also construed "embedded in the base" in § II.D.1.f. The Court concludes that its prior constructions of constituent claim terms determine the correct construction of the claim term now in dispute. Therefore, the Court now adds its construction of "wherein said base comprises a removable end piece within which said magnet is embedded" in claim **2** and claim **21** to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **2**, 2. The light fixture assembly of claim 1, **wherein said base comprises a removable end piece within which said magnet is embedded**. *See also* '264 Patent, Claim **21** | wherein said base comprises a removable end piece within which said one or more components creating a magnetic field are fixed firmly and deeply in a surrounding mass | the base that fits into a socket end in its original construction has a removable end piece within which a single magnet is enclosed firmly | wherein said base comprises a removable end piece within which one or more magnets are fixed or enclosed firmly in the surrounding mass of the base |

> g. "a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors"

The next claim term in the '264 Patent that requires construction is "a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors" in claim **6**. Filing 134-1 at 17–18. The Court construed a similar claim term in claim **15** of the '779 Patent above in § II.D.1.j. However, the Court finds that some differences in language in the present claim term require separate consideration and possibly a separate construction. Thus, the claim term now at issue is set out in bold in the context of claim **6** of the '264 Patent in the first column of the following chart with the parties' proposed constructions in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim **6** 6.  The light fixture assembly of claim **1**, wherein said base comprises: **a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors** | Plain and ordinary meaning | a wire clamp that fits through the second opening in the socket and holds all electrical wires in electrical contact with one particular conductor. |

Filing 134-1 at 17–18.

For the most part, Lite-Netics combined into one argument its construction of both the language from claim **15** of the '779 Patent and the present language from claim **6** of the '264 Patent, asserting that HBL was improperly asserting constructions that would render the device non-functional. Filing 127 at 33. However, Lite-Netics points out that the language of the present claim term is "a respective one of said two conductors," apparently as additional support for an assertion that this language does not claim a short circuit. Filing 127 at 33. HBL argues that the construction of this "wire clamp" term should be consistent with the construction of the "conductor" claim terms in § I.D.1.a. ("a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket") and § II.D.2.a. ("wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires"). Filing 129 at 45. HBL argues that all that is added is "a wire clamp . . . holds," so that the wire clamp holds the electrical wires in contact with a single conductor. Filing 129 at 45. Lite-Netics asserts in its reply that there is no reason why the previously construed terms need to be reconstrued here. Filing 133 at 20–21.

The problem is that the language of the various claim terms that the parties point to for comparisons is not identical. The difference between the previously construed claim term in claim **15** of the '779 Patent (at issue in § II.D.1.j.) and the claim term now at issue in claim **6** of the '264 Patent is shown in the following chart.

| Claim term at issue in § II.D.1.j. | Claim term now at issue |
|---|---|
| a wire clamp that fits through ||
| the opening in the second end of the socket | said second opening |
| and holds ||
| said electrical wires | each of said electrical wires |
| in contact with ||
| the conductor | a respective one of said two conductors |

The first six words are the same in both claim terms ("a wire clamp that fits through"). In its construction of the claim term now at issue, Lite-Netics accords these and all the other words

106

their ordinary meaning, while in its construction of the claim term now at issue, HBL simply sets them out. *See* Filing 134-1 at 17–18. The language of the next part of the two claim terms is different, but the meaning remains the same. Specifically, "the opening in the second end of the socket" in dependent claim **15** of the '779 Patent refers back to independent claim **1** of the '779 Patent in which the only "opening at the second end" is in the second end of the light socket in limitation (a). Filing 128-1 at 7 (4:53–55). Similarly, "said second opening" in dependent claim **6** of the '264 Patent refers back to independent claim **1** of the '264 Patent in which the only "second opening" is likewise in the light bulb socket, albeit in both limitation (a) and limitation (b). Filing 128-2 at 8 (5:21–22), (5:26–27). The next two words in both claim terms are "and holds." Again, Lite-Netics accords these words their ordinary meaning, while HBL simply sets them out. *See* Filing 134-1 at 17–18. Thus far, the Court's previous construction of the claim term in claim **15** of the '779 Patent was as follows: "a wire clamp included in the base that fits through the opening in the second end of the socket and holds. . . ." There does not appear to the Court to be any compelling reason that this construction should not apply thus far in the claim term now at issue.

The key differences begin to appear with the next phrase concerning the electrical wires. The language in dependent claim **15** of the '779 ("said electrical wires") must refer back to the "electrical wires" in independent claim **1** of the '779 Patent. In the claim term now at issue in dependent claim **6** of the '264 Patent, the language is "each of said electrical wires," meaning the "electrical wires" of independent claim **1** of the '264 Patent, but "each of said electrical wires" means each one of them, considered separately. *See* https://www.merriam-webster.com/dictionary/each (defining "each" as a pronoun to mean "each one"). In both the claim term previously construed and the claim term now at issue, the "electrical wires" are "in contact with" something, but what and how they are "in contact" differs. In the previously construed claim

term, the Court concluded that "the electrical wires" were "in contact with the conductor resulting in a short circuit," which rendered the claim inoperable, so that Claim 15 of the '779 Patent is invalid. However, in the claim term now at issue, "each one of said electrical wires" is "in contact with a respective one of said two conductors." According to the Merriam-Webster Dictionary, "respective" means "particular, separate." *See* https://www.merriam-webster.com/dictionary/respective. Similarly, according to the Oxford English Dictionary, "respective" means "[r]elating or belonging separately to each individual, group, etc., of those in question; associated with each considered in turn; corresponding." *See* https://www.oed.com/search/dictionary/?scope=Entries&q=respective (defining). Thus, if each one of the electrical wires is in contact with a separate and corresponding one of said two conductors, then there is no short circuit, and claim **6** of the '264 Patent is neither inoperable nor invalid. HBL's construction is rejected because it does not account for the difference between the language of the previously construed claim term and the claim term now at issue.

Therefore, the Court now adds its construction of the claim term now at issue in claim **6** of the '264 Patent to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **6** 6. The light fixture assembly of claim 1, wherein said base comprises: **a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors** | Plain and ordinary meaning | a wire clamp that fits through the second opening in the socket and holds all electrical wires in electrical contact with one particular conductor. | a wire clamp included in the base that fits through the opening in the second end of the socket and holds each one of said electrical wires in contact with a separate and corresponding one of said two conductors. |

h.  "tugging"

The last claim term of the '264 Patent (indeed the last claim term of either Asserted Patent) that the Court must construe is "tugging" in claim **19**. Filing 134-1 at 29. The disputed claim term is set out in bold in its context in claim **19** in the first column of the following chart with the parties' assertions about the definiteness or indefiniteness of the claim term in the second and third columns.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction |
|---|---|---|
| '264 Patent, Claim 19<br>19. The method of claim 17, wherein said at least one of said light fixture assemblies may be removed by hand from said ferrous metal surface by **tugging** on said light fixture assembly. | Not indefinite | Indefinite |

Filing 134-1 at 29.

Lite-Netics argues that a person of ordinary skill in the art would understand the meaning of the term "tugging" with reasonable certainty because it is synonymous with "pulling." Filing 127 at 43. HBL argues that the indefiniteness problem with this claim term is the lack of antecedent basis, where the specification lacks an equivalent description. Filing 129 at 49. HBL adds that "pulling" is indefinite for the same reasons that "pull force" is indefinite. Filing 129 at 49. Lite-Netics asserts in reply that defining "tugging" as synonymous with "pulling" came from the testimony of HBL's expert. Filing 129 at 24.

Again, a claim is indefinite if "read in light of the specification delineating the patent, and the prosecution history, [it] fail[s] to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). In this instance, the Court begins with the extrinsic evidence of dictionary definitions for the ordinary meaning of "tugging," because the parties have not directed the court to any intrinsic evidence that

109

provides guidance. *See Grace Instrument Indus.*, 57 F.4th at 1008 ("A court . . . may rely on dictionary definitions, 'so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents.'" (quoting *Phillips*, 415 F.3d at 1322-23)).

The Merriam Webster Dictionary defines "tug" as "to pull hard." *See* https://www.merriam-webster.com/dictionary/tugging. The Oxford English Dictionary defines "tugging, in tug," as "[t]o pull with great effort or force; to drag, haul. Often with at." *See* https://www.oed.com/search/dictionary/?scope=Entries&q=tugging&tl=true. In the Court's view, important differences between "tugging" as a synonym of "pulling" and the "pull force" terms of the Asserted Patents is that the "pull force" terms specified a measurable amount of force without specifying the methodology for measuring the amount of force, *see* § II.D.1.g., or specified factors that had to be overcome by the pull force without specifying a methodology for measuring the amount of force required to do so, *see* § II.D.2.e. As to the "tugging" claim term, the methodology to measure the amount of "pulling" required is that it must be accomplished "by hand." *See* Filing 128-2 at 8 (6:36–39). The Court concludes that this human measurement of the required "tugging" is sufficient "to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Maxell*, 94 F.4th at 1372 (quoting *Nautilus*, 572 U.S. at 901). The Court concludes further that this claim term does not require construction beyond its ordinary meaning.

Therefore, the Court now adds its conclusion about the "definiteness" or "indefiniteness" of the claim term "tugging" in claim **19** and of the '264 Patent to the chart below:

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **19**<br>19. The method of claim 17, wherein said at least one of said light fixture assemblies may be removed by hand from said ferrous metal surface by **tugging** on said light fixture assembly. | Not indefinite | Indefinite | Not indefinite<br><br>Ordinary meaning |

## III. CONCLUSION

The Court believes that the most effective way to summarize its conclusions on constructions of claim terms is to set them out in a claim construction chart.  Accordingly,

IT IS ORDERED that the constructions of the claim terms set out in the following chart are adopted.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim 1<br>**1**.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and *at least one opening at the second end*, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket | Agreed | Agreed | Plain and ordinary meaning |

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim 2, 21<br>**2**.  The light fixture assembly of claim **1**, wherein said base comprises a *removable end piece* within which said magnet is embedded.<br>* * * | Agreed | Agreed | Plain and ordinary meaning |
| **21**.  The method of claim **17**, wherein said base comprises *a removable end piece* within which said magnet is embedded. | Agreed | Agreed | Plain and ordinary meaning |
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising: (a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes **a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket** | Plain and ordinary meaning | a single conductor that places a light bulb inserted into the first end in electrical contact with each of at least two electrical wires inserted through the socket | Plain and ordinary meaning resulting in a short circuit<br><br>This claim is inoperable, so that Claim **1** of the '779 Patent is invalid, and all the other claims of the '779 Patent are invalid because they depend from Claim **1**. |

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the **socket** includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the **socket**<br><br>*See also* '779 Patent, claims **2**, **3**, **5**, **12**, and **15**, and in the '264 Patent in claims **1**, **6**, **8–10**, and **14** | Not indefinite | Indefinite | a light bulb socket of a light fixture assembly in independent claim **1** |
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base **attached** to the second end of the light bulb socket | joined in close association | connected or joined to something in a manner that is more than merely pressing into or touching | directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items |

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) **a base attached to the second end of the light bulb socket** | a structure comprising one or more components joined in close association to the second end of the light bulb socket | a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching | a base directly engaged or mounted to the second end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket |
| '779 Patent, Claim **1**<br>1.   A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) **a neodymium magnet** embedded in the base wherein said magnet has a pull strength of at least five pounds. | one or more neodymium components having a magnetic field | A single permanent magnet made from an alloy of neodymium, iron, and boron ($Nd_2Fe_{14}B$) with a unitary structure, taking on, as such single magnet, characteristics noted later in the claim regarding pull strength | One or more magnets made from an alloy of neodymium |

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **1**<br>1.  A light fixture assembly, comprising:<br>(a) a light bulb socket with an opening at the first end for accommodating a light bulb and at least one opening at the second end, wherein the socket includes a conductor that places a light bulb inserted into the first end in electrical contact with electrical wires inserted through the socket;<br>(b) a base attached to the second end of the light bulb socket<br>(c) a neodymium magnet embedded in the base **wherein said magnet has a pull strength of at least five pounds**. | Not indefinite<br><br>wherein the magnetic field produced by the one or more neodymium components provides a resulting pull force of at least five pounds as measured using tests known by one with skill in the art for determining pull force | Indefinite | Indefinite<br><br>This claim is indefinite, so that Claim **1** of the '779 Patent is invalid, and all the other claims of the '779 Patent are invalid because they depend from Claim **1.** |
| '779 Patent, Claim **5**<br>5.  The light fixture assembly according to claim 1, wherein the retaining clips on the base are separate from **the wire clamp** and fit through separate holes in the second end of the socket | Not indefinite<br><br>a wire clamp | Indefinite | a wire clamp included in the base that holds the electrical wires in contact with the conductor<br><br>This claim is not indefinite, but it is inoperable, so that Claim **5** of the '779 Patent is invalid |
| '779 Patent, Claim **9**<br>9.  The light fixture assembly according to claim 1, wherein the **magnet is a disc** one half inch in diameter and one eighth inch thick.<br><br>*See also* '264 Patent, Claims **13** and **26** | the one or more neodymium components are mounted to form a cylindrical shape <u>that is shorter than it is wide</u> | the single magnet is a thin circular object | one or more magnets form a thin circular shape |

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '779 Patent, Claim **15**<br>15.   The light fixture assembly of claim 1 wherein said base comprises:<br>(i) **a wire clamp that fits through the opening in the second end of the socket and holds said electrical wires in contact with the conductor**. | Plain and ordinary meaning | a wire clamp that fits through the opening in the second end of the socket and holds each of at least two electrical wires in contact with a single conductor | a wire clamp included in the base that fits through the opening in the second end of the socket and holds the electrical wires in contact with the conductor resulting in a short circuit<br><br>Claim **15** of the '779 Patent is inoperable, so that Claim **15** of the '779 Patent is invalid. |
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, **wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires** | Plain and ordinary meaning | wherein the socket includes two conductors that each places a light bulb inserted into the first end in electrical contact with each of at least two electrical wires: | Plain and ordinary meaning resulting in a short circuit<br><br>Claim **1** of the '264 Patent is inoperable, so that Claim **1** of the '264 Patent is invalid, and claims **2** through **16**, which depend from claim **1**, are also invalid.[12] |

<hr>

[12] The parties have not identified claim terms in all the claims **2** through **16** of the '264 Patent as at issue. Of the claims with terms at issue, claims **2**, **6**, **9**, **10**, and **13** directly depend from claim **1**. Claim **8** directly depends from claim **6** and thus indirectly depends from claim **1**, while claim **14** directly depends from claim **13** and thus indirectly depends from claim **1**. Claim **17** is an independent claim, while claims **19**, **21**, and **26** depend from that independent claim.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim 1<br>1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; a base **integrally attached** to the second end of the light bulb socket<br><br>*See also* '264 Patent, Claim **17** | joined in close association so as to create a unified whole | attached (see above) as part of original construction and not as an optional accessory | directly engaged or mounted together with a retaining force created by the physical interaction of the components of the items so as to make up a unified whole |
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising: a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires; **[a base integrally attached to the second end] of the light bulb socket**<br>(Brackets added). *See also* '264 Patent, Claim **17** | Bracketed part:<br><br>Not indefinite<br><br>a base joined in close association to a second end so as to create unified whole<br><br>Entire claim term:<br><br>a structure comprising one or more components that is integrally attached to a second end of the light bulb socket | Bracketed part:<br><br>Indefinite<br><br><br><br>Entire claim term:<br><br>a base connected or joined to an end of the light bulb socket in a manner that is more than merely pressing into or touching as part of the light assembly's original construction | Bracketed part:<br><br>Not indefinite<br><br><br><br>Entire claim term:<br><br>a base directly engaged or mounted to the second end of the light bulb socket with a retaining force created by the physical interaction of the components of the base and the light bulb socket so as to make up a unified whole |

117

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base integrally attached to the second end of the light bulb socket; and<br>a magnet **embedded in the base such that said magnet does not protrude outside of said base**, wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies.<br>*See also* '264, Claim **17** | fixed firmly and deeply in the surrounding mass of the base such that said one or more components having a magnetic field become part of the base | [a single magnet is][13] enclosed firmly in the surrounding base that fits into a socket end, such that no portion of the magnet extends outside the volume of the base in any direction (radial or axial) | fixed or enclosed firmly in the surrounding mass of the base such that the magnet does not extend beyond the surrounding surface of the base |

---

[13] The Court finds the bracketed part of HBL's construction is extraneous because it is not part of the claim term presently at issue.

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **1**<br>1. A light fixture assembly, comprising:<br>a light bulb socket with an opening at a first end for accommodating a light bulb and a second opening for insertion of electrical wires, wherein the socket includes two conductors that places [sic] a light bulb inserted into the first end in electrical contact with said electrical wires;<br>a base integrally attached to the second end of the light bulb socket; and<br>a magnet embedded in the base such that said magnet does not protrude outside of said base, **wherein said magnet has sufficient pull force to hold said light fixture assembly to a ferrous object while said light fixture assembly is connected to a string of other light fixture assemblies**.<br><br>*See also* Claim **17**. | Not indefinite | Indefinite | Indefinite<br><br><br><br><br>Claims **1** and **17** of the '264 Patent are invalid for indefiniteness, and all other claims of the '264 depend from either claim **1** or claim **17**, rendering the entire patent invalid. |
| '264 Patent, Claim **2**,<br>2. The light fixture assembly of claim 1, **wherein said base comprises a removable end piece within which said magnet is embedded**.<br>*See also* '264 Patent, Claim **21** | wherein said base comprises a removable end piece within which said one or more components creating a magnetic field are fixed firmly and deeply in a surrounding mass | the base that fits into a socket end in its original construction has a removable end piece within which a single magnet is enclosed firmly | wherein said base comprises a removable end piece within which one or more magnets are fixed or enclosed firmly in the surrounding mass of the base |

119

| Claim Language | Lite-Netics's Proposed Construction | HBL's Proposed Construction | Court' Construction |
|---|---|---|---|
| '264 Patent, Claim **6** 6.  The light fixture assembly of claim 1, wherein said base comprises: **a wire clamp that fits through said second opening and holds each of said electrical wires in contact with a respective one of said two conductors** | Plain and ordinary meaning | a wire clamp that fits through the second opening in the socket and holds all electrical wires in electrical contact with one particular conductor. | a wire clamp included in the base that fits through the opening in the second end of the socket and holds each one of said electrical wires in contact with a separate and corresponding one of said two conductors. |
| '264 Patent, Claim **19** 19. The method of claim 17, wherein said at least one of said light fixture assemblies may be removed by hand from said ferrous metal surface by **tugging** on said light fixture assembly. | Not indefinite | Indefinite | Not indefinite  Ordinary meaning |

IT IS FURTHER ORDERED that

1.    claims **1**, **5**, and **15** of the '779 Patent and claim **1** of the '264 Patent are invalid because they are inoperable;

2.    claim **1** of the '779 Patent and claims **1** and **17** of the '264 Patent are invalid because they are indefinite;

3.    the invalidity of independent claim **1** of the '779 Patent renders invalid all remaining claims of that Patent, which depend from claim **1**, and the '779 Patent is invalid as a matter of law;

4.    the invalidity of independent claim **1** of the '264 Patent renders invalid claims **2** through **16** of that Patent, which depend from claim **1**, and the '264 Patent is invalid to that extent as a matter of law;

120

5.    the invalidity of independent claim **17** of the '264 Patent renders claims **18** through **26**, which depend from claim **17**, invalid as a matter of law, which leaves no valid claims of the '264 Patent, and the '264 Patent is invalid as a matter of law.

IT IS FURTHER ORDERED that

1.    Lite-Netics's Complaint alleging infringement of these Patents is dismissed as moot because these Patents are invalid;

2.    HBL's Counterclaims in Counts VII and VIII, seeking declaratory judgment of non-infringement by HBL of Lite-Netics's '779 Patent and '264 Patent, are dismissed as moot because the Patents are invalid;

3.    On HBL's Counterclaims in Counts IX and X, the Court enters declaratory judgment of invalidity of Lite-Netics's '779 Patent and '264 Patent.

This case shall proceed only on HBL's Counterclaims in Counts I through V, XI, and XII (improperly also labeled XI in the Counterclaim).

Dated this 10th day of September, 2024.

BY THE COURT:

Brian C. Buescher
United States District Judge

121